Michael J. Novotny
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005
AZ State Bar No. 033792
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: mnovotny@bigfirelaw.com

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DARLENE YAZZIE, CAROLINE BEGAY, LESLIE BEGAY, IRENE ROY, DONNA WILLIAMS and ALFRED MCROYE,<br><br>Plaintiffs,<br><br>v.<br><br>KATIE HOBBS, in her official capacity as Secretary of State for the State of Arizona,<br><br>Defendant. | Case No. _____<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

Plaintiffs Darlene Yazzie, Caroline Begay, Irene Roy, Donna Williams, Leslie Begay and Alfred Mc Roye ("Plaintiffs") bring this Complaint against Secretary of State Katie Hobbs ("Defendant") alleging that Arizona's requirement that Vote By Mail ("VBM") ballots be received – not postmarked – before 7:00 pm on November 3, 2020 ("Election Day") to be counted is an unconstitutional burdens on Plaintiffs' right to vote at Navajo Nation as applied during the COVID-19 pandemic and United States Postal Service ("USPS") reorganizational issues.[1]

## PARTIES

### Plaintiffs

1.  Plaintiffs are Tribal Members of the Navajo Nation, a federally recognized Indian Tribe with a government-to-government relationship with the United States. The Navajo Nation Reservation ("Reservation") was established by the Treaty of 1868 and was thereafter expanded by successive executive orders. The Reservation consists of approximately 13,989,222 acres of tribally-owned, allotted and government-owned land. The Reservation is located in Apache, Navajo, and Coconino counties in Arizona, as well as 13 counties in Utah and New Mexico. According to the 2010 census, the population of the Reservation is 173,667 of whom

---

[1] According to U.S.P.S. employees, recent actions by the new Postmaster General Louis DeJoy are causing additional delays in processing the mail. American Postal Workers Union President Mark Dimondstein, has received reports of slowed mail delivery and "degraded" service. This is consistent with an internal U.S.P.S. memo stating that postal workers are to stop making late trips and extra trips that did not originate at postal service headquarters. *See* Dean, Jessica, Jessica Schneider, and Caroline Kelly. 2020. "Postal Services Says It Has 'Ample Capacity' to Handle Election After Trump Casts Doubt." CNN. August 3, https://www.cnn.com/2020/08/03/politics/postalservide-says-it-has-ample-capacity-to-handle-election-after-trump-casts-doubt.

101,835 live on the Arizona portion of the Reservation.  The Navajo Nation has a voting age population exceeding 67,000 living within the Arizona portion of the Reservation.

        2.     Plaintiff, Darlene Yazzie, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

        3.     Plaintiff, Caroline Begay, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

        4.     Plaintiff, Irene Roy, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

        5.     Plaintiff, Donna Williams, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

        6.     Plaintiff, Leslie Begay, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. He resides on-Reservation in Apache County.

        7.     Plaintiff, Alfred McRoye, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. He resides on-Reservation in Apache County.

        8.     The Plaintiffs desire to participate in the electoral and political processes of Arizona on an equal basis with non-Indian voters.

**Defendant**

        9.     Defendant Secretary of State Katie Hobbs is the chief elections officer in the state, and is responsible for supervising and issuing directives concerning the conduct of all elections in the state. A.R.S. § 16-142.  Her duties include certifying the results of the elections. A.R.S. §16-648.

## JURISDICTION AND VENUE

10.     This case arises under the Constitution and laws of the United States. This Court has original jurisdiction over this matter pursuant to 52 U.S.C. § 10301(a) and (b); 42 U.S.C. § 1983; 28 U.S.C. §1362; 28 U.S.C. §1331; 28 U.S.C. § 1343(a)(3) and (4); and 28 U.S.C. § 2201 and 2202, along with Article III of the United States Constitution.

11.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because this action is predicated upon a federal question and a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this District.

## BACKGROUND

13.     "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

14.     Arizona first made Voting By Mail ("VBM") available to all voters in 1998.

15.     The 2010 election marked the first time that more than half of all ballots cast in Arizona were through VBM. *See Archived Table; Voting by Mail*, N.Y. Times (Oct. 7, 2012), *available at* https://nyti.ms/3fEKQeV.

16.     Defendant has publicly announced that Ballots will only be counted if they are received by 7:00 p.m. on Election Day, November 3, 2020 ("Election Day"). *See* https://azsos.gov/votebymail.

17.     Arizona requires that VBM ballots be received by 7:00 p.m. on Election Day. A.R.S. 16-548(A).

18.     For the upcoming general election, the last time that a voter can request a ballot-by-mail is Friday October 23 at 5:00 p.m. when the county recorder office closes for the day. A.R.S. 16.

19.     Defendant requested an investigation of the President Trump Administration's intervention in the USPS regarding VBM. *See* https://www.12news.com/article/news/politics/katie-hobbs-asks-arizona-ag-to-investigate-trump-administration-over-usps/75-bc57ca9a-789a-40ab-9305-16be8ec236e0.

20.     Plaintiffs have fewer days to cast their ballot if they VBM in comparison to non-Indian voters who utilize the VBM ballot due to slower postal service when compared to affluent areas like Scottsdale, Arizona.

21.     USPS mail sent First Class from Pinon, Arizona requires six (6) days to arrive at the Navajo Recorder's Office in Holbrook, Arizona.

22.     USPS mail sent Priority from Teec Nos Pos, Arizona requires six (6) days to arrive at the Apache Recorder's Office in St. Johns, Arizona.

23.     USPS mail sent Certified First Class from Scottsdale, Arizona required less than eighteen (18) hours to arrive at the Maricopa Recorder's Office in Phoenix, Arizona.

24.     USPS mail sent Certified First Class from Dinnehotso required ten (10) days to arrive at the Apache Recorder's Office in Phoenix, Arizona.

25.    USPS mail sent Certified First Class from Rock Point required six (6) days to arrive at the Apache Recorder's Office in Phoenix, Arizona.

26.    There is one Post Office for every 15.3 square miles in Scottsdale versus one Post Office every 707 square miles On-Reservation.

27.    Tribal Members face the additional cost of renting a Post Office box, which can be a considerable amount if one is poor or even near poor. For example, the fees at the Leeup Post Office are as follows: $6.00 key fee for new box, $9.00 for replacement of a key, and $136.00 rental for a year.

28.    Non-Indians in Scottsdale and other affluent areas effectively have twenty-five (25) days to consider, cast and return their VBM ballots while Tribal Members effectively only have fifteen (15) days to consider, cast and return their VBM ballots.

29.    6.72% of Arizona households do not own a vehicle while approximately 29% of Tribal Member households do not own a vehicle.

30.    The Scottsdale median household income is 327% of the Tribal Member median household income.

31.    Plaintiffs residing at or near Teec Nos Pos and utilizing the post office at Teec Nos Pos where their mail has to travel 26-fold further than Scottsdale residents (917 miles v. 35 miles).

32.    A novel coronavirus has killed more than 167,000 Americans and continues to spread throughout the country. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html.

33.     The pandemic has triggered an extraordinary increase in voting by mail.  For example, the use of mail-in voting increased by 1,000% in the 2020 Iowa primary and just under 500% in South Dakota.

34.     The U.S.P.S. has been cutting back on delivery and services and closing post offices and processing centers since 2011.  Many state processing centers are also simply unprepared to handle the mass influx of mailed ballots when they arrive.  *Id*.  During the 2020 Wisconsin and Ohio primaries, mail processing errors and other problems resulted in more than 2,000 ballots not being counted.

35.     The U.S.P.S. recommends that voters request mail-in ballots at least fifteen (15) days prior to Election Day to ensure that their ballots will be returned by state deadlines.

36.     Voting by mail systems rest upon the premise that all citizens have equal mail service, however,  hundreds of thousands of rural Americans have non-standard mail service burdened with a range of service limits including irregular service or unreliable service, no residential delivery, excessive distances to post offices or other postal providers with limited hours of operation among other issues.

37.     Other states across the country have seen the increase in absentee balloting due to COVID19 stretch the capacity of their election officials and the U.S. Postal Service. See Michelle Ye Hee Lee and Jacob Bogage, *Postal Service Backlog Sparks Worries that Ballot Delivery Could be Delayed in November*, Wash. Post, (July 30, 2020), https://www.washingtonpost.com/politics/postal-service-backlog-sparks-worries-that-ballotdelivery-could-be-delayed-in-november/2020/07/30/cb19f1f4-d1d0-11ea-8d32-1ebf4e9d8e0d_story.html.

38.     Tribal Members living on the Arizona portion of the Navajo Nation Reservation ("Tribal Members") have more restrictive access to VBM than non-Indian voters in Arizona.

39.     Native Americans living on reservation lands are among the most impacted by the lack of standard mail service and non-standard addresses.

40.     VBM is not a simple or easy task for Tribal Members. In addition to general barriers impeding voting access, VBM adds an additional layer of challenges which include lack of home mail delivery, the need for language translation, lack of access to public transportation and lack of access to any vehicle all impede voter registration by mail. In general, VBM does not have the accessibility for Tribal Members living in Reservation communities as it does for voters in urban areas.

41.     Nearly 60% of the Navajo Nation's population resides within the boundaries of the State of Arizona and the population density of the Navajo Nation is 6.33 persons per square mile in comparison to the U.S.  average of 345 persons per square mile.  Most residents do not have access to at home delivery and must travel from their home in order to obtain their mail.  The reservation has eleven post offices and fifteen postal provider offices which service the Arizona portion of the Reservation, compare this to the rural state of West Virginia, which has a smaller land mass but includes 725 post offices and/or postal provider sites.

42.     Defendant's requirement that VBM ballots are to be received – rather than postmarked – on or before Election day, leads to the disenfranchisement of Navajo Nation Tribal Members living On-Reservation when their overdue ballots are rejected.

43.     On August 17, 2020, Plaintiffs requested that Defendant count VBM ballots postmarked on or before Election Day.

44.     Defendant has the authority to compile VBM ballots postmarked - or with date information encoded - by Election Day and count these ballots if received within ten (10) days or November 13, 2020.

45.     Defendant's refusal to count VBM ballots postmarked on or before Election Day will have a significant disparate impact on Tribal members' voting power.

46.     Plaintiffs allege that this failure to act, if allowed, would reinforce a "history of official racial discrimination in voting."

47.     If the Defendant's action and inaction is allowed, the ability of Navajo Nation Tribal Members living On-Reservation to effectively participate in the political process will be hindered.

48.     Plaintiffs seek declaratory and injunctive relief, both temporary and permanent, compelling the Defendant to count Tribal Members VBM ballots postmarked on or before Election Day. This relief is sought on the grounds that failure to provide the requested relief is an abridgement of their right to vote.

49.     The failure to count ballots postmarked on or before Election Day is an abridgement of Plaintiffs and other Tribal Members' right to vote.

50.     Accordingly, Plaintiffs ask this Court to grant them declaratory and injunctive relief compelling Defendant to count VBM ballots from Tribal Members postmarked on or before Election Day that are received on or before November 13, 2020.

**Voting in Arizona**

51.     On March 19, 2020, California became the first state to issue a stay-at-home order. Arizona followed on March 31, 2020 along with most remaining states. *See* Sarah Mervosh,

Denis Lu & Vanessa Swales, *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (updated Apr. 20, 2020), *available at* https://nyti.ms/30NSnns.

52.     Elections proved that they were not immune to the pandemic's effects. Arizona held its primary on March 17, 2020, but it was one of the last states to do so. Sixteen states postponed their primaries because of the pandemic. *See* Nick Corasaniti & Stephanie Saul, 16 *States have Postponed Primaries During the Pandemic*. Here's a List, N.Y. Times (May 5, 2020), *available at* https://nyti/ms/2C-cqtHm.

53.     Currently, approximately 80 percent of all Arizonans receive their ballot by mail. See Ariz. Clean Elections Comm'n, *Ballot by Mail*, *available at* https://bity.ly/3ffz2a4P.

### Navajo Nation Tribal Members Bear the Effects of Discrimination in Education, Employment and Health which Hinder their Ability to Participate Effectively in the Political Process

54.     The Navajo Nation is the largest reservation in the United States and is located within the states of Arizona, New Mexico, and Utah.[2]

55.     The poverty rate on the Reservation is 38%, twice the poverty rate in the State of Arizona.[3] On the Arizona part of the Navajo Nation Reservation, 21.8% have incomes below the 0.5 of the poverty threshold and another 19.3% are between 0.5 and 0.99 of the poverty threshold, while another 8.4% meet the criteria for near poor (1.0 to 1.24% of the poverty threshold).

56.     The median household income on the Reservation is $27,389, "which is approximately half that of the State of Arizona." *Id*. at 29.  Thirty-two percent of the population

---

[2] navajobusiness.com/FastFacts/Overview.htm

[3] Ariz. Rural Policy Institute, Demographic Analysis of the Navajo Nation Using 2010 Census and 2010 American Community Survey estimates at 34, available at https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf.

lives below the poverty level. *Id*.  Only 7% of the Tribal membership have obtained a college degree.

57.     The overall American Indian Alaska Native H1N1-related death rate was 3.7 per 100,000 population, compared with 0.9 per 100,000 for all other racial/ethnic populations combined      resulting      in      a      mortality      rate      ratio      of 4.0.  https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5848a1.htm?s_cid=mm5848a1_e.

58.     Public transportation on the Navajo Nation is minimal and access to a vehicle is crucial because in addition to the time and travel distance required to get to a post office, there is the added financial burden of fuel or the expense of paying someone to take them to the post office or postal provider.

59.     For many voters, especially Tribal Members and others living in remote or rural areas, casting a ballot by mail is difficult. As a result, the Inter-Tribal Council of Arizona opposes having all ballots cast through VBM. Native American Rights Fund ("NARF"), *Obstacles at Every Turn: Barriers to Political Participation Faced by Native American Voters93* (2020) ("NARF Report") (quoting Travis Lane). The NARF Report is *available at* https://bit.ly/2Ccrc.Ac.

60.     Approximately one-third of all American Indians and Alaska Natives ("AIAN") live in Hard-to-Count Census Tracts – roughly 1.7 million out of 5.3 million people from the 2011-2015 American Community Survey ("ACS") estimates. Hard-to-Count Census Tracts include those Census Tracts "in the bottom 20 percent of 2010 Census Mail Return Rates (i.e. Mail Return Rates of 73 percent or less) or tracts for which a mail return rate is not applicable because they are enumerated in 2010 using the special Update/Enumerate method." *See* The Leadership Conference Education Fund, Table 1a: States Ranked by Number of American Indian/Alaska Natives (race alone or combination) living in Hard-to-Count ("HTC") Census Tracts,

*available at* https://bit.ly/2ACvn08. The states with the greatest percentage of the Native population in such tracts reside in the western states: New Mexico (78.6 percent), Arizona (68.1 percent) and Alaska (65.6 percent). *See* The Leadership Conference Education Fund, Table 1b: States Ranked by Percent of American Indian/Alaska Natives (race alone or combination) living in Hard-to-Count ("HTC") Census Tracts, *available at* https://bit.ly/2CfY9nv.

61.     Geographic isolation is a significant reason states like Arizona have such a large percentage of their Native population in HTC areas.

62.     Isolation due to physical features such as mountains, canyons, oceans, rivers and vast expenses of unoccupied land are compounded on-Reservation by an absence of paved roads to connect tribal lands with off-reservation communities.

63.     Even where roads are present, Tribal Members often lack reliable transportation to travel the vast distances to county seats, election offices and post offices.

64.     In Arizona, the Reservation has over 10,000 miles of roads, 86 percent of which are unpaved. FY2019 Navajo Nation Tribal Transportation Plan at 1, *available at* https://bit.ly/.

65.     Services by the U.S. Postal Service are limited in Indian Country because of the poor quality of the road systems on Indian reservations and many of the roads are unnamed. A significant number of these reservation residents have no traditional street addresses. Brief for National Congress of American Indians et al. as Amici Curiae supporting Petitioners, *Crawford v. Marion County* as 11-12 (2008), *available at* https://bit.ly/3fznL.Kp.

66.     Alaska, Arizona and New Mexico have the largest number of Limited-English Proficient (LEP) persons voting-age citizens (that is, U.S. citizens who are 18 years of age and older). Between them, they account for approximately 87 percent of all AIANs who reside in

an area required to provide language assistance in an AIAN language under Section 203 of the Voting Rights Act. AAJC, NALEO & NARF, Voting Rights Act Coverage Update 3 (Dec.2016) ("Section 203 Update"), *available at* https://bit.ly/2Binug6.

67.     Six Arizona counties are subject to Section 203 for Indian languages: Apache, Coconino, Gila, Graham, Navajo, and Pinal and must provide all election materials, including assistance and ballots, in the language of the applicable language minority group.[4] This includes the Navajo language in Apache, Coconino, and Navajo Counties.

68.     Over 70% of the households on the Reservation speak a language other than English, and over 18% of individuals over the age of 5 speak English less than very well.[5]

69.     In Arizona, in covered areas for which census data is available, the illiteracy rate among LEP American Indians of voting age is 25 percent for Navajo-speakers. *See* U.S. Census Bureau, Voting Rights Determination File: Section 203 Determinations. (Dec. 5, 2016), Public Use Data File and Technical Documents (Excel spreadsheet of "Determined Areas Only") (Section 203 *Determination* File") available at https://bit.ly/3diHdd6. The illiteracy rate among LEP voting-age citizens in covered areas compares to the national illiteracy rate of 1.31 percent as follows: 19.1 times higher for Navajo-speakers. *See id.*

70.     Among all population groups, the digital divide is most profoundly felt in Indian Country. People residing in tribal areas have virtually no access to computers or the internet, with the Federal Trade Commission estimating broadband penetration in tribal communities at less than 10 percent. Parkhurst el al., The Digital Reality: E-Government and Access to Technology

---

[4] Voting Rights Act Amendments of 2006, Determinations under Section 203, 81 See. Reg. 87532, 87533 (2016).

[5] Ariz. Rural Policy Institute, Demographic Analysis of the Navajo Nation Using 2010 Census and 2010 American Community Survey estimates at 59, *avaialable at* https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf.

and Internet for American Indian and Alaska Native Populations 3, *available at* https://bit.ly/3edV2uz.

71.     VBM breaks down in Indian Country because of housing instability/homelessness and lack of physical address where election materials will be mailed. According to the 2016 ACS, only 52.9 percent of single-race AIAN householders owned their own home, compared to 63.1 percent of the total population. *See* 2017 AIAN Summary, U.S. Census Bureau, Facts for Features: American Indian and Alaska Native Heritage Month: November 2017 (October 6, 2017), *available at* https://bit.ly/37F2z2.

72.     AIANs also experience high levels of literal homelessness and near homelessness. Nancy Pindus, et al., U.S. Dep't of Housing and Urban Development, Housing Needs of American Indians and Alaska Natives in Tribal Areas 76-77 (U.S. Dep't of Hous. and Urb. Dev. 29 (2017)).

73.     When defining "literal homelessness" as living on the street and "near homelessness" as living in a place that is not one's own (e.g., not having their own home – couch surfing, living with a friend, doubling up), HUD discovered that 99.8 percent of tribes surveyed said that their members experience near homelessness. *Id.* at 79. 88 percent of tribe also stated that, despite "doubling up" or living with a friend, their members also experience literal homelessness. *Id.* at 82.

74.     HUD has estimated that, out of 399,400 households in tribal areas, 67,900 households include someone who qualifies as near homeless. There are an estimated 42,100 to 84,700 living in near homelessness in tribal areas. Seventeen percent of AIANs surveyed stated that they have people living in their household only because they have nowhere else to go. *Id.* at 85.

75.     Even for those who have a home, access to voting in Indian Country is made substantially more difficult because of the prevalence of "non-traditional" addresses. Non-traditional addresses are prevalent among AIANs residing on tribal lands. These addresses encompass "noncity-style" addresses, which the Census Bureau define as those that do not contain a house number and/or a street name." U.S. Census Bureau, 2020 Census Local Update of Census Addresses Program improvement Project Recommendations 2 (April 13, 2015), *available at* https://bit.ly/3fB3OCW. Examples of non-city-style mailing addresses include: general delivery; rural route and box number; highway contract route and box number; post office box only delivery; or location descriptions such as "Brick house with attached garage on the right," geographic coordinates, or other geographic coding. It is commonplace for homes on tribal lands to use noncity-city-style addresses.

76.     In Arizona, only 18 percent of Native American voters outside of urban Maricopa (metropolitan Phoenix) and Pima (metropolitan Tucson) areas have physical addresses and receive mail at home. *Democratic Nat'l comm. v. Reagan*, 329 F. Supp. 3d 824, 869-870 (D. Ariz.), *rev'd sub nom DNC v. Hobbs*, No. 18-15845 (9th Cir. Jan 27, 2020) (en banc).

77.     The Navajo Nation, the largest reservation in the United States, does not have an addressing program, and most people live in remote communities. Carrie Jung, *Home Addresses on Navajo Nation are Rare* (Oct. 8, 2015), *available at* https://bit.ly/2USR3Ma.

78.     Throughout Indian Country, many Native voters can only receive election mail through post office boxes. NARF Report, supra note 16, at 40 (quoting Beverly Harry and Thomas Eugene)."

79.     The distance Navajo Nation voters must travel to obtain mail is compounded by socioeconomic factors including decreased access to public transportation, personal

transportation or requisite funds to travel such distances to obtain or return a ballot. Getting mail-in ballots is a "big problem" for Native Voters. *Id.* (quoting Hangry Cagey).

### A History of Discrimination by Arizona Officials Restricting the Rights of Navajo Nation Tribal Members to Register to Vote, Vote and Otherwise Participate in the Democratic Process

80.     In addition to the depressed socio-economic status of Indians in Navajo country, there is a long history of racial discrimination against Indians in Arizona.

81.     Prior to 1924, Indians were denied citizenship and the right to vote based on the underlying trust relationship between the federal government and the tribes and on their status as citizens of their tribes. Indians could only become citizens through naturalization "by or under some treaty or statute."[6]

82.     It was not until Congress passed the Indian Citizenship Act of 1924 that all Indians were granted United States citizenship.[7]  Enactment of the 1924 Act ended the period in United States history in which United States citizenship of Indians conditioned on severance of tribal ties and renunciation of tribal citizenship and assimilation into the dominant culture.[8]

83.     Notwithstanding the passage of the Indian Citizenship Act, states continued to discriminate against Indians by denying them the right to vote in state and federal elections through the use of poll taxes, literacy tests, and intimidation.[9]

---

[6] *Elk v. Wilkins*, 112 U.S. 94, 103 (1884).

[7] An Act of June 2, 1924, 43 Stat. 253, Pub. L. 175 (1924) (codified as amended at 8 U.S.C. § 1401(b)).

[8] COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 14.01[3], n. 42-44 (2005 Ed.).

[9] Continuing Need for Section 203's Provision for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 309 (2006) (letter from Joe Garcia, NCAI).

84.     Even after 1924, Arizona Indians were prohibited from participating in elections. The Arizona Supreme Court upheld the prohibition finding that Indians living on reservations could not vote because they were wards of the federal government and, as such were "persons under guardianship" and thereby prohibited from voting in Arizona.[10]

85.     Reservation Indians in Arizona did not achieve the right to vote in state elections until 1948 when the Arizona Supreme Court overturned the *Porter v. Hall* decision.[11]

86.     The State of Arizona continued its discrimination through its imposition of English literacy tests which were not repealed until 1972.[12] Only those Indians who could read the United States Constitution in English and write their names were eligible to vote in state elections.

87.     The enactment of the VRA included a temporary prohibition of literacy tests in covered jurisdictions. Apache County, Arizona was included in the original list of jurisdictions covered by Section 5 of the VRA.[13]

88.     On November 19, 1965, Navajo and Coconino Counties also became covered by Section 5.[14]

---

[10] *Porter v. Hall*, 34 Ariz. 308, 331-332, 271 P. 411, 419 (Ariz. 1928).

[11] *Harrison v. Laveen*, 67 Ariz. 337, 196 P.2d 456 (Ariz. 1948) (holding that Indians living on Indian reservations should in all respects be allowed the right to vote).

[12] *See* ARIZ. REV. STAT. ANN. § 16-101(A)(4)-(5) (1956); Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1372 (2006) (appendix to the statement of Wade Henderson).

[13] Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (Aug. 7, 1965).

[14] Determination of the Director Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 14505 (Nov. 19, 1965).

89.     As a result of this coverage, the Arizona literacy tests were suspended in each of these three counties.

90.     In 1966, these three counties became the first jurisdictions to successfully bail out from coverage under Section 5 after the U.S. District Court for the District of Columbia held that Arizona's literacy test had not been discriminatorily applied against Indians in the preceding five years.[15]

91.     When the VRA was amended in 1970, it included a nationwide ban on literacy tests, which again preempted the operation of Arizona's literacy tests.[16]  Arizona became one of the states to unsuccessfully challenge the ban on literacy tests. In upholding the ban and striking down literacy tests, the Supreme Court noted that Arizona had "a serious problem of deficient voter registration among Indians."[17] The Court recognized that non-English speakers may make use of resources in their native languages in order to responsibly and knowledgeably cast a ballot.[18]

92.     The VRA amendments of 1970 included, as one of the measures of voting discrimination, registration and turnout in the 1968 presidential election. As a result, Apache, Coconino and Navajo Counties again became covered by Section 5 along with five (5) other Arizona counties.

93.     Even after 1970, there were a number of challenges to Indians' right to vote and to hold office. Many of these cases challenged activities in Apache County, one of only

---

[15]*Apache County v. United States*, 256 F. Supp. 903, 910 911 (D.D.C. 1966).

[16]The Voting Rights Act, 42 U.S.C. § 1973aa (1970) (current version at 42 U.S.C. § 1973b (2008)).

[17] *Oregon v. Mitchell*, 400 U.S. 112, 117, 132, 153 (1970).

[18] 400 U.S. at 146.

a few counties within the United States in which the predominant languages spoken are American Indian. Of these languages, the most commonly used is Navajo, a historically unwritten language.[19]

94.     The Arizona Supreme Court quashed a permanent injunction by the lower court against the seating of Tom Shirley, a Navajo Indian living on the Navajo Reservation, who had been elected to the Apache County Board of Supervisors.[20] The Arizona Court reaffirmed the right of Indians to vote, vacated the injunction and directed the Apache County Board of Supervisors to certify Shirley as the elected supervisor from District 3.[21]

95.     Apache County also discriminated against Indian voters by gerrymandering the districts for the three seats on the County's Board of Supervisors. In the early 1970's, Apache County District 3 had a population of 26,700 of whom 23,600 were Indian, while District 1 had a population of 1,700 of whom only 70 were Indian and District 2 had a population of 3,900 of whom only 300 were Indian. Several Indian voters challenged Apache County for violating the one-person, one-vote rule.[22]   Apache County claimed that Indians are not citizens of the United States and the Indian Citizenship Act granting them citizenship was unconstitutional.[23]   The federal court rejected the County's arguments, noted that the County must be redistricted in

---

[19] Considering the Navajo Reservation as a whole, including parts of the States of Arizona, New Mexico and Utah, over one-third of the voting age citizens on the Navajo Nation Reservation are limited-English proficient and over one-quarter are illiterate. Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1403-1404 (2006) (appendix to the statement of Wade Henderson).

[20] *Shirley v. Superior Court for Apache County*, 109 Ariz. 510, 516, 513 P.2d 939, 945 (Ariz. 1973).

[21] *Id*. at 516, 513 P.2d at 945.

[22] *Goodluck v. Apache County*, 417 F. Supp. 13, 14 (D. Ariz. 1975), aff'd, 429 U.S. 876 (1976).

[23] 417 F. Supp. at 14.

accordance with one-person, one-vote standards and granted plaintiff's motion for summary judgment.[24]

96.    In 1976, Apache County attempted to avoid integration of its public schools to include Indian students by holding a special bond election to fund a new school in the almost entirely non-Indian southern part of the county. Although the special election affected Indian students who would be denied equal schooling, Indian turnout for the election was abnormally low. Investigation demonstrated that the low turnout was a result of the closing of nearly half of the polling places on the reservation, the total lack of language assistance, the absence of Navajo language informational meetings regarding the bond election and the use of English-only in the implementation of absentee voting procedures.[25]

97.    In 1988, the United States filed a complaint to enforce Sections 2 and 4(f)(4) of the VRA.  The complaint alleged that various election standards, practices, and procedures by the State of Arizona, the Apache County Board of Supervisors and Navajo County Board of Supervisors unlawfully denied or abridged the voting rights of Navajo citizens residing in Apache and Navajo counties.  The challenged practices included discriminatory voter registration, absentee ballot, and voter registration cancellation procedures, as well as failure to implement effective bilingual election procedures, including the effective dissemination of election information in Navajo and providing for a sufficient number of adequately trained bilingual persons to serve as Navajo translators on election day.  This litigation ended in a Consent Decree, which established the Navajo Language Election Information Program, required the Counties to employ two full-

---

[24]417 F. Supp. at 16.

[25] *Apache County High School No. 90 v. United States*, No. 77-1815 (D.D.C. June 12, 1980).

time bilingual outreach workers, and agreed to a number of changes to increase voter registration and the dissemination of election procedures.[26]

98.     Following the 2018 election, the Navajo Nation and Navajo voters filed suit arguing that the lack of language assistance in the VBM process violated Section 203 and there were insufficient in-person voting locations. Even though there was low participation in VBM on the Navajo Nation Reservation, over 100 VBM and in-person early voting ballots were discarded for failure to sign the ballot affidavit. These voters were neither properly instructed in the Navajo language on how to complete the ballot and were not given an opportunity to cure the deficiency, violating Section 203, and the lack of curing violated the Equal Protection and Due Process clauses of the U.S. Constitution. *Navajo Nation v. Hobbs*, No. CV-18-0829-PCT-DWL, First Amended Complaint (Dec. 11, 2018).

99.     VBM ballots in Apache and Coconino counties were rejected for missing signatures at twice the statewide rate. Dianna Nanez, *Navajo Nation: Arizona's Broken Compact Discriminates Against, Disenfranchisement Native Voters* (May 7, 2020) *available at* https://bit.ly/3fzJSAn. Although the settlement agreement in that case required the Secretary of State to include a ballot-curing provision in the election manual to allow unsigned ballot voters the same amount of time to cure as those with mismatched signatures and those who fail to show ID on election day, the Attorney General quashed that change. *Navajo Nation v. Hobbs*, No. CV-18-08329-PCT-DWL, Settlement Agreement (Aug. 6, 2019).

100.     Current voting practices utilized in Arizona discriminate against the Navajo Nation's Tribal members.

---

[26]*Apa v. Arizona*, Consent Decree, CIV 88-1989 (May 22, 1989).

## RELEVANT STATUTES

101.    This action is brought by the Plaintiffs pursuant to Sections 2 of the Voting

Rights Act of 1965, as amended, 52 U.S.C. § 10301 (formerly codified at 42 U.S.C. 1973); 42

U.S.C. § 1983, providing for civil action for deprivation of rights; the Fourteenth Amendment to

the United States Constitution; 28 U.S.C. §§ 2201-2202 providing for declaratory relief and other

necessary or proper relief; and Article 2, Section 21 of the Constitution of the State of Arizona.[27]

This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear claims under the

Constitution and laws of the State of Arizona.

102.    Article 2, Section 21 of the Constitution of the State of Arizona provides

that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time

interfere to prevent the free exercise of the right of suffrage."

103.    Section 2 of the VRA, 42 U.S.C.S. § 1973(a), provides that no voting

qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or

applied by any State or political subdivision in a manner which results in a denial or abridgement

of the right of any citizen of the United States to vote on account of race or color.

104.    Section 4(f)(4) of the VRA provides in relevant part:

> Whenever any State of political subdivision [subject to the bilingual
> electoral requirements] . . . provides any registration or voting notices,
> forms, instructions, assistance, or other materials or information relating
> to the electoral process, including ballots, it shall provide them in the
> language of the applicable language minority group as well as in the
> English language.

---

[27]Article 1, Section 21. <u>Free and equal elections</u>.  All elections shall be free and equal, and no
power, civil or military, shall at any time interfere to prevent the free exercise of the right of
suffrage.

105.    Arizona law provides, "Any election called pursuant to the laws of this state shall provide for early voting. Any qualified elector may vote by early ballot." A.R.S. § 16-541(A).

## WHY THIS ACTION IS NECESSARY

106.    Tribal Members bear the effects of discrimination on the basis of race and tribal status in education, housing, employment, and health services which have resulted in a lower socioeconomic status which hinders their ability to participate effectively in the political process.

107.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part, states that it is a violation of the Voting Rights Act, if,

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected… in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Thus, Section 2 of the Voting Rights Act, as amended, protects Indians from voting practices which have a disparate impact on their right to vote.

108.    The crux of Plaintiffs' § 2 claim is that the failure to count VBM ballots from Tribal Members postmarked on or before Election Day interacts with the socioeconomic factors of poverty and the predominant non-use of the English language on the Reservation to deprive Plaintiffs and other members of the Navajo Nation who would like to VBM on an equal basis to non-Indians. The ability to VBM on the Reservation must be viewed in conjunction with practical realities—such as poverty and a predominant non-use of the English language—that exist on the Reservation and must be compared to the opportunity to vote available to other Arizona citizens.

109.    The legitimate interests of the Defendants will not be undermined in the event that the Court grants the relief prayed for herein.

110.    Plaintiffs have no adequate remedy at law.

111.    Plaintiffs will suffer irreparable harm as a result of the violations complained of herein, and that harm will continue unless Defendants' count VBM ballots from Tribal Members postmarked on or before Election Day in the 2020 general election is declared unlawful and enjoined by this Court.

**FIRST CLAIM FOR RELIEF**
**(Violation of the 14th Amendment of the United States Constitution**
**and 42 U.S.C. § 1983)**

112.    Plaintiffs restate and incorporate by reference every allegation in the preceding paragraphs.

113.    Section 1 of the Fourteenth Amendment of the United States Constitution provides: "No…State shall . . . deny to any person within its jurisdiction the equal protection of the law."

114.    Defendants have no legitimate, non-racial reason for rejecting the Nation' request that Tribal Members VBM ballots postmarked on or before Election Day be counted.

115.    By engaging in the acts and/or omissions alleged herein, Defendant acted and continues to act under color of state law to deprive the Plaintiffs their rights that are guaranteed by the Fourteenth Amendment to the United States Constitution and will continue to violate said rights absent relief

116.    granted by this Court.

## SECOND CLAIM FOR RELIEF
### (Violation of the Arizona Constitution)

117.    Plaintiffs restate and incorporate by reference every allegation in the preceding paragraphs.

118.    The Defendants have acted under color of state law to deprive Tribal Members equal elections by arbitrarily refusing to count VBM ballots from Tribal Members postmarked on or before Election Day.

## THIRD CLAIM FOR RELIEF
### (Violation of the Voting Rights Act of 1965)

119.    Plaintiffs restate and incorporate by reference every allegation in the preceding paragraphs.

120.    Section 2 of the VRA, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group. Section 2 provides: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," or membership in a language minority group.  52 U.S.C. § 10301.

121.    Indians are recognized as a language minority group under the VRA.

122.    The Navajo Nation is a covered jurisdiction under Section 203 of the VRA.

123.    Defendant's failure to count VBM ballots from Tribal Members postmarked on or before Election Day denies members of the federally-recognized Tribe, including the Plaintiffs, the same rights of other members of the electorate to participate in the political process and elect representatives of their choice, in violation of Section 2 of the VRA.

124.   Plaintiffs will continue to suffer the violation of their rights as alleged in the Complaint absent relief granted by the Court.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request this Court to enter judgment as follows:

1.   That this Court assume jurisdiction;

2.   That this Court declare that the Defendant's failure to count VBM ballots of Tribal Members living On-Reservation that are postmarked on or before Election Day violates existing law, including, but not limited to, § 2 of the VRA, as amended, the Fourteenth Amendment to the United States Constitution, and the Arizona Constitution;

3.   That this Court grant preliminary and permanent injunctive relief by ordering Defendant to count VBM ballots cast by Tribal Members living On-Reservation that are postmarked on or before Election Day for all future elections, and further relief as the interest of justice may require;

4.   That this Court grant preliminary and permanent injunctive relief by ordering Defendant to count VBM ballots cast by Tribal Members living On-Reservation in the 2020 election that are postmarked by Election Day and received on or before November 13, 2020, and further relief as the interest of justice may require;

5.   That this Court grant Plaintiffs' reasonable attorneys' fees, litigation expenses and costs pursuant to 42 U.S.C. § 1973(e) and § 1988; and

6.   That this Court grant the Plaintiffs any further relief which may in the discretion of the Court be necessary and proper to ensure that the voting rights of Tribal Members living On-Reservation are properly respected in accordance with the Orders of this Court.

Dated this 26th day of August 2020.

       /s/ Michael J. Novotny

Michael J. Novotny
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005
AZ State Bar No. 033792
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: mnovotny@bigfirelaw.com

*ATTORNEY FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

/s/  Lourdes Zoe Sorando, Paralegal