Chris McClure
SD Bar No. 3962
101 S. Reid St. Ste. 307
605-496-9858
mcclurechris@gmail.com
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DARLENE YAZZIE, CAROLINE BEGAY, LESLIE BEGAY, IRENE ROY, DONNA WILLIAMS and ALFRED MCROYE,<br><br>Plaintiffs,<br><br>v.<br><br>KATIE HOBBS, in her official capacity as Secretary of State for the State of Arizona,<br><br>Defendant. | Case No. 3:20 20-cv-08222-GMS<br><br>**EMERGENCY MOTION FOR PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**ORAL ARGUMENT REQUESTED** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................i

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 1

ANALYSIS ..................................................................................................................... 4

    **A.**  Plaintiffs Are Likely to Succeed on Their Section 2 Claim ............................................. 5

    i.      VRA Section 2 Applies to VBM Ballot Procedure .................................……………5

    ii.     The First, Fifth & Eighth Senate Factors Are Relevant to Plaintiffs' ......................... 6
            Abridgement Claim

    iii.    First Senate Factor – History of Official Discrimination Related to Voting ............... 9

    iv.   Fifth Senate Factor – Discrimination Which Hinders the Ability............................. 10
            to Participate Effectively in the Political Process

    v.      Eighth Senate Factor -Responsiveness of Elected Officials to ................................. 13
            Particularized Needs

    vi.    The Experts have Concluded that the Disparities Warrant Court Intervention.......... 13

    **B.**  Section 1983 Claim.................................................……………………………………15

    **C.**  State Constitution Claim ................................................................................. 16

    **D.**  Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief ................. 16

    **E.**  The Balance of the Equities Tip in the Favor of Plaintiffs ............................................ 17

    **F.**  The Public Interest Favors Immediate Injunctive Relief .................................................. 17

CONCLUSION ............................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court**

*Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000) ............................ 15

*Dunn v. Blumstein*, 405 U.S. 330 (1972) .......................................................................... 1

*Elk v. Wilkins*, 112 U.S. 94, 103 (1884) ............................................................................ 9

*Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)......................... 16

*League v. Apache County*, 417 F. Supp. 13-16 (D. Ariz. 1975),...................................... 10
aff'd, 429 U.S. 876 (1976)

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224.......................... 6, 7, 17
(4th Cir. 2014) *stay granted*, 135 S. Ct. 6 (2014), *cert. denied*,
135 S. Ct. 1735 (2015)

*Lubin v. Panish*, 415 U.S. 709, 94 S. Ct. 1315, 39 L. Ed. 2d 702 (1974)........................ 15

*Ohio State Conference of NAACP v. Husted*, 768 F.3d, 524 (6th Cir. 2014) ................. 5, 7
*stay granted*, 135 S. Ct. 42 (2014), *vacated on other grounds*,
2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014)

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ......................................................................... 10

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................................................ 16

*Thornburg v. Gingles*, 478 U.S. 30 (1986)......................................................................... 6

*Washington v. Davis,* 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976) ............... 15

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ......................................................................... 16

*White v. Regester*, 412 U.S. 755 (1973).............................................................................. 8

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ............................ 4

**Ninth Circuit**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................. 5

*Bernhardt v. Los Angeles Cty.*, 339 F.3d 920 (9th Cir. 2003) ............................................ 5

*Democratic Nat'l comm. v. Reagan*, 329 F. Supp. 3d 824, 869-870 (D. Ariz.), ............. 12
*rev'd sub nom DNC v. Hobbs*, No. 18-15845 (9th Cir. Jan 27, 2020) (en banc)

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........................................................ 16

*Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513 (9th Cir. 1985) ........................................... 5

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) ............................... 5

*Smith v. Salt River Project Agric. Improvement. & Power Dist.*, 109 F.3d 586 ................ 7
(9th Cir. 1997)

**Other Appellate Decisions**

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ................................................. 16

*Veasey v. Abbott*, 830 F.3d 216, 2016 WL 3923868 (5th Cir. 2016) (*en banc*) ................. 7

*Williams v. Salerno*, 792 F.2d 323 (2d Cir.1986) .......................................................... 16

**District Courts**

*Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837 ............................ 16
(N.D. Cal. 1992)

*Sanchez, et al. v. Cegavske, et al.*, 214 F. Supp. 3d 361 (2016) ........................................ 6

*Spirit Lake Tribe v. Benson Cty*., No. 2:10-CV-095, 2010 U.S. Dist. LEXIS ................. 17
116827, 2010 WL 4226614 (D.N.D. Oct. 21, 2010)

**State Courts**

*Porter v. Hall*, 34 Ariz. 308, 331-332, 271 P. 411, 419 (Ariz. 1928) ................................ 9

**United States Statutes**

42 U.S.C. § 1983 ............................................................................................................. 5

Fourteenth Amendment to the United States Constitution ................................................. 5

Voting Rights Act of 1965 ("VRA"), as amended, 52 U.S.C. § 10301 ........ 1, 5, 6, 15, 17
(formerly codified at 42 U.S.C. 1973)

**Arizona Constitution**

Constitution of the State of Arizona Article 2, Section 21 .......................................... 5, 16

**Arizona Statutes**

ARIZ. REV. STAT. ANN. § 16-101(A)(4)-(5) (1956) ..................................................... 9

A.R.S. § 16-142 ..................................................................................................... 1

**Other References**

Expert Report:.................................................................................. 2, 3, 4, 10, 11, 13, 14
Declaration of Dr. Jean Schroedel and Bret Healy (August 23, 2020)

2017 AIAN Summary, U.S. Census Bureau, Facts for Features: American ................... 12
Indian and Alaska Native Heritage Month: November 2017 (October 6, 2017),
*available at* https://bit.ly/37F2z2

An Act of June 2, 1924, 43 Stat. 253, Pub. L. 175 (1924) (codified as ........................... 9
amended at 8 U.S.C. § 1401(b)).

*Apa v. Arizona*, Consent Decree, CIV 88-1989 (May 22, 1989) ..................................... 10

Ariz. Rural Policy Institute, Demographic Analysis of the Navajo Nation .................. 12
Using 2010 Census and 2010 American Community Survey estimates at 59,
*available at* https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf

Brief for National Congress of American Indians et al. as Amici Curiae....................... 11
supporting Petitioners, *Crawford v. Marion County* as 11-12 (2008),
*available at* https://bit.ly/3fznL.Kp

Continuing Need for Section 203's Provision for Limited English Proficient ................. 9
Voters: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 309 (2006)
(letter from Joe Garcia, NCAI)

Determination of the Attorney General Pursuant to Section 4(b)(1) of the.................... 10
Voting Rights Act of 1965, 30 Fed. Reg. 9897 (Aug. 7, 1965)

FY2019 Navajo Nation Tribal Transportation Plan at 1, ................................................ 11
*available at* https://bit.ly/

The Leadership Conference Education Fund, Table 1a: States Ranked by ................... 11
Number of American Indian/Alaska Natives (race alone or combination)
living in Hard-to-Count ("HTC") Census Tracts,
*available at* https://bit.ly/2ACvn08

NARF Report, supra note 16, at 40 (quoting Hangry Cagey) ........................................ 13

U.S. Census Bureau, 2020 Census Local Update of Census Addresses ......................... 12
Program improvement Project Recommendations 2 (April 13, 2015),
*available at* https://bit.ly/3fB3OCW.

U.S. Census Bureau, Voting Rights Determination File: Section 203 ............................ 12
Determinations. (Dec. 5, 2016), Public Use Data File and Technical Documents
(Excel spreadsheet of "Determined Areas Only") (Section 203
*Determination* File") available at https://bit.ly/3diHdd6

Voting Rights Act Amendments of 2006, Determinations under Section ....................... 12
203, 81 See. Reg. 87532, 87533 (28.5, 2016)

Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before ......................... 9
the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th
Cong. 1372 (2006) (appendix to the statement of Wade Henderson)

Plaintiffs Darlene Yazzie, Caroline Begay, Irene Roy, Donna Williams, Leslie Begay and Alfred McRoye (collectively "Plaintiffs"), by and through their counsel, move this Court for preliminary injunction requiring Defendant to count Vote By Mail  ("VBM") ballots cast in the 2020 general election by Navajo Nation Tribal Members living On-Reservation ("Tribal Members") postmarked on or before November 3, 2020 ("Election Day"). This motion is based upon Plaintiffs' Complaint for Declaratory and Injunctive Relief, this Points and Authorities, and the Affidavit of Chris McClure, with attached exhibits. Plaintiffs respectfully request this emergency motion be heard, and that the Court establish an expedited briefing schedule so that a decision may be made prior to October 7, 2020, the first day for Arizona Counties to mail ballots.

## INTRODUCTION

The Supreme Court has made clear that a "citizen has a constitutionally protected right to participate in an election on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  Plaintiffs' complaint alleges that Defendant will not count VBM ballots received after 7:00 p.m. on Election Day,  violating Section 2 of the Voting Rights Act of 1965 ("VRA").  Plaintiffs seek preliminary injunction requiring Defendant to count VBM ballots cast by Tribal Members if postmarked on or before Election Day.  Absent the requested relief, Tribal Members will not have the same opportunity to participate in the 2020 general election compared to other members of the electorate, in violation of the VRA.

## STATEMENT OF FACTS

Plaintiffs are registered voters and enrolled members of the Navajo Nation living on the Navajo Nation Reservation ("Reservation") in Apache County.  Defendant Katie Hobbs ("Defendant') is the Secretary of State for the State of Arizona and is statutorily mandated to act as the Chief Officer of Elections responsible and responsible for supervising and issuing directives concerning the conduct of all elections in the state. A.R.S. § 16-142

1

The Reservation is vast, encompassing 27,425 square miles and is located in three states, Arizona, New Mexico and Utah.[1] *Affidavit of Chris McClure*, Exhibit 1, (*McClure* Ex. 1) Page 15.  More than two-thirds of the land mass of the Reservation is in three Arizona counties: Apache, Coconino and Navajo.  *McClure*, Ex. 1, p. 15.  According to the 2010 Census, the population living on the Navajo Reservation is 173,667 and approximately 60% live in Arizona.  *Id.* The population eligible to vote and living in these three Arizona counties is 67,252.  *Id.*  However, while the average population density in the U.S. is 345 per square mile, Tribal Members on the Arizona portion of the Reservation average a mere 6.33 persons per square mile.  *Id.*  In addition to the disperse population, there is non-standard mail service, meaning most residents do not have access to at home delivery and instead must travel to get their mail, yet there are only eleven Reservation post offices and fifteen postal provider offices who service the entire Arizona portion of the Reservation.  *Id.*  The Utah and New Mexico portions of the Reservation have thirteen postal offices which service a population of one third fewer individuals.  *Id.*  In contrast to these statistics, the rural state of West Virginia which has a slightly smaller land mass than the Reservation, has a whopping 725 post offices or postal provider sites.  *Id.*

Apart from the difficulty in obtaining their VBM ballot, the typical Tribal Member has fewer days in which to cast their mail-in ballot compared with voters in more affluent areas. *McClure*, Ex. 1, p. 15-16.  The accessibility to mail is curtailed by travel distance and impedance; both of which are relevant to assessing the quality of mail service on the Reservation.  *McClure*, Ex. 1, p.16.  The distance one must travel includes 1) the distance Tribal Member voters must travel to pick up and return ballots to the post office, and 2) the distance that mail-in ballots must travel from the post office to mail processing centers and then to the election official's office.  *Id.*

---

[1] navajobusiness.com/FastFacts/Overview.htm

When analyzing the travel issues faced on the Reservation, the excessive distances Tribal Members must travel to obtain mail is compounded by socioeconomic factors faced by most Native Americans which include reduced access to public transportation and funds necessary to travel the distance required to obtain and return a ballot.   *McClure*, Ex. 1, p.16.   Thus, having access to a vehicle is extraordinarily important in order to have regular access to mail.   However, traveling long distances to get mail is not only a burden in terms of travel distance and time, but also imposes a financial cost either to pay for gasoline or pay a person to take them to the post office/postal provider. *McClure*, Ex. 1, p. 16-17.   It is important to realize that the median house-hold income on the Reservation is $25,827, which is roughly half that of the rest of Arizona and only 30% of the median household income of Scottsdale residents.   *McClure*, Ex. 1, p. 16.   More troubling is the high number of people classified by the Census Bureau as "severely poor," meaning their income is less than half of that designated as delineating between the "poor" and "near poor." *Id*.   On the Arizona part of the Navajo Nation Reservation, 21.8% have incomes below 0.5 of the poverty threshold and another 19.3% are between 0.5 and 0.99 of the poverty threshold, while another 8.4% meet the criteria for near poor (1.0-1.24% of the poverty threshold).   *Id.*

Additionally, a substantial number of Tribal Members are forced to rely on general delivery mail service or choose to rent a post office box.   *McClure*, Ex. 1, p. 18.   Post office box rental fees can be a considerable expense if one is poor or even near poor and general delivery mail is unreliable and may be discarded after 30 days or returned to sender.   *Id.*   Thus, Tribal Members face barriers otherwise inapplicable to Non-Indian voters living off-Reservation.   *Id.*

Non-Indian voters living in affluent areas, such as Scottsdale (median household income $84,601) do not face a significant travel distance barrier in obtaining and casting a VBM ballot.   *Id.*   For most of these voters, the total distance they are required to travel is from their front door to their mailbox.   *Id*.   In contrast to the situation on the Reservation, the city of Scottsdale

3

encompasses 184 square miles and has twelve post offices to serve its residents, ensuring that no resident has to travel far to conduct postal business.  *Id.*

In addition to the distance the voter must travel to obtain and cast their vote using vote by mail ballot systems, the ballot must then travel to the county recorder's office that handles the voting on the Reservation.  *McClure*, Ex. 1, p. 19-20.  The county recorder offices that handle voting on the Reservation are those in Apache, Navajo and Coconino Counties.   *McClure*, Ex. 1, p. 20.  Research has found that the total distance a letter travels in the Reservation is far greater and the route of travel more diverse than expected.  *McClure*, Ex. 1, p. 21-22.  This increased distance and variable route both provide many more opportunities for the mail to be delayed or mis-placed.  *McClure*, Ex. 1, p. 23.  The degree of geographic isolation from urban America is compounded by physical features of the terrain, such as mountains and canyons, bad weather conditions and poorly maintained roads.  *McClure*, Ex. 1, p. 25.  In other words, the problem is not simply distance and isolation, but equally one of impedance.  *Id.*  On the Arizona portion of the Reservation, there are more than 10,000 miles of roads, but less than 14% are paved, which makes travel slow and subject to closures.  *Id.*  The research conducted by Dr. Schroedel and Mr. Healy found that mail from Teec Nos Pos travels as far as 917 miles before delivery, while the furthest mail for a Scottsdale resident travels is 35 miles.  *Id*.  Thus, the mail from Teec Nos Pos travels 26 times farther than that from Scottsdale, which vastly increases the potential for lost, damaged or otherwise mismanaged mail to occur.  *Id*.    *McClure*, Ex. 1, p. 24.

## ANALYSIS

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, the Ninth Circuit permits use of a

4

"sliding scale" approach when there are serious questions underlying the merits and the balance of hardships tips sharply in favor of the plaintiff. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). The plaintiff, however, must still show a likelihood of irreparable injury and that an injunction is in the public interest. *Id*. at 1135. "[S]erious questions are those 'which cannot be resolved one way or the other at the hearing on the injunction.'" *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 926-27 (9th Cir. 2003) (*quoting Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Marcos*, 862 F.2d at 1362 (*quoting Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

A. **Plaintiffs Are Likely to Succeed on Their Section 2 Claim.**

This action is brought by the Plaintiffs pursuant to Section 2 of the VRA, as amended, 52 U.S.C. § 10301 (formerly codified at 42 U.S.C. 1973); 42 U.S.C. § 1983, providing for civil action for deprivation of rights; the Fourteenth Amendment to the United States Constitution; 28 U.S.C. §§ 2201-2202 providing for declaratory relief and other necessary or proper relief; and Article 2, Section 21 of the Constitution of the State of Arizona.

i.   VRA Section 2 Applies to VBM Ballot Procedures.

Section 14(c)(1) of the VRA defines the terms "vote" and "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to registration, …casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast." 52 U.S.C. § 10310(c)(1). Courts have found that access to polling places, to voter registration, and to opportunities for absentee and early voting are protected by Section 2. *See, e.g., Ohio State Conference of NAACP v. Husted*, 768 F.3d , 524, 552-53 (6th Cir. 2014), *stay granted*, 135 S. Ct. 42 (2014), *vacated on other grounds*, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014) ("[T]he plain language of Section 2 does not exempt early-

voting systems from its coverage…Nor has any court held that the VRA does not apply to early-voting systems."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238-39 (4th Cir. 2014), *stay granted*, 135 S. Ct. 6 (2014), *cert. denied*, 135 S. Ct. 1735 (2015) (applying Section 2 to various practices including procedures for late registration and early voting, and noting that "courts have entertained vote-denial claims regarding a wide range of practices").

ii.     The First, Fifth & Eighth Senate Factors Are Relevant to Plaintiffs' Abridgement Claim.

The United States assisted the Court in distinguishing the Section 2 VRA dilution requirements with the vote denial/abridgment cases in the Statement of Interest filed in *Sanchez, et al. v. Cegavske, et al.*, 214 F. Supp. 3d 361 (2016), Document 43 filed on October 3, 2016 where Section 2 of the VRA prohibits any state or political subdivision from  "imposing or applying a "voting qualification," "prerequisite to voting," or "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group." 52 U.S.C. § 10301(a).

Section 2 was amended by Congress in 1982 to clarify that a violation of this Section *can* be established by showing a discriminatory purpose or result. *See Thornburg v. Gingles*, 478 U.S. 30, 34-37, 43-45 (1986); S. Rep. No. 97-417, at 27-28 (1982)(Senate Report). Specifically, a violation of Section 2(b) is established if the totality of circumstances demonstrates that the ability to vote is "not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

The test utilized by Courts in its analysis of whether the location of election sites or limitations to early voting and voter registration result in a violation of the right to vote under Section 2, specifically a denial or abridgment of the right to vote, is comprised of a two-step anal-

ysis. First, do the practices amount to material limitations that bear more heavily on minority citizens than nonminority citizens. When evaluating this factor, the court should consider both the likelihood that the minority voters will face a burden as well as the voter's relative ability to overcome that burden. *See, e.g., Veasey v. Abbott*, 830 F.3d 216, 2016 WL 3923868, at *17 (5th Cir. 2016) (en banc); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 245 (4th Cir. 2014), *stay granted*, 135 S. Ct. 6 (2014), *cert. denied*, 135 S. Ct. 1735 (2015).

Second, if a disparity is established, the court is to conduct an "intensely local appraisal" of the "totality of the circumstances" in the jurisdiction at issue, to determine whether the challenged practice works in cooperation with historical, social, and political conditions to produce a discriminatory result. *See League of Women Voters*, 769 F.3d at 240-41; *Smith v. Salt River Project Agric. Improvement. & Power Dist.*, 109 F.3d 586, 591 (9th Cir. 1997) ("[the Section 2] examination is intensely fact-based and localized"); *Veasey*, 2016 WL 3923868, at *17.

The legislative history of Section 2 states that there are a variety of typical factors that should be considered when evaluating whether a Section 2 violation has occurred. There is no requirement as to the number of these factors (known as "Senate Factors") being proved, and the list is not cumulative, nor exhaustive and other factors may be relevant and considered. *League of Women Voters*, 769 F.3d at 245 (quoting *Gingles*, 478 U.S. at 45); *see also Veasey*, 2016 WL 3923868, at *17-19; NAACP, 768 F.3d at 554; See *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29). The Senate Factors are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37 (citing S. Rep. No. 97-417, at 28-29).  These factors can be applied not only in the consideration of the relevant jurisdiction's conduct but also that of other governmental entities as well as private individuals.  *See, e.g., Gingles*, 478 U.S. at 80; *cf. White v. Regester*, 412 U.S. 755, 765-70 (1973). The court utilized these Senate Factors in evaluating whether the challenged practice, in light of current social and political conditions, result in a discriminatory denial or abridgement of the right to vote by creating a reduced opportunity for the allegedly affected group to participate in the political process relative to other voters.

The Courts have found that the First, Fifth and Eighth Senate Factors are significant in the analysis of a Section 2 violation.  Specifically, in the *Sanchez* case, the Court focused on these same factors (First, Fifth and Eighth) in a vote abridgement case:

[T]he extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; [and] the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process. [and] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

For this reason, Plaintiffs request that this Court to review these Factors in its analysis herein and

8

in so doing, come to the same conclusion finding a violation of Section 2 as follows.

iii.     First Senate Factor – History of Official Discrimination Related to Voting.

In addition to the depressed socio-economic status of Tribal Members, there is a long history of racial discrimination against Indians in Arizona.  Arizona officials have a long history of restricting the rights of Tribal Members to register to vote, vote or otherwise participate in the democratic process. Prior to 1924, Indians were denied citizenship and the right-to-vote based on the underlying trust relationship between the federal government and the tribes and on their status as citizens of their tribes.  Indians could only become citizens through naturalization "by or under some treaty or statute." *Elk v. Wilkins*, 112 U.S. 94, 103 (1884).  It was not until Congress passed the Indian Citizenship Act of 1924 that all Indians were granted U.S. citizenship. An Act of June 2, 1924, 43 Stat. 253, Pub. L. 175 (1924) (as amended at 8 U.S.C. § 1401(b)).

Notwithstanding the passage of the Indian Citizenship Act, states including Arizona continued to discriminate against Indians by denying them the right to vote in state and federal elections through the use of poll taxes, literacy tests, and intimidation.[2]  Even after 1924, Arizona Indians were prohibited from participating in elections.  The Arizona Supreme Court upheld the prohibition finding that Indians living on reservations could not vote because they were wards of the federal government and, as such were "persons under guardianship" and thereby prohibited from voting in Arizona.  *Porter v. Hall*, 34 Ariz. 308, 331-332, 271 P. 411, 419 (Ariz. 1928).

The State of Arizona continued its discrimination through its imposition of English literacy tests which were not repealed until 1972.  *See* ARIZ. REV. STAT. ANN. § 16-101(A)(4)-(5) (1956); Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1372 (2006) (appendix to the

---

[2] Continuing Need for Section 203's Provision for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 309 (2006) (letter from Joe Garcia, NCAI)

statement of Wade Henderson).  When the Voting Rights Act was amended in 1970, it included a nationwide ban on literacy tests, which preempted the operation of Arizona's literacy tests.  Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (Aug. 7, 1965).  In response, Arizona attempted to challenge the ban on literacy tests but was unsuccessful.  In upholding the ban and striking down literacy tests, the Supreme Court noted that Arizona had "a serious problem of deficient voter registration among Indians." *Oregon v. Mitchell*, 400 U.S. 112, 117, 132, 153 (1970).  Apache County, specifically, has a long history of discrimination against Indians which include gerrymandering districts, closing polling places on the Reservation, the total lack of language assistance, the use of English-only in the implementation of absentee voting procedures, discriminatory voter registration, absentee ballot, and voter registration cancellation procedures, as well as failure to implement effective bilingual election procedures, including the effective dissemination of election information in Navajo and providing for a sufficient number of adequately trained bilingual persons to serve as Navajo translators on election day.[3]  *League v. Apache County*, 417 F. Supp. 13-16 (D. Ariz. 1975), aff'd, 429 U.S. 876 (1976);  *see also Apa v. Arizona*, Consent Decree, CIV 88-1989 (May 22, 1989).  All of these activities evidence that current and past voting practices utilized in Arizona discriminate against Tribal Members.

    iv.    <u>Fifth Senate Factor –Discrimination Which Hinders the Ability to Participate Effectively in the Political Process</u>.

The Navajo Nation is the largest reservation in the United States and is located within the states of Arizona, New Mexico, and Utah.  *McClure*, Ex. 1, p. 15.  The poverty rate on

---

[3] Considering the Navajo Reservation as a whole, including parts of the States of Arizona, New Mexico and Utah, over one-third of the voting age citizens on the Navajo Nation Reservation are limited-English proficient and over one-quarter are illiterate. Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1403-1404 (2006) (appendix to the statement of Wade Henderson)

the Reservation is 38%, twice the poverty rate in the State of Arizona.  *Id*.  On the Arizona part of the Reservation, 21.8% have incomes below the 0.5 of the poverty threshold and another 19.3% are between 0.5 and 0.99 of the poverty threshold.  *McClure*, Ex. 1, p. 14.  The median household income on the Reservation is $27,389, approximately half that of the State of Arizona and thirty-two percent of the population lives below the poverty level.  *McClure*, Ex. 1, p. 16.  Public trans-portation on the Reservation is minimal and access to a vehicle is crucial because in addition to the time and travel distance required to get to a post office, there is the added financial burden of fuel or the expense of paying someone to take them to the post office or postal provider.  For many voters, especially Tribal Members and others living in remote or rural areas, casting a ballot by mail is difficult.  *McClure*, Ex. 1, p. 16-17.

Geographic isolation is a significant reason states like Arizona have such a large percentage of their Native population in 'Hard-to-Count' areas.  *See* The Leadership Conference Education Fund, Table 1a: States Ranked by Number of American Indian/Alaska Natives (race alone or combination) living in Hard-to-Count ("HTC") Census Tracts, *available at* https://bit.ly/2ACvn08.  Isolation due to physical features such as mountains, canyons, oceans, rivers, and vast expanses of unoccupied land are compounded on-Reservation by an absence of paved roads to connect tribal lands with off-reservation communities.  FY2019 Navajo Nation Tribal Transportation Plan at 1, *available at* https://bit.ly/.  Even where roads are present, Tribal Members often lack reliable transportation to travel the vast distances to county seats, election offices and post offices.  *McClure*, Ex. 1, p. 15-16.

Because of the poor quality of the road systems on the Reservation, many roads are unnamed and a significant number of reservation residents have no traditional street addresses.[4]

---

[4] Brief for National Congress of American Indians et al. as Amici Curiae supporting Petitioners, *Crawford v. Marion County* as 11-12 (2008), *available at* https://bit.ly/3fznL.Kp.

Even for those who have a home, Tribal Member access to VBM is made substantially more difficult because of the prevalence of "non-traditional" addresses.[5]  These addresses encompass "noncity-style" addresses, which the Census Bureau define as those that do not contain a house number and/or a street name.  *Id*.

Other barriers to VBM including language limitations exist as well.  Over 70% of the households on the Reservation speak a language other than English, and over 18% of individuals over the age of 5 speak English less than very well.[6]   Six Arizona counties are subject to Section 203 for Indian languages: Apache, Coconino, Gila, Graham, Navajo, and Pinal and must provide all election materials, including assistance and ballots, in the language of the applicable language minority group. Voting Rights Act Amendments of 2006, Determinations under Section 203, 81 See. Reg. 87532, 87533 (28.5, 2016).  This includes the Navajo language in Apache, Coconino, and Navajo Counties.  *Id*.  In Arizona, in covered areas for which census data is available, the illiteracy rate among Limited English Proficient American Indians of voting age is 25 percent for Navajo-speakers.[7]

VBM also breaks down in Indian Country because of housing instability/homelessness in addition to the lack of physical address for election materials to be mailed.[8]  In Arizona, only 18 percent of Native American voters outside of urban Maricopa (metropolitan Phoenix) and

---

[5] U.S. Census Bureau, 2020 Census Local Update of Census Addresses Program improvement Project Recommendations 2 (April 13, 2015), *available at* https://bit.ly/3fB3OCW.
[6] Ariz. Rural Policy Institute, Demographic Analysis of the Navajo Nation Using 2010 Census and 2010 American Community Survey estimates at 59, *available at* https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf
[7] *See* U.S. Census Bureau, Voting Rights Determination File: Section 203 Determinations. (Dec. 5, 2016), Public Use Data File and Technical Documents (Excel spreadsheet of "Determined Areas Only") (Section 203 *Determination* File") available at https://bit.ly/3diHdd6.
[8] *See* 2017 AIAN Summary, U.S. Census Bureau, Facts for Features: American Indian and Alaska Native Heritage Month: November 2017 (October 6, 2017), *available at* https://bit.ly/37F2z2

Pima (metropolitan Tucson) areas have physical addresses and receive mail at home. *Democratic Nat'l comm. v. Reagan*, 329 F. Supp. 3d 824, 869-870 (D. Ariz.), *rev'd sub nom DNC v. Hobbs*, No. 18-15845 (9th Cir. Jan 27, 2020) (*en banc*). On-Reservation, many Tribal Members can only receive election mail through post office boxes.

Problems faced by Tribal Members are compounded by socioeconomic factors including decreased access to public transportation, personal transportation or requisite funds to travel such distances to VBM. Getting mail-in ballots is a "big problem" for Native Voters. NARF Report, supra note 16, at 40 (quoting Hangry Cagey).

v.   <u>Eighth Senate Factor - Responsiveness of Elected Officials to Particularized Needs</u>.

Defendant announced publicly that Ballots will only be counted if they are received by 7:00 p.m. on Election Day. *See* https://azsos.gov/votebymail. However, Defendant recently requested an investigation of the President Trump Administration's intervention in the USPS.[9] Further, Defendant has failed to respond to Plaintiffs' August 17, 2020 request to accept VBM ballots postmarked before or after Election Day. *McClure* Exhibit 2.

vi.   <u>The Experts have Concluded that the Disparities Warrant Court Intervention</u>.

It is paramount that the Court consider the most salient conclusions presented in the Expert Report of Dr. Schroedel and Mr. Bret Healy. *McClure*, Ex. 1. These experts detailed crucial conclusions that are overriding to the decision herein.

The first conclusion is that for voters who are mailed a VBM ballot on the first day - October 7, 2020 - of the early voting period, non-Indians in Scottsdale and other affluent areas effectively have twenty-five (25) days in which to consider, mark their ballot and return their VBM ballots to the county recorder, in contrast to Tribal Members who only effectively have fifteen (15)

---

[9] https://www.12news.com/article/news/politics/katie-hobbs-asks-arizona-ag-to-investigate-trump-administration-over-usps/75-bc57ca9a-789a-40ab-9305-16be8ec236e0

days in which to accomplish the same actions because mail for Tribal Members takes 5 to 9 days longer to travel – one way. VBM ballots have to make that journey twice within the 27 days from the first day ballots are mailed until election day. *Id*. The second conclusion is that Tribal Members have less access to VBM than non-Indian voters in Arizona because they have fewer financial resources, less access to transportation, the postal infrastructure is more remote, and VBM ballots must travel further than ballots mailed to and returned by non-Indian voters in Arizona. Third, requiring mail-in ballots to be returned - rather than postmarked - on or by 7:00 pm on Election Day leads to disenfranchisement of Tribal Member voters when their overdue ballots are rejected. Fourth, while only 6.72% of households in Arizona do not own a vehicle, approximately 29% of Tribal Member households do not own a vehicle. *McClure*, Ex. 1, p. 17. That means that the typical Tribal Member is more than four times likely to lack a vehicle at their disposal than the average Arizonan. Fifth, the median household income of a Scottsdale resident is more than 300% greater than a Tribal Member. *McClure*, Ex. 1, p. 16. Specifically, the median household income for a Scottsdale resident is 327% greater than that of a Tribal Member. *McClure*, Ex. 1, p. 18. Sixth, there is only one post office for every 707 square miles of Reservation land, in contrast to the ratio of one post office for every 15.3 square miles for the city of Scottsdale. *McClure*, Ex. 1, p. 22, 24. A Tribal Member must utilize a postal delivery system that is 46 times more remote than a Scottsdale resident, with increased travel requirements.

Finally, each Plaintiff in this action resides at or near Teec Nos Pos, an area that has some of the highest 'letter-travel' distances on the Reservation. *McClure*, Ex. 1, p. 22, 24. Research conducted by Dr. Schroedel and Mr. Healy found that mail from Teec Nos Pos travels as far as 917 miles before delivery, while the furthest mail for a Scottsdale resident travels is 35 miles. *Id*. Thus, mail from Teec Nos Pos travels 26 times farther than that from Scottsdale, vastly increasing the potential for lost, damaged or otherwise mismanaged mail to occur. These differences

between a resident of Scottsdale and that of the Navajo Nation Reservation, detail a disparity so great that it cannot be ignored and must be held a violation of Section 2 of the VRA.

### B. <u>Section 1983 Claim</u>

Plaintiffs are likely to succeed on the merits of their claim that limited access to VBM due to slower postal service violates the 14th Amendment of the United States Constitution. Defendant's decision to void VBM ballots received after 7:00 pm on Election Day is an action taken under color of state law.  As Arizona's chief elections officer, Defendant has the responsibility to ensure a fair and equal election in conformance with federal law.  This she has failed to do.

"It has been established in recent years that the Equal Protection Clause confers the substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population." *Lubin v. Panish*, 415 U.S. 709, 713 (1974)(internal quotations omitted).  "The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104-05, (2000).  The current VBM system in Arizona violates the Equal Protection Clause in that Plaintiffs do not have equal access to voting. Existing VBM procedures have a discriminatory impact on the Plaintiffs who have fewer opportunities to vote compared to Non-Indians.

"[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis,* 426 U.S. 229, 242 (1976).  In this case, Defendant's policy limits VBM opportunities because of slower postal service in addition to the extensive history of discrimination against Indian voters in the United States which has led to voting rights litigation.  The actual discriminatory impact described herein, in conjunction with evidence of discriminatory intent, supports the likelihood that Plaintiffs will succeed on the merits of their claim that Arizona

15

VBM violates the Equal Protection Clause of the 14th Amendment.

### C.   State Constitution Claim

Article 1, Section 21 of Arizona's Constitution provides:  "All elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  However, elections in Arizona are not equal because Plaintiffs do not have equal access to VBM procedures.  Accordingly, Plaintiffs are likely to succeed on the merits of their claim that unequal access to early voting violates the Arizona Constitution.

### D.   Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

It is clear that abridgement of the right to vote constitutes an irreparable injury. See *Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote ... constitutes irreparable injury.") (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986)).

Part of the reason for this treatment of voting harms is the special importance of the right to vote in the American democratic tradition:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964); *accord Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").

In this case, the irreparable harm is clear. Without an injunction, Plaintiffs will not have the same electoral opportunities as their Non-Indian counterparts. Therefore, this factor weighs in favor of a preliminary injunction.

**E.**     **The Balance of the Equities Tips in Favor of Plaintiffs.**

The relief that Plaintiffs seek here is appropriately tailored to Defendant's violation of federal law.  Plaintiffs order merely requires Defendant to count ballots postmarked on or before Election Day and will not increase costs to Defendant. Whatever burden may be created is outweighed by the risk of harm to Tribal Members and in balance, the equities favor Plaintiffs.

**F.**     **The Public Interest Favors Immediate Injunctive Relief.**

The public interest is served by the enforcement of the VRA and the inclusion of protected classes in the political process. See *League of Women Voters*, 769 F.3d at 247 ("By definition, the public interest…favors permitting as many qualified voters to vote as possible.") (internal quotes omitted); *Spirit Lake Tribe v. Benson Cty.*, No. 2:10-CV-095, 2010 U.S. Dist. LEXIS 116827, 2010 WL 4226614, at *5 (D.N.D. Oct. 21, 2010). Therefore, the public interest is served by preliminary injunction.

**I.**     **CONCLUSION**

It is apparent that the VBM regulations outlined by Defendant is in violation of Section 2 of the Voting Rights Act and this Court should grant Plaintiffs' motion for a preliminary injunction to ensure Plaintiffs the opportunity to effectually vote in the November election.

Dated this 1st day of September 2020.         /s/ Chris McClure_____
                                              Chris McClure
                                              101 S. Reid St. Ste. 307
                                              605-496-9858
                                              mcclurechris@gmail.com
                                              Attorney for Plaintiffs