Brett W. Johnson (#021527)
Eric H. Spencer (#022707)
Colin P. Ahler (#023879)
Derek C. Flint (#034392)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Email: bwjohnson@swlaw.com
        espencer@swlaw.com
        cahler@swlaw.com
        dflint@swlaw.com
*Attorneys for Intervenor-Defendants Donald J.
Trump for President, Inc., Republican National
Committee, National Republican Senatorial
Committee, National Republican Congressional
Committee, Arizona Republican Party, Coconino
County Republican Committee, Maricopa County
Republican Committee, Yuma County Republican
Committee*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Darlene Yazzie, Caroline Begay, Leslie Begay, Irene Roy, Donna Williams, and Alfred McRoye,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Secretary of State for the State of Arizona,<br><br>Defendant. | No. 3:20-cv-08222-GMS<br><br>**Intervenor-Defendants' Response in Opposition to Plaintiffs' Emergency Motion for Preliminary Injunctive and Declaratory Relief** |

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**Introduction**

The November 3, 2020 election ("General Election") is a mere 50 days away. What's more, the deadline to send absentee ballots to military and overseas voters (UOCAVA voters) is 5 days away. Some counties will actually receive completed, voted ballots by this Friday. For all intents and purposes, the General Election is already underway.

Despite having ample notice of the facts underlying their claims for months or even years (after all, the statute they are challenging has been in effect since *1997*), Plaintiffs waited until the eleventh hour to file this lawsuit and their Motion for Preliminary Injunction (the "Motion"). Even then, Plaintiffs failed to sue all required parties by not joining the county recorders. Granting the Motion[1] at this late stage would upend the expectations of all parties with an interest in the election, including Intervenor-Defendants, and threaten to introduce disarray into election administration. This is precisely why the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020). The Court should deny the Motion on this ground alone. *See id.*

As to the merits, Plaintiffs ask this Court for an extraordinary remedy: a race- and geography-based carveout to the uniformly applicable ballot-return deadline required by A.R.S. § 16-548(A). And they make this request without presenting any evidence required to prove a constitutional or statutory violation (or show a likelihood of success on such claims): there is no indication Arizona's run-of-the-mill ballot-return deadline was enacted with discriminatory intent or that it has had a disproportionate impact on the ability of Navajo Nation Tribal Members living on-reservation ("Tribal Members") to cast a ballot. What is more, Plaintiffs fail to recognize that the race-based remedy they propose flies in the face of the Fourteenth Amendment's prohibition on race-conscious policymaking. As such, Plaintiffs are highly unlikely to succeed on the merits of their claims, and the Court should deny their request for extraordinary relief on the eve of the General Election.

---

[1] It appears the Court may have tentatively granted the Motion. (Doc. 24). To the extent the Court granted the Motion, Intervenor-Defendants respectfully submit that the Court erred.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**Argument**

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted). The Court may only grant Plaintiffs the "extraordinary remedy" of a preliminary injunction if they establish: (1) they are "likely to succeed on the merits" of their claims; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the [other] *Winter* factors are satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Here, however, Plaintiffs cannot satisfy any of the four *Winter* factors.

I.     **Plaintiffs Are Unlikely to Succeed on the Merits of Any of Their Claims.**

       A.     **Plaintiffs' Claims Are Barred by the *Purcell* and Laches Doctrines.**

"Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. *As an election draws closer, that risk will increase*." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam) (emphasis added). For these reasons, as well as a state's compelling interest in preserving the integrity of its election process, courts should not alter election laws close to an election. *Id*.

Here, Plaintiffs could have raised their claims earlier. In their own words, the "crux" of these claims is alleged "discrimination" due to "socioeconomic factors of poverty" and "the predominant non-use of the English language" on the Navajo Reservation—both of which are allegedly decades-old problems. (Doc. 1 at ¶¶ 106, 108). In fact, Plaintiffs assert that the foundation of this "discrimination" began "[p]rior to 1924." (*Id*. at ¶¶ 80-100).

Nevertheless, Plaintiffs delayed until August 26, 2020 to file their Complaint (Doc. 1), until September 2, 2020 (7 days later) to file their "Emergency" Motion for Preliminary Injunction (Doc. 9), and then until September 7, 2020 (incredibly 5 days after the

"emergency" motion) to file their "Emergency" Motion for a Hearing (Doc. 21).

By waiting Plaintiffs created their own emergency. The Ninth Circuit has held that "[a] preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights, a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213–14 (9th Cir. 1984) (citations omitted); *see also Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"). Asking for a preliminary injunction now is like asking a police officer not to issue a speeding ticket because you overslept and were late for work.

Furthermore, Plaintiffs cannot create their own emergency and then deprive defendants of a reasonable time to respond or prepare for a hearing by then attempting to expedite it further. *See Martin v. Family Lending Servs.*, No. CV 09-2133-PHX-ROS, 2009 WL 3340460, at *1 (D. Ariz. Oct. 15, 2009) (noting that a plaintiff may not create her own emergency to circumvent the notice requirement in seeking a TRO).

Despite this self-made emergency, Plaintiffs nonetheless request that the Court re-write an Arizona election deadline that has been in effect since 1997 by overriding a state statute that requires all ballots to be received by the county recorder no later than 7:00 p.m. on Election Day. (Doc. 1 at ¶¶ 114, 118, 123); *compare* Ariz. Laws 1997, 2nd Spec. Sess. Ch. 5 (S.B. 1003), *with* A.R.S. § 16-548(A). This deadline has remained unchanged for the last 23 years since the Clinton presidency. *Compare* Ariz. Laws 1997, 2nd Spec. Sess. Ch. 5 (S.B. 1003), *with* A.R.S. § 16–548(A); *see also Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 368-69 (9th Cir. 2016) (holding that the *Purcell* doctrine is implicated when "a federal court injunction would disrupt long standing state procedures.").

Courts have repeatedly held that when an election is imminent, the status quo must be preserved. *See, e.g., Purcell*, 549 U.S. 1, 5 (2006); *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (affirming the district court's denial of a preliminary injunction when a new districting scheme would not be timely completed in advance of the 2018 election season);

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

*Brakebill v. Jaeger*, 139 S. Ct. 10, 10 (2018) (Mem.) (denying an application to vacate the Eighth Circuit's stay of a new election regime to which voters would have a month to adapt); *Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018) (denying requested injunction when the defendants demonstrated that changes in procedures would be difficult and result in voter confusion); *Thomas v. Bryant*, 919 F.3d 298, 317-18 (5th Cir. 2019) (denying a stay when primary voting was more than 4 months away and the general election was more than 7 months away); *Veasey v. Perry*, 769 F.3d 890, 896 (5th Cir. 2014).

Maintaining the status quo is particularly important here, when UOCAVA ballots for military and overseas personnel will be sent no later than September 19, 2020. (*See* Ex. A, Excerpts of Election Procedures Manual at 57; A.R.S. § 16-543(A); 52 U.S.C. § 20302(a)(8)). Moreover, A.R.S. § 16-547(C) and the Manual require each county recorder to supply printed instructions to accompany all early ballots (including UOCAVA ballots) that include the current statutory election deadline. (*See id*. at 56; Ex. B, Declaration of Helen Purcell at ¶¶ 20-21). The burdensome obligations imposed on counties—namely, having to reprint and re-stuff early ballot envelopes as early as this week—simply cannot be accomplished this close to the election. And that assumes counties are capable of identifying which voters reside on-reservation. (*See* Ex. B at ¶¶ 35-36). Accordingly, this Court must deny the injunction and allow the election to proceed with the ballot-return deadline in effect. *See Purcell*, 549 U.S. at 5-6 ("Given the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed without an injunction . . . .").

Plaintiffs provide no legitimate justification for seeking to upend a long-standing election process so close to the General Election and notwithstanding the pending statutory deadlines. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) (Plaintiffs must proffer "a legitimate excuse for its delay."); *see also Feldman*, 843 F.3d at 368 (an injunction that affects election processes is a factor "that animated the Supreme Court's concern in *Purcell*."). Plaintiffs fail to allege any *recent* changes to U.S. Postal Service ("USPS") practices that have impacted mail systems on the Navajo

Reservation. On the contrary, Plaintiffs' experts concede that USPS began "cutting back on delivery and services and closing post offices and process centers since 2011." (Doc. 9-3 at 10, 19 (USPS closed a mail processing facility in Flagstaff in 2012)).

Nor does the COVID-19 pandemic justify Plaintiffs' delay in filing. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (rejecting argument that ballot-submission deadline should be altered "on the eve of an election" due to COVID-19). First, the COVID-19 pandemic has impacted Arizona for at least seven months. (*See* Ex. C, ADHS COVID Data Dashboard). Governor Ducey declared a Public Health Emergency as a result of COVID-19 nearly six months ago. (*See* Ex. D, Declaration of Emergency: *COVID-19* (Mar. 11, 2020)). In the interim, the State held its primary election. Yet Plaintiffs waited until fewer than 70 days remained before the General Election to raise their claims, and they did so without providing any evidence of the pandemic having any actual impact on voting by mail in Arizona.

Second, Plaintiffs' argument that COVID-19 will trigger dramatic increases in voting by mail (citing increases in Iowa (1,000%) and South Dakota (500%)), neither applies to Arizona nor justifies the delay. (Doc. 9-3 at 10-11). Plaintiffs concede that (1) early voting has been used for over 20 years in Arizona; (2) by 2010, more than half the ballots cast in Arizona were by mail; and (3) approximately 80 percent of all Arizona voters currently vote early. (Doc. 1 at ¶¶ 14-15, 53). These admissions undermine any theory COVID-19 will trigger a drastic increase in early voting in Arizona that could overwhelm USPS.

For the same reasons outlined above, the laches doctrine also bars Plaintiffs' claims. *See Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) ("The candidate's and party's claims to be respectively a serious candidate and a serious party with a serious injury become less credible by their having slept on their rights.") "In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice." *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 922-23 (D. Ariz. 2016) (quoting *Ariz.*

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

*Pub. Integrity All. Inc. v. Bennett*, CV-14-01044-PHX-NVW, 2014 WL 3715130, at *2 (D. Ariz. June 23, 2014)). "Special interest groups and the lawyers who represent them . . . have an affirmative duty to bring their [election] challenges as early as practicable." *Mathieu v. Mahoney*, 851 P.2d 81, 85 (Ariz. 1993).

Intervenor-Defendants have been campaigning and preparing for the General Election for years. They have done so based on the long-standing and uniform election laws in Arizona. A change at the last minute permitting tardy ballots of certain Tribal Members to be counted differently than all other voters would be highly prejudicial to the Intervenor-Defendants. Moreover, this change would be extremely burdensome for election officials to implement in such a short period of time. Specifically, the creation and enforcement of necessary procedures for determining which ballots will be counted after the state-mandated deadline would require a significant amount of time, staff, and expense. (*See* Ex. B at ¶¶ 20-22, 25, 30-43). These types of changes would require far more than the few days now at hand, and changing the deadline at this late hour would create a significant risk of voter confusion as to when ballots must be submitted. (*See id*. at ¶¶ 22, 25).

Plaintiffs' dilatory conduct in filing this lawsuit requesting that the Court enjoin a long-standing state election law on the eve of the General Election is precisely the concern the Supreme Court raised in *Purcell*. For the reasons set forth above, this Court should refrain from interfering with Arizona's election process so close to the General Election.

**B.    Plaintiffs Failed to Join Required Parties.**

Plaintiffs also failed to include the necessary county parties to implement their requested relief. Rule 19(a) requires a party to be joined if feasible and necessary to "accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). Federal courts are "powerless" to issue preliminary injunctions against non-parties. *Citizens Alert Regarding the Env't v. EPA*, 259 F. Supp. 2d 9, 17 n.7 (D.D.C. 2003). Accordingly, "[i]n the absence of . . . a necessary party under Rule 19(a) . . . the merits may not be reached and a preliminary injunction may not be granted." *Boat Basin Inv'rs, Inc., v. First Am. Stock Transfer, Inc.*, No. 03 Civ. 493, 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003).

Arizona law makes the counties solely responsible for validating and counting early ballots. *See* A.R.S. §§ 16-411, 16-531, 16-584(E), 16-601; (*see also* Ex. A at 68, 141, 195). Consequently, Apache, Navajo, and Coconino Counties—and their County Recorders—are necessary parties to "accord complete relief" to Plaintiffs. Only the counties can provide Plaintiffs' requested relief: that ballots be validated and counted after the state-mandated deadline. And the fact that those independent jurisdictions would be subject to and affected by such injunctive relief requires their joinder here.

Because the Secretary is not charged with validating or counting early ballots, she cannot be presumed to adequately represent the counties' interests in this matter. *See Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999) (non-parties must be represented by named parties adequately to overcome Rule 19). The burden of complying with an injunction against A.R.S. § 16–548(A) would fall on three counties—not the Secretary.[2]

Moreover, Plaintiffs' failure to join necessary parties in their original Complaint only exacerbates the *Purcell* problem: the counties will have no opportunity to be heard yet would bear the burden to implement radically different procedures so close to the election.[3]

**C.    Plaintiffs Fail to Show that A.R.S. § 16-548(A) Violates § 2 of the VRA.**

Section 2 of the VRA prohibits states from enacting any law that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The Ninth Circuit uses a two-step approach to evaluate vote-denial challenges under the "results test" of § 2. In the first step, courts "ask whether, 'as a result of the challenged practice or structure[,] plaintiffs do not have an equal opportunity

---

[2] Moreover, the requested injunction against A.R.S. § 16–548(A) would necessarily require counties and County Recorders to disregard A.R.S. § 16-547(C) and the Elections Manual—something the Secretary cannot direct them to do.

[3] Notably, the Navajo Reservation is located in 13 counties in Utah and New Mexico, which also have not been included as parties. (Doc. 1 at ¶ 1). New Mexico's deadline mirrors A.R.S. § 16-548(A), while Utah's deadline is one hour later (8:00 p.m. on Election Day). (*See* Ex. E, New Mexico Voter Information Portal, https://www.sos.state.nm.us/voting-and-elections/voting-faqs/absentee-voting-by-mail/; Ex. F, Utah Vote By Mail, https://slco.org/clerk/ elections/vote-by-mail/). To the extent that Plaintiffs' seek relief for all voters on the Navajo Reservation for alleged discrimination resulting from the mail-service on the reservation, Utah and New Mexico must be added to "accord complete relief."

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

to participate in the political processes and to elect candidates of their choice.'" *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012 (9th Cir. 2020) (en banc), *petition for cert. filed*, (U.S. Apr. 27, 2020) (Nos. 19-1257, 19-1258).[4] To make the required showing at this step, "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (quoting *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997)). In other words, "a § 2 challenge 'based purely on a showing of some relevant statistical disparity between minorities and whites,' without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Id.* (quoting *Smith*, 109 F.3d at 595). Notably, "a bare statistical showing of disproportionate *impact* on a racial minority" does not satisfy this step. *Smith*, 109 F.3d at 595 (emphasis in original). If a party does not make the requisite showing at step one, its § 2 claim fails. *Hobbs*, 948 F.3d at 1012.

Step two requires courts to "ask whether, under the 'totality of the circumstances,' there is a relationship between the challenged 'standard, practice, or procedure,' on the one hand, and 'social and historical conditions' on the other."[5] *Id.* To determine whether there is a violation, the court "consider[s], as appropriate, factors such as those laid out in the Senate Report accompanying the 1982 amendments to the VRA." *Id.*

Here, Plaintiffs are highly unlikely to succeed on their VRA claim because they have not made a showing that A.R.S. § 16-548(A) fails either step of the § 2 test.

1.   Plaintiffs present no evidence of a causal nexus.

Plaintiffs' Motion should be denied because it skips the first step of the § 2 analysis entirely, failing to present any evidence that A.R.S. § 16-548(A) causes a "prohibited

---

[4] The Ninth Circuit has stayed its mandate in *Hobbs* pursuant to Federal Rule of Appellate Procedure 41. *See Democratic Nat'l Comm. v. Hobbs*, Case No. 18-15845 (9th Cir. Feb. 11, 2020) (Doc. 127) (order).

[5] Step two has been heavily criticized by other circuits, and its validity is at issue in the pending petitions for certiorari in *Hobbs*. As the Eleventh Circuit has explained, the Senate Report factors apply in vote-dilution cases, but "cannot" sensibly "apply" in "vote denial" cases. *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1235 (11th Cir. 2020). The Seventh Circuit has echoed this criticism. *See Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) ("We are skeptical about the second of these steps . . . .").

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

discriminatory result." *Gonzalez*, 677 F.3d at 405. "Only a voting practice that results in discrimination gives rise to § 2 liability." *Smith*, 109 F.3d at 595. And failure to provide evidence that the challenged practice "result[s] in [a minority group] having less opportunity to participate in the political process" is fatal. *Gonzalez*, 677 F.3d at 407.

For example, in *Gonzalez*, the plaintiffs claimed that a statute requiring voters to possess certain forms of identification to cast a ballot violated § 2 because minorities "are less likely to possess the forms of identification required" by the statute. *Id.* The Ninth Circuit rejected this argument because the plaintiffs "produced no evidence supporting this allegation" and "adduced no evidence that Latinos' ability or inability to obtain or possess identification for voting purposes (whether or not interacting with the history of discrimination and racially polarized voting) resulted in" less opportunity for minorities. *Id.*

Here, Plaintiffs have similarly failed to present any evidence showing that § 16-548(A)'s generally applicable deadline caused a discriminatory result. They claim that mail delivery is slower on reservations and that historical and socioeconomic factors compound this issue. (Doc. 9 at 13-14). At most, this claim indicates a "bare statistical showing of disproportionate impact on a racial minority," which "does not satisfy the § 2 'results' inquiry." *Smith*, 109 F.3d at 595. Plaintiffs offer no evidence, quantitative or otherwise, to connect disparities in mail service to § 16-548(A) or any prohibited discriminatory result. Specifically, they offer no evidence to show how many Tribal Members actually use early voting; nor do they make any comparison to the number of non-minority voters who vote in this manner. Plaintiffs similarly fail to show that Tribal Members have their ballots rejected at a higher rate due to the ballot-return deadline set forth in § 16-548(A). This dearth of evidence is fatal to Plaintiffs' § 2 claim. *See Gonzalez*, 677 F.3d 407.[6]

Even if Plaintiffs had presented some evidence of a prohibited discriminatory result (they have not), their § 2 claim would still fail because they have not shown that State discrimination and § 16-548(A) caused such a result. *See Smith*, 109 F.3d at 595. They do

---

[6] Proposed Intervenor-Defendants will supplement the record with their rebuttal expert reports on this subject prior to the September 22, 2020 evidentiary hearing.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

not show, for example, that State discrimination has caused more minorities to live on reservations or that the State has caused delays in on-reservation mail service. Instead, Plaintiffs claim that various factors *outside* the State's control make voting-by-mail more difficult for Tribal Members, including poverty, geographic isolation, poor road quality, the prevalence of non-traditional addresses, and homelessness. (*See* Doc. 9 at 10-13). But these factors have nothing to do with the ballot-return deadline in § 16-548(A). Accordingly, Plaintiffs' § 2 claim fails at step one because they have failed to present any evidence that as a result of the challenged statute (§ 16-548(A)), Tribal Members do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.

### 2.   Plaintiffs fail to establish the presence of Senate Factors.

Because Plaintiffs have not made the required showing at step one, the Court need not analyze the Senate Factors. Should the Court reach them, however, they do not help.

The Ninth Circuit considers the nine Senate Factors at step two of its analysis. *Hobbs*, 948 F.3d at 1013 (citing S. Rep. No. 97-417 and *Gingles*, 478 U.S. at 36-37). Factors five (extent to which group members bear effects of past discrimination in socioeconomic areas) and nine (whether policy underlying challenged practice is "tenuous") are "particularly important," factor one (history of official discrimination against minority group) is "important," and the other factors are "not essential" but "provide 'helpful background context.'" *Id.* (citations omitted). A showing of causation is also required at step two, as the challenger must show that "the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 638 (6th Cir. 2016) (emphasis in original).

Here, Plaintiffs do not even bother to present evidence concerning six of the nine factors, thus conceding that they are not at issue here. (*See* Doc. 9 at 10-13). Specifically, they present no evidence that voting in a relevant political subdivision is polarized (second factor); that a relevant political subdivision uses a voting practice that may enhance the opportunity for discrimination against a minority group (third factor); that members of Indian tribes have been denied access to the candidate slating process (fourth factor); that

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

racial appeals have been used in a relevant campaign (sixth factor); or that Indians have not been elected to public office (seventh factor). *See id.*

Significantly, Plaintiffs completely fail to address factor nine (the policy underlying the challenged statute), which is "particularly important." *Hobbs*, 948 F.3d at 1013. This factor weighs heavily in Defendants' favor. Far from being "tenuous," § 16-548(A)'s ballot-return deadline is a well-designed policy that furthers the orderly and efficient administration of elections. By ensuring that all ballots are in possession of counties by 7:00 p.m. on Election Day, § 16-548(A) allows counties to provide faster and more accurate vote tallies. In turn, this allows other election processes that depend on the initial vote-count to move forward in a timely fashion. *See, e.g.*, A.R.S. § 16-648 (election canvass); A.R.S. § 16-661 (recounts); A.R.S. § 16-672 (election contests); (*see also* Ex. B at ¶¶ 18-19, 37-43). Accordingly, this "particularly important" factor strongly favors Defendants.

Of the limited Senate Factors that Plaintiffs do address, the expert report prepared by Dr. Critchlow shows how Plaintiffs' analysis is incomplete at best and fails to establish the requisite causal connection between the ballot-return deadline and "social and historical conditions." (*See* Critchlow Report, Ex. G at ¶¶ 10-14); *see also Husted*, 834 F.3d at 638. Plaintiffs' examples of historical voting-related discrimination (first factor) are not contemporary and ignore positive trends in minority voting (including mail-in voting), turnout, and consideration of minority interests in the redistricting process. (*See id.* at ¶¶ 32-33, 40, 51-61). Plaintiffs' analysis of the extent to which Native Americans bear the effects of past socioeconomic discrimination (fifth factor) ignores other causal factors that limit the Tribal Members' participation in the political process, including general political culture. (*See id.* at ¶¶ 38-39). Finally, responsiveness to the needs of minorities (eighth factor) is shown in Arizona by a series of legislative enactments, including the redistricting process, the Arizona Taxpayer and Citizen Protection Act, and Proposition 202. (*See id.* at ¶¶ 33-37). The only "evidence" Plaintiffs present on the eighth factor—that Secretary Hobbs did not respond to their request to accept late vote-by-mail ballots in violation of § 16-548(A), (Doc. 9 at 13)—merely shows that the Secretary will not disregard state statutes on a whim.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

It has no relevance to whether the State is responsive to the needs of minorities.

Not only have Plaintiffs failed to show a prohibited discriminatory result with respect to voting; they have also failed to show that the State of Arizona is responsible for many of the alleged socioeconomic disparities of which they complain. For instance, any alleged disparities in USPS mail service are the responsibility of the federal government. *See Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1, 9 (1877) ("Both commerce and the postal service are placed within the power of Congress . . . ."). Likewise, road quality on reservations is a federal and tribal government issue. *See, e.g.*, *Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980) ("States have no authority over Indians in Indian Country unless it is expressly conferred by Congress."); *see also* 23 U.S.C. § 202 (establishing the Tribal Transportation Program, which funds road construction on tribal lands). Thus, Plaintiffs fail at both steps of the § 2 analysis.

### D. Plaintiffs Fail to Show that A.R.S. § 16-548(A) Violates the Equal Protection Clause of the U.S. Constitution.

It is unclear whether Plaintiffs' claim under the Fourteenth Amendment is based on an allegation that § 16-548(A): (1) was enacted with discriminatory intent; or (2) imposes an unjustified burden on voters in violation of substantive due process rights. Either way, Plaintiffs are highly unlikely to succeed on the merits of the claim.

#### 1. Plaintiffs have no evidence § 16-548(A) had discriminatory intent.

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" and "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). Plaintiffs have a heavy burden to show intentional discrimination, which they cannot satisfy in this case.

The "good faith of [the] state legislature must be presumed." *Miller v. Johnson*. 515 U.S. 900, 915 (1995). This presumption can only be overcome by proof that a law was motivated by an "invidious discriminatory purpose." *Arlington Heights*, 429 U.S. at 266.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

"The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott v. Perez.* 138 S. Ct. 2305, 2311 (2018).

The "ultimate question" is whether legislation was enacted "'because of,' and not just 'in spite of,' its discriminatory effect." *N.C. St. Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). To help guide this inquiry, *Arlington Heights* provides a list of non-exhaustive, fact-intensive factors that may be relevant to the ultimate intent determination. *See* 429 U.S. at 266-68. Plaintiffs do not address any of these factors or even cite *Arlington Heights*. Plaintiffs merely make the conclusory statement that there is "evidence of discriminatory intent"—but without pointing to any such evidence. (Doc. 9 at 15). That bald assertion does not meet the *Arlington Heights* test. Not even close.

Section 16-548(A) is a facially neutral "time, place, and manner" regulation that draws a simple, bright-line rule: return ballots by 7:00 p.m. on Election Day so that counties can quickly and accurately determine election results. This rule is consistent with the U.S. Constitution, which provides States "broad authority to structure and regulat[e] elections." *See* U.S. Const. art. I, § 4, cl. 1; *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018).

2.      A.R.S. 16-584(A) does not impose an undue burden on voting.

To the extent Plaintiffs argue that their right to vote has been impermissibly burdened, this claim also fails. The two-part *Anderson/Burdick* framework is the standard under which these constitutional challenges are evaluated. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under that framework, courts "must first consider the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Short*, 893 F.3d at 676 (quoting *Anderson*, 460 U.S. at 789). If the asserted injury fails to demonstrate any burden, then "there is no reason to call on the State to justify its practice." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015). If the burden is minimal, a state need only identify an important regulatory interest to justify a reasonable, non-discriminatory restriction. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick*, 504 U.S. at 434).

- 13 -

The asserted injury here is having to comply with the § 16-548(A)'s ballot-return deadline. Again, Plaintiffs assert no facts as to why this deadline is discriminatory. They instead suggest that the burden on Tribal Members is elevated by slower mail service on the Navajo Nation. But Plaintiffs ignore that Arizona law mandates counties send early ballots to voters beginning twenty-seven days before an election. *See* A.R.S. § 16-542(C). By Plaintiffs' own admission, they have ample time—*more than two weeks*—to review, mark, and return their early ballots. (Doc. 9 at 13). In addition, Plaintiffs are free to vote early in-person or to deliver their early ballot to any polling location in the county on Election Day—and there are polling locations in the specific cities referenced in Plaintiffs' Complaint. *See* A.R.S. § 16-548(A); (Ex. B at ¶¶ 27-28). Thus, any "burden" imposed by § 16-548(A) is minimal. *See Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1377 (S.D. Fla. 2004) (denying preliminary injunction against Florida statute that required ballots be received by 7 p.m. on Election Day). Moreover, that "burden" is easily justified by Arizona's interest in having a uniform deadline for when all voters must return their ballots. Among other things, such a deadline allows for easier education of Arizona voters about applicable deadlines, promotes a speedy and efficient counting and reporting of the ballots by the counties, and bolsters public confidence in an orderly election. *See Timmons*, 520 U.S. at 364-65 ("State certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials").

**E.      Plaintiffs Fail to Show that A.R.S. § 16-548(A) Violates the Free and Equal Clause of the Arizona Constitution.**

Plaintiffs also allege a violation of Article 1, § 21 of the Arizona Constitution. (Doc. 9 at 16). But they offer no evidence or legal authority to support their position. None exists.

Arizona courts have held that a "free and equal" election for purposes of Article 1, § 21 is "one in which a voter is not prevented from casting a ballot" because of "intimidation or threat of violence, or any other influence that would deter the voter from exercising free will, and in which each vote is [not] given the same weight as every other ballot." *See Chavez v. Brewer*, 214 P.3d 397, 407 (App. 2009). Here, Plaintiffs make no allegations of

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

intimidation or any other influence that would deter them from voting. Nor do Plaintiffs allege that their ballots would be given different weight than any other ballot. Put simply, a neutral regulation like A.R.S. § 16-548(A) does not somehow violate Article 1, § 21.

And any attempt to expand the "free and equal" clause falls flat. In *Pub. Integrity Alliance Inc. v. City of Tucson*, the court "decline[d] to find that the Free and Equal Elections Clause of the Arizona Constitution affords any greater protections than . . . the Due Process Clause of the U.S. Constitution[.]" 2015 WL 10791892, at *7 (D. Ariz. May 20, 2015). Because Plaintiffs have failed to demonstrate that Section 16-548(A) violates the Fourteenth Amendment, Plaintiffs' "free and equal" claim necessarily fails too.

**F.  Plaintiffs' Broad Interpretation Would Violate the Equal Protection Clause.**

Plaintiffs' interpretation of § 2 as requiring the Court to implement a race- and geography-based exception to § 16-548(A) would violate the Equal Protection Clause in at least two ways. *First*, it would force states (and courts) to build race-based exceptions into election statutes. Taken to its logical conclusion, Plaintiffs' argument that a limited subset of Native American voters should be subject to a more lenient set of election rules than all other voters would lead to carveouts in or the invalidation of countless other election laws. For example, under Plaintiffs' reasoning, if a party could show that historical and socioeconomic factors make voter registration more difficult for certain tribal members, § 2 would compel a court to blue-pencil the voter-registration statute to somehow make voter registration easier—but only for the benefit of those tribal members. Forcing such race-conscious decision-making onto states under the guise of § 2 is impermissible. *See, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."); *see also Shaw v. Hunt*, 517 U.S. 899, 907 (1996) ("Racial classifications are antithetical to the Fourteenth Amendment . . . .").

*Second*, Plaintiffs' proposed relief would result in the disparate treatment of ballots. The Supreme Court has held that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Yet "arbitrary and disparate treatment" of ballots is exactly what Plaintiffs request by asking the Court to create a carveout to § 16-548(A). (*See* Doc. 9-1 at 2). On its face, this race-based exception would violate the Equal Protection Clause by treating the certain Tribal Members' ballots more favorably than the ballots of all other voters.

## II.     Plaintiffs Have Not Suffered Irreparable Harm.

Plaintiffs' likelihood of success on the merits is extremely low, which raises their threshold requirement for showing irreparable harm. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005). Plaintiffs must demonstrate not only that irreparable harm is "possible" without an injunction, but that it is "likely." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 22). "Speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

Plaintiffs claim they will suffer irreparable harm because their right to vote has been abridged. (Doc. 9 at 16).[7] As discussed above, they are wrong on both counts. In any event, the alleged harm is *completely within Plaintiffs' control to avoid*. Plaintiffs have voluntarily opted to vote by mail. (Doc. 1 ¶¶ 1-8). By their own admission, Plaintiffs have fifteen days to mark and return their ballots, even with the alleged difficulties related to on-reservation mail service. (Doc. 9 at 13-14). Plaintiffs' own efforts are all that is required to mark and return their ballots and therefore Plaintiffs' alleged harm is speculative at best.

## III.     The Balance of Equities and Public Interest Tip Sharply in Favor of Defendants.

When the government is a party to a lawsuit, the Ninth Circuit "consider[s] the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). "Courts should be extremely cautious about issuing a preliminary injunction" when the injunction "goes beyond maintaining the status quo" and should not

---

[7] Plaintiffs have not alleged they have had their early ballots invalidated due to late arrival in the past. As such, the Intervenor-Defendants also challenge the Plaintiffs' standing and intend to present evidence at the September 22, 2020 hearing.

grant such relief "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (internal citation and quotations omitted). Plaintiffs' burden is heightened here because "election cases are different from ordinary injunction cases" and "[i]nterference with impending elections is extraordinary . . . ." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003).

Here, the balance of equities and the public interest tip decidedly in favor of Defendants. A state "suffers an irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). And, as the Supreme Court recognized in *Purcell*, enjoining § 16-548(A) on the eve of the General Election would cause voter confusion and harm the orderly administration of the election. Plaintiffs' requested relief would place a considerable burden on county recorders, who are not even parties to this lawsuit. Notably, extending the election deadline would (1) make it difficult or impossible for counties to implement a postmark policy; (2) impose a number of obstacles in the process of timely verifying and counting ballots; and (3) make it difficult for the counties to meet their statutory deadlines to canvass the election. (*See* Ex. B at ¶¶ 22-26, 29-43). Plaintiffs' requested relief would also likely require the Secretary and Clean Elections Commission to reprint the 2020 publicity pamphlets set to be mailed to all Arizona voters. (*See id.* at ¶¶ 23-24). All this, when Plaintiffs could avoid any "harm" themselves by simply marking and mailing their ballots within 15 days or delivering their ballots to a voting location on Election Day. For all these reasons, Plaintiffs cannot establish that the balance of equities and public interest favor a preliminary injunction.

## Conclusion

Granting Plaintiffs' Motion less than two months before the November 3, 2020 General Election would destabilize Arizona's electoral process. Voting will be underway within just days. *Purcell* warns against this. Even without *Purcell*, Plaintiffs still would not be entitled to a preliminary injunction because all four preliminary injunction factors weigh against them. This Court should deny the Motion.

- 17 -

Dated this 14th day of September 2020.

SNELL & WILMER L.L.P.


By: s/ *Brett W. Johnson*
Brett W. Johnson
Eric H. Spencer
Colin P. Ahler
Derek C. Flint
*Attorneys for Proposed Intervenor-*
*Defendants Donald J. Trump for*
*President, Inc., Republican National*
*Committee, National Republican*
*Senatorial Committee, National*
*Republican Congressional Committee,*
*Arizona Republican Party, Coconino*
*County Republican Committee,*
*Maricopa County Republican*
*Committee, and Yuma County*
*Republican Committee*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2020 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record in this matter.

*s/Elysa Hernandez*