# EXHIBIT G

1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

DISTRICT OF ARIZONA

8

9  Darlene Yazzie, Caroline Begay, Leslie
   Begay, Irene Roy, Donna Williams, and
10 Alfred McRoye,

No. 3:20-cv-08222-GMS

**DECLARATION OF DONALD T.
CRITCHLOW**

11          Plaintiffs,

12     v.

13 Katie Hobbs, in her official capacity as
   Secretary of State for the State of Arizona,

14          Defendant.

15

16         I, Donald T. Critchlow, declare as follows:

17         1.      I have been retained as an expert by the Intervenor-Defendants in this lawsuit

18 to examine allegations regarding historical political discrimination by the State of Arizona

19 against Navajo Nation voters. I offer expertise on these subjects as an expert in Arizona and

20 American political history, having done extensive research on Indian reform.

21         2.      My rate of compensation is $350.00 per hour.

22         3.      I testified at trial and in a deposition in *Feldman v. Reagan, Ariz. Dist. Court*.

23 No. 2:16-cv-01065 (DLR). Aside from this case, I have not testified as an expert within the

24 last four years.

25         4.      In developing expert opinions in this matter, I have examined the Complaint,

26 the Motion for Preliminary Injunction, and the Declaration of Dr. Jean Schroedel and Bret

27 Healy filed by Plaintiffs. I have also relied upon the references set forth in the Selected

28 Bibliography attached as **Appendix A**.

## I.    Qualifications

5.    In addition to the experience and education described in my resume (attached as **Appendix B**), I have published nine monographs with major university presses, including Harvard University Press, Oxford University Press, Princeton University Press, Cambridge University Press, University of Pennsylvania Press, as well as other academic and commercial publishers. My most recent publication was an edited book, *The Oxford Handbook of Political History* (2020), which included essays by thirty leading historians and political scientists who examine political and policy history. These books have undergone extensive peer review.

6.    I am also the editor of the *Journal of Policy History*, a quarterly journal published by Cambridge University Press. Published authors include historians, political scientists, and social scientists from the United States, Europe, and Japan.

7.    As it relates to this case, I have researched and written on Indian reform in the 1920s and 1930s, which specifically involved the Navajo Nation. This research involved archival research of the John Collier papers at the Library of Congress, the Lewis Meriam papers at the Brookings Institution, and the Harold Ickes papers at the Library of Congress. It also included the large secondary literature on Native American history, specifically Navajo history. John Collier was a leading reform activist and later director of the Bureau of Indian Affairs under the Franklin Roosevelt administration. Harold Ickes, an Indian reform activist in the 1920s, became Secretary of the Interior in the Roosevelt administration. Lewis Meriam at the Brookings Institution conducted a major review on federal policy relating to and administration of Indian affairs. My research was published in a scholarly, peer reviewed journal and a chapter in Expertise in a Democratic Society: The Brookings Institution.

8.    I have won two fellowships from the Woodrow Wilson International Scholars Center in Washington, D.C., and served as a Guest Scholar at the Brookings Institution in Washington, D.C, and a Distinguished Lecture for the U.S. Department of State. I have lectured throughout Europe, China, and Australia.

**II.     Summary of Expert Opinions**

9.     From an examination of historical records, including court opinions, newspaper articles, and archival material, as well as research into extensive scholarly literature on Native American history and the history of voting rights, and racial discrimination in the State of Arizona, specifically in regard to Native Americans, I offer the following expert opinions:

a.     Historical analysis of discrimination of ethnic minorities, including Hispanics, African-Americans, and Native Americans, is a complex story, especially in Arizona. Any conclusion that finds a linear trajectory of past discrimination to current alleged voter discrimination inferred in Arizona election law is a misuse of history.

b.     To conclude from history that there has been a linear and continuous history of discrimination against Native American voters in Arizona, specifically Navajo voters, is misleading. The Plaintiffs' Complaint, Motion for Preliminary Injunction, and Declaration of Dr. Jean Schroedel and Bret Healy ("Plaintiffs' Experts"), present a narrative that denies great advancements made in Arizona to end discriminatory practices and to provide wider and greater access to voting and political participation to members of the Navajo Nations and other Native Americans. These advancements have been made through a combination of active civic rights activism, court actions, and legislative reform.

c.     Although there is a history of discriminatory laws against ethnic minorities (including Native Americans), the successful efforts to repeal such laws calls into question any assertions of a systematic and linear pattern of systematic racism.

d.     Through a process of reform initiated by court orders, legislative involvement, and citizen participation, Native Americans have become more involved in and have greater access to political participation in local, state, and national elections. This is evidenced by the large voter turnout of Native Americans concerning the 2002 Gaming Act and subsequent state and local elections.

e.     Native American voting in Arizona remained low after Native Americans were awarded citizenship in congressional legislation enacted in 1924, but the

focus of Native American involvement in politics remained largely focused on tribal elections until the 1970s as a result of voluntary behavior, not necessarily restrictive legislation.

f.      The State of Arizona has been at the forefront of mail-in balloting for all citizens, led by Republican lawmakers. Voter access has improved significantly from these efforts.

**III.    General Observations**

10.    Not all historical and social science interpretation is of the same quality. Of course, this is true for legal arguments as well. Often historical argument, under the guise of analysis, is little more than an argument based on analogy and from analogy turns into a false claim for causation, *cum hoc, ergo propter hoc*. The fact that, many years ago, the State of Arizona enacted early anti-miscegenation law outlawing marriage between non-minorities and Native Americans provides a specious argument that the Arizona election officials should now count mail-in ballots received after the November 3 deadline for the 2020 General Election. To claim a continuity between early miscegenation laws or required literacy tests in an early period and setting ballot deadlines for counting mail in ballots is a misuse of history and a logical fallacy. What history should provide is a context for understanding current events and to recognize that advances have been made increasing greater access to voting, ending legal segregation, and Native American voting participation.

11.    Plaintiffs' Experts provide a review of the extensive and contentious social science literature on the relationship between institutional barriers to voting and voter participation.[1] A broader review of this literature shows the relationship between institutional barriers and voter participation, demonstrating a divided opinion as to the exact relationship between institutional barriers and voter participation. At the core of this debate

---

[1] Institutional barriers to voting include legislative and legal restraints, such as registration requirements, poll taxes, literacy test, inaccessible or minimum voting places. Institutional barriers can be erected without the intention of suppressing the vote; while at other times, consciously designed to suppress the vote.

is institutional barriers versus political culture. No historian or social scientist denies that institutional barriers can suppress voter participation. Institutional barriers, especially in the later 19th century South, undoubtedly prevented African Americans from voting. These institutional barriers affected the poor white vote as well in the South, although not to the degree as suppression of the African American vote. The issue of institutional barriers and the larger political culture encouraging voter participation is especially pointed among historians who have examined why massive voter participation occurred throughout the nineteenth century for eligible voters (white males) and declined significantly beginning in the twentieth century, even as eligible voters increased to include women.

12.    In the 19th century, voter participation was widespread, reaching in some elections well over 90 percent of eligible voters casting ballots. Most voters were from rural locations and of lower socio-economic backgrounds. And in urban areas, many voters were recently arrived immigrants, many of them coming from countries without a strong tradition of voting. Access to voting was often difficult. Rural voters often had to travel long distances by horseback and wagon to vote. Nonetheless voting turnout remained extremely high. High partisan passions drove these voters to the polls in rural and urban areas. Yet even as voting access increased in the 20th century in the North, voting participation declined. Scholars have asked whether this was a decline in political culture or a result of institutional barriers of varying sorts. There is not an agreement among political historians as to why voter participation declined.

13.    As Plaintiffs' Experts observe, social scientists have examined in extreme detail a range of variables related to voter behavior and turn out including, "voter costs," "accessibility," "voter habituation," and "demographics." Obviously, these variables might be, as Plaintiffs' Experts assert, "inter-connected and may [sic: might] reinforce tendencies toward participation or non-participation in elections" (p.6). Nonetheless, the exact weighing of these variables and the exact inter-connection of these variables remains open to scholarly debate. The larger issue remains what historians and social scientists describe

as "political culture."[2] Plaintiffs' Experts assert, only in passing, that civic skills, knowledge, and political culture are essential to political activity. This raises a fundamental question as to how to create a healthy political culture that encourages civic duty, while ensuring that state election rules to guarantee fair elections and voter confidence in election results can be ensured. How this is decided by the Navajo peoples and its leaders is a larger question that is completely unrelated to the Plaintiffs' claim that there is a correlation—asserted without empirical evidence—between systematic historical racism toward Navajo Nation members and voting behavior today, as well as the demand to count late ballots.

14.     More problematic, though, as it relates to Plaintiffs' claims, is the neglect of the complexity of the historical record. A closer examination of the historical record shows uneven development in addressing racial bias toward Native American peoples in Arizona. Nonetheless, progress has been made and continues to be made in addressing these issues.

## IV.     The Struggle Over Anti-Miscegenation Law in Arizona

15.     The history of anti-miscegenation law in Arizona presents an example of gradual reform. Plaintiffs assert a causal connection, without empirical proof, that anti-miscegenation legislation in the early 20th century is related, even causally, to the rejection of late ballots in the early 21st century.

16.     Arizona adopted an anti-miscegenation law before statehood. The Arizona Territorial legislation enacted an anti-miscegenation law in 1865 (Haraway, 377). This territorial law was expanded in 1931, when nativism was especially pronounced in an economic depression, to cover "Malays" and "Hindus." Exactly why these two groups—one ethnic and the other religious—were included in this resolution remains unclear, especially given that neither Malays nor Hindus were prominent in Arizona. The resolution was opposed in the state legislation by eleven of the sixty-two members.

17.     In 1942, the Arizona Supreme Court in *Pass v. Pass* affirmed the constitutionality of the marriage law. The case came before the court over a criminal trial

---

[2] Political culture can be broadly defined for the purposes of this report as civic duty, basic values, feelings, and knowledge.

in which a white woman was forced to testify against her husband of mixed ancestry. In the criminal trial, the wife invoked marital privilege to avoid testifying against her husband, but was rebuked by the court because at that time, miscegenous marriage was unlawful in Arizona. Although the Arizona Supreme Court upheld the lower court decision, it expressed deep skepticism about the broad sweep of the law and questioned the vague language of the legislation. The Court suggested that Arizona lawmakers need to revisit this legislation.

18.     Only two months after the *Pass* decision, the Arizona State Legislature revised the legislation. In the legislative debate, some called for the scrapping of the law in its entirety. The debate was quite substantive, although in conclusion the legislature offered a strict definition of white (Caucasian) as "someone who is at least seventy-five percent Caucasian, no more that twenty-five percent Indian, and with not Hindu, Mongolian, or Malay blood." At the same time the legislature eliminated the prohibition of marriage between whites and Native Americans. There is no evidence on record that can be found that these marriage laws were actually being enforced. Nonetheless, marriage between whites and Native Americans was not lawful.

19.     In 1959, the state statute was challenged when Henry Oyama and his fiancé filed suit over the constitutionality of the statute itself. Oyama was of Japanese descent and his fiancé was white. They challenged the law based on the constitutional guarantees of religious freedom, due process and equal protection. A district court, under Judge Herbert F. Krucker, ruled in their favor within an hour of the hearing. The ruling was challenged by County Attorney Henry Ackerman who wanted the Court to overturn the legislation on constitutional grounds.[3] Ackerman spoke for many in the state when he told the press that "This is one suit I hope to lose" (Kreis). Within the state legislature, momentum developed to erase the statute.

20.     In March 1961, Superior Court Judge Lee Garrett held the marriage law unconstitutional. The occasion declaring the law unconstitutional involved a man of

---

[3] https://apps.azlibrary.gov/officials/Legislators/Person/

Chinese descent and a white woman who sought a marriage license. Two months before oral arguments were heard, two Democrats and two Republicans introduced a repeal bill. The repeal legislation passed the State House by a margin of 71-6 and the Senate 20-6. Marriage between Native Americans and whites was already held legal in the 1942 legislation; now in 1962, the anti-miscegenation law had been repealed. It is not clear from my historical investigation that this law was ever rigorously enforced except in a criminal trial and by test cases. In any case, the argument that anti-miscegenation state law was directed solely at the Navajo people or that its consequences are evident in current voting right requirements or political behavior appears as an assertion without evidence.

**V.     Progress in Native American Voting Rights**

21.     The history of Indian voting rights in Arizona has been extremely contentious and remains so today, but a close examination of the historical record reveals that this history has not been one of uniform or persistent discrimination.

22.     The United States Constitution recognized Native America tribes as sovereign entities and considered tribes to be extra-jurisdictional. In 1831, the United States Supreme Court in *Cherokee Nation v. Georgia* distinguished tribal nations from foreign sovereigns and deemed them to be domestic dependent nations. The result of this decision resulted that tribes occupied a separate status. This legal distinction prevented tribal peoples from voting in state and federal elections.

23.     The issue of Native American citizenship was examined a number of times by the courts. In *McKay v. Cambell* (1871), the court ruled that McKay, whose mother was a Chinook Indian and his father of white British ancestry, was not allowed to vote as a citizen, and therefore, was properly denied this right in the East Dalles precinct in Oregon because he was not a citizen of the United States. Importantly, the Court ruled that "Indian tribes within the limits of the United States have always been held to be distinct and independent political communities, retaining the right of self-government, though subject to the protecting power of the United States." Furthermore, the court held that voting rights for Native Americans were not protected under the Fourteenth Amendment because Native

Americans were not citizens: "To be a citizen of the United States by reason of birth, a person must not only be born within its territorial limits, but he must be born subject to its jurisdiction—that is, in its power and obedience" (Law Resource). This exclusion from citizenship was affirmed in subsequent cases, *US. v. Osborne* (1880) and *Elk v. Wilkens* (1884).

24.    The Dawes Act of 1887 called for voluntary individual allotment of Native American lands. The law authorized the President to allot Indian land to individual Native Americans, initially 160 acres to each head of family, 80 acres to each single persons over the age of eighteen and orphans, and 40 acres to all single persons under the age of eighteen. Later these allotments were revised to grant every tribal member, regardless of age and status, 160 acres. To encourage participation in the program, the act granted U.S. citizenship to individual Native Americans when they received their land. As a result, by 1900, there were 53,168 Native Americans who were citizens. A year later, in 1901, Congress awarded citizenship to another 101,506 Native American inhabitants of Indian territory. As a result, one half of the Indian population had been granted citizenship. The other half that did not participate in the Dawes Act and land allotment program, however, remained non-citizens. But, as thousands of Native Americans (citizens and non-citizens) volunteered for military service during the First World War, the issue of full citizenship became an obvious issue.

25.    In 1924, the Indian Citizenship Act was passed by Congress, granting Native Americans the right to participate in elections. This legislation was passed by Congress in an act of consent, meaning that the entire Congress consented to this act, including the Arizona congressional delegation, without a dissenting vote.

26.    Granting citizenship to Native Americans born in the United States did not provide voting rights in city, county, state or federal elections; allow them to testify in courts; serve or juries, attend public schools, or sell or buy alcohol. Furthermore, states, as allowed under the U.S. Constitution, established regulations and voting procedures. In Arizona, because state and local public officials believed that because the state lacked jurisdiction in Indian lands, polling places were not established on Indian reservations

during this period. The exception to this was in Apache County, with the highest proportion of Indian voters, where Apache County Attorney, Levi Udall (1923-24; 1927-28), argued that polling places should be established on tribal lands, but he was opposed by some county attorneys (Ferguson-Bohnee, 2015, p. 1107). A close look at the State Archives containing letters sent to Levi Udall show that this opposition from other county attorneys, whom Udall had solicited for their opinion, focused only on whether placing polling stations on tribal lands might be considered an unwarranted intrusion by the state into sovereign Native American tribal lands.

27.    This issue of Indian voting rights remained unresolved as the 1928 state election approached. Governor George Hunt, a Democrat, fearing that Apache County with its large population might vote Republican in recognition of the Republican Congress and a Republican President enacting the citizenship act, sought to limit Indian access to voting. The governor was especially concerned that the Republican Party would register the approximately 1500 Navajos in the county. Governor Hunt was advised to challenge Indian election rights. Native Americans filed suits challenging Apache County and Pinal County recorder offices for rejecting voter registration forms for Native American voters living on the reservation. These suits were supported by the Republican Party. The Arizona Court held that "all Indian reservations in Arizona are within the political and governmental, as well as geographical boundaries of the state" (Ferguson-Bohnee, 2015, p1108). In *Harrison v. Laveen* (1948), the Court affirmed that Native Americans could not be denied access to the ballot.

28.    The affirmative decision in *Harrison* reflected changing and improving attitudes toward race and ethnicity following the Second World War, especially in non-southern states (Alba, 2009). Prior to America's entry into the war, the Nationality Act of 1940 reaffirmed citizenship of Native Americans. Native Americans registered for the military draft. Ten percent of the Native American population served in World War II, a larger proportion than any other group. During the Second World War, Americans of all races joined together—often for the first time. In the Second World War, over 17,000 Native

Americans saw service. Navajo code talkers in the Pacific became national heroes. Arizonans took special pride that Navajo servicemen in battles from Salerno to Iwo Jima earned seventy-one Air Medals, fifty-one Silver Stars, forty-seven Bronze Stars, thirty-four Distinguished Flying Crosses, and two Congressional Medals of Honor.

29.     At the same time, after the war, tribal and national political participation increased. In 1952, there was approximately 3,000 Navajos of voting age in Arizona and New Mexico. In 1956, 4,606 Navajos voted. In percentage terms, this was a huge increase. Much of this increase was due to the formation of the National Congress of American Indians in 1944, as well as the development and growth of tribal and intertribal organizations. Candidates responded slowly to the increase in Native American participation. In 1957, Stewart Udall, representing Arizona in Congress, stated that "As near as I can ascertain, substantially larger numbers of Indians have registered and voted at each subsequent election. I think I can safely say that the Indian vote is now courted by most candidates and spokesmen for both parties" (Peterson, 1957). One political scientist writing in 1957 noted "startling increases in registering and voting were recorded on many Indian reservations in 1956" (Peterson, 1957).

30.     This assessment was overly optimistic, but challenges to the literacy test by Native Americans in the 1960s (*see* Section VI of this report) suggests that Navajo leaders were becoming increasingly politically active. The Voting Rights Act of 1965 prohibited voting practices and procedures that result in a denial or abridgement on the right to vote on the account of race or membership in a language minority group. The State of Arizona, in particular Apache, Navajo, and Coconino counties, were added to the list for federal oversight due to low registration among Native Americans. One result was increased registration and voting among Navajo Nation members.

31.     In 1976, Tom Shirley, a Navajo, won office as Supervisor in District 3 of the Apache County Board of Supervisors. The Arizona Supreme Court quashed a legal challenge to his election, reaffirming the right of Native Americans to vote and to be eligible to seek office [Ferguson-Bohnee]. An attempt to redistrict supervisor districts was

overturned by a three-judge federal court [Ferguson-Bonhee]. Native American turnout continued to remain low among Navajo, Apache, and Hopi tribes. In response to legal actions and a consent agreement reached in 1989, the Navajo, Apache, and Coconino counties consented to establish the Navajo Language Election Information Program, which included the employment of outreach workers to assist Native American voters.

32.     Redistricting within the State has been equally contentious, especially for the Navajo Nation, which comprises over 300,000 members and occupies approximately 25,000 square miles of trust lands within Arizona, New Mexico, and Utah. In 2000, through Proposition 106, an Arizona Independent Redistricting Commission ("AIRC") was established. In redistricting efforts, as noted by Patty Ferguson-Bohnee, who served as director of the Indian Legal Program, "Tribes actively participated in the most recent redistricting process," which adopted districts to "strengthen the ability of Native Americans to elect their candidates of choice." The most underpopulated district in Arizona, Legislative District 7 ("LD 7"), includes the Navajo Nation, Hopi, Havasupai, Hualapi, Kaibat-Paiute, San Carolos Apache, White Mountain Apache, and Zuni reservations (Ferguson-Bohnee. 2015, p. 1121).

33.     In the Supreme Court case of *Harris v. Arizona Independent Redistricting Commission*, 136 S. Ct. 1301, 1308 (2016), the Navajo Nation submitted an amicus brief that expressed its support for the redistricting map created by the AIRC.[4] Of particular interest are the following statements within that amicus brief, all of which show the State of Arizona's responsiveness to the needs of minorities, and Native Americans in particular:

a.     <u>Page 14</u>: "LD 7 is the only Native American majority minority district. LD 7, largest in geographical area, smallest in population and the most sparsely populated, is comprised of 66.9% Native Americans and has

---

[4] This brief can be found at https://www.scotusblog.com/wp-content/uploads/2015/11/navajo-amicus-brief-in-harris-v-arizona-independent-redistricting-commission.pdf

1    a Native American voting age population ('Native American VAP') of

2    63.7%."

3        b.   Pages 14-15: "The Navajo Nation and other tribal leaders requested a

4    robust Native American majority-minority district. LD 7 was drawn in

5    order to meet the [Voting Rights Act] requirements and to satisfy to

6    the extent practicable the communities of interest of both Native

7    American and non-Native American voters."[5]

8        c.   Page 12: "Arizona had never before obtained [U.S. Department of

9    Justice] preclearance of its legislative map on its first attempt. A

10   principal goal of the Commission was to obtain preclearance on its first

11   attempt, which it succeeded to do. The Department of Justice

12   precleared the Commission's Legislative Plan on April 26, 2012."

13   (Internal record citations omitted)

14       34.   In 2000 and 2002, Native Americans elected candidates of choice for all the

15   state legislative positions. Native American voting participation increased in record

16   numbers when Proposition 202, the Indian Gaming Preservation and Self-Reliance

17   initiative appeared on the ballot in 2002. The Arizona Indian Gaming Association and

18   member tribes undertook a vigorous get-out-the-vote campaign. The proposition won an

19   easy majority. In the 2004 Flagstaff state senate race, Ann Kirkpatrick defeated the

20   incumbent Sylvia Laughter. Flagstaff was in the only majority-minority voting district in

21   the state. Native American activists have argued that Kirkpatrick's election represents an

22   example of discrimination against Native Americans (Ferguson-Bohnee, 2015, pp. 1122-

23   23). Kirkpatrick accused Laughter, a Democrat, of siding too often with Republicans in

24   Congress and not representing her district constituents well.[6]

25   _____

26   [5] The amicus brief is available at https://www.scotusblog.com/wp-
     content/uploads/2015/11/navajo-amicus-brief-in-harris-v-arizona-independent-
27   redistricting-commission.pdf.

28   [6] http://azdailysun.com/laughter-not-best-medicine-for-dems/article_e2d54d46-fbc4-503e-
     8a7e-c6ba4f7a5375.html

35.     In May 2014, Diane Humetewa was confirmed by the US. Senate to become a judge for the U.S. District Court for Arizona, making her the first Native American woman federal judge in U.S. history and the third Native American to ever hold such a position. She is a citizen of the Hopi Tribe. She worked as a U.S. attorney for Arizona under the George W. Bush administration. This was a small but important step forward in advancing Native American representation in the courts. As Chris Stearns (Navajo), former counsel to the House Natural Resources Committee told the press, "Let's hope Diane's confirmation is just the start of a slew of Native American federal judges." This sentiment was reinforced by a statement issued by the National Congress of American Indians (NCAI) that declared, "We eagerly anticipate many more nominations of Native people to the federal bench and other offices" (Capriccoiso, 2014).

36.     In addition, two of the three members on the Board of Supervisors ("BOS") in Apache County, three of the five members on the BOS in Navajo County, and one of the five members of the BOS in Coconino County are Native American.[7]

37.     In 2004, Arizona voters approved Proposition 200, the "Arizona Taxpayer and Citizen Protection Act." This proposition required in-person voting procedures, including certain identification. The issue of voter ID remains an especially divisive issue nationally. In 2008, in *Marion County v. Crawford*, the U.S. Supreme Court upheld Indiana's voter ID requirement. Following this decision, Indian plaintiffs who had filed suit against the new ID law agreed to revised procedures for proof of identification required at the polls. The procedures were intended to make voting easier for tribal voters.

38.     James Thomas Tucker et al, "Voting Rights in Arizona, 1982-2006," The Review of Law and Social Justice (2006), undertook extensive interviews with Native American and Hispanic voters to support a claim of political discrimination toward minority voters. The essay affirms, however, that the Voting Rights Act of 1965 and subsequent

---

[7] https://www.apachecountyaz.gov/Board-of-Supervisors;
https://www.navajocountyaz.gov/Departments/Board-of-Supervisors/Districts;
https://www.governing.com/gov-institute/wig/lena-fowler.html.

legislation has increased Hispanic and American Indians registration and voting in record numbers in Arizona. Furthermore, the interviews suggest other reasons for relatively low voter turnout among Native American voters. These interviews are worth quoting at length because they suggest progress and other reasons for why some eligible Native American voters are disinterested in politics and do not vote either at the polls or through mail in ballots. The following quotations reveal that alleged voter suppression is less an issue than general political cultural within the Navajo and other tribal lands.

a.   *Harold Noble, Navajo, (pp. 300-302): "In the 1950s, the Navajo were not voting…Although there are still problems, things are getting better. Because of the efforts of the outreach office, the Navajo are finally talking about their current situation and the issues facing them." This statement suggests greater voter interest because of voter outreach efforts.

b.   *Felicia Tsosie, Navajo, (pp. 303-304): "Tsosie says that people she knows pay more attention to local government than the larger elections. This is not just because they believe the local government has more of an impact on their lives, but also because tribal governments make much more of an effort to reach out to local residents." This statement suggests that local elections were at the time of greater interest to some to Navajo people than state or national elections.

c.   *Stella Begay, Navajo, (pp. 303-304): "In general, however, Begay states that in the past ten years, elections have been getting better…more people have been showing up to cast a ballot. Additionally, more Navajo have been running for office. This includes women, a practice that was formally severely frowned upon." This statement affirms that progress has been made.

d.   *Alfred Lee Kahn, Sr., Navajo, (pp. 307-308): "Political disillusionment is also a problem. Every election season candidates will come to the local chapter houses and ask members to vote for them in return for the candidate keeping promises. However, this is the only time the tribe will see candidates.

1      Despite this disillusionment over candidates, more Navajo are participating

2      in politics than ever before." This statement suggests that disillusionment with

3      politicians is shared by Navajo Nation members, although people continue to

4      vote.

5      e.      *Manuel "Manny" Herrera, Apache, (pp. 309-310): "While obstacles for

6              language minority voters have decreased overall, Herrera says the media

7              portrays candidates negatively, so many people do not want to vote." This

8              statement indicates that language assistance at voting has improved, but many

9              voters simply dislike the choice of candidates.

10     f.      *Alex Rodriquez, Hispanic, (pp. 310-311): "Rodriquez says there is a general

11             lack of outreach to less wealthy, minority communities because the candidates

12             have less at stake in their communities. Rodriquez also maintains that the

13             voters have less at stake in the political process. 'The high a person's income,

14             the higher their propensity to vote because people have economic interests at

15             stake in the political process.'" Mr. Rodriquez's observation affirms that

16             many voters, especially low-income voters, simply do not think they have a

17             stake in the process, which explains why many low-income voters are not

18             voting.

19     39.     These quotations reflect problems within the political culture within tribal

20     culture more than institutional barriers. Although institutional barriers should not be

21     dismissed completely, political culture needs to be included in any discussion of voter

22     participation among Navajo voters. In a 2004 Inter Tribal Council of Arizona discussion of

23     the history of Indian voting in Arizona, the following key observation was made, which is

24     worth quoting in full because it suggests larger problems than just institutional barriers:

25             Some Indian people were unsure about their newly won voting rights. Many
               did not see themselves as active participants in the federal and state political
26             process—simply because they did not view it as their process. Some feared
               that involvement in this non-Indian process would lead to taxation, further

loss of reservation lands, and the termination of their special relationship with the federal government. (Inter Tribal Council of Arizona, 2004)

40.    Additionally, clear signs of Native American participation in elections, specifically among members of the Navajo Nation, is evident. This is shown by charts from voting data from the Secretary of State's office, "Official Canvas":

| Arizona General Election (1994) | Navajo County |
|---|---|
| Total Eligible Registration | 40,646 |
| Total Ballots Cast | 22,669 |
| Voter Turnout Percent | 55.77% |
| Number of Voting Precincts | 69 |

| Arizona General Election (2002) | Navajo County |
|---|---|
| Total Eligible Registration | 50,745 |
| Total Ballots Cast | 36,163 |
| Voter Turnout Percent | 47.73% |
| Number of Voting Precincts | 70 |

| Arizona General Election (2010) | Navajo County |
|---|---|
| Total Eligible Registration | 57,702 |
| Total Ballots Cast | 30,021 |
| Voter Turnout Percent | 52.03% |
| Number of Voting Precincts | 70 |

| Arizona General Election (2018) | Navajo County |
|---|---|
| Total Eligible Registration | 63,034 |
| Total Ballots Cast | 37,176 |
| Voter Turnout Percent | 58.98% |
| Number of Voting Precincts | 14 |



**VI.** **Challenging Literacy Requirements in Arizona: A Record of Progress**

41. Following a series of editorials in the Arizona Republican (later the Arizona Republic) in 1905, the Arizona territorial legislature enacted a literacy test to vote in 1909. The editorials in 1905 made it clear that the call for an English literacy test was aimed at preventing Republicans from winning the Hispanic vote. The Arizona Republican editorial declared that "No person should be permitted to vote in Arizona unless he can read a paragraph in simple English" (Farzan, 2018). A few days after this first editorial, another editorial declared, "We are referring, of course, to the ignorant Mexican vote."

42. When the 1909 state territorial legislature met, Democrats pushed through a legislation requiring a literacy test. As the Coconino Sun reported, "The bill is a strict Democratic caucus measure, introduced in the hope of disenfranchising a sufficient number of Mexicans, who they claim are mainly Republican, to make Arizona safely Democratic for years to come."

43. The then-Arizona governor, Joseph H. Kibbey, fought the measure. He declared that "To say that all men in Arizona who cannot read the constitution in the English language, are so ignorant and illiterate that they ought to be denied the right to

suffrage, is grossly unjust." Governor Kibbey vetoed the bill, but the legislature overrode him.

44.     In 1910, the law was in place, even though Governor Richard E. Sloan, a Democrat who succeeded Kibbey, denounced the bill as "unjustly discriminatory, racial in its application, and such is to be condemned." He referred to the test as similar to those literacy tests used in the South to disenfranchise African-American voters. He added that "As the Mexican vote in Arizona does not exceed 10 percent of the whole and is relatively growing less, it is idle to suggest that Anglo-Saxon supremacy is here in danger even remotely." At this point, even the Arizona Republican had changed its view of the law and sought its removal.

45.     When Arizona became a state in 1912, all mention of a literacy test from the State's new constitution was removed. Opponents of a literacy test warned that any literacy test would disenfranchise hundreds of voters. Shortly after Arizona became a state in 1912, the legislature passed a new literacy test. In actual fact, many Hispanics, even if eligible, did not vote. The test remained in place until well after the Second World War.

46.     In *Harrison v. Laveen* (1948), the Court affirmed that Native Americans could not be denied access to the ballot. The literacy test, however, remained as Arizona law. It is important to note that challenges to literacy tests, if enforced without racial prejudice, were upheld by the U.S. Supreme Court during this general time period. To state this is not to defend a literacy requirement, but only to suggest that such voting requirements were not necessarily seen by the courts as racially discriminatory in themselves. In *Lassiter v. Northampton County Board of Elections* (1959), a case was brought before the Supreme Court challenging the constitutionality of a literacy test to register to vote in Northampton County, North Carolina. In an opinion delivered by Justice William O. Douglas, the Court held that because the tests were applied equally to all races, and not "merely a device to make racial discrimination easy", a state could use its power to "determine the conditions under which the right of suffrage may be exercised" (Lassiter v. Northampton, 1959). As

this ruling applied to Arizona, the state literacy requirement operated within constitutional law at the time, as held by the U.S. Supreme Court.

47.    In 1965, Congress passed the Voting Rights Act ("VRA"). Among other things, the VRA included provisions, some which were temporary, relating to language assistance, preclearance, and the use of federal poll observers. In *Apache County, Navajo County and Coconino County, and the State of Arizona v. United States*, the District of Columbia Court of Appeals ruled in favor of the state of Arizona using literacy tests in a non-discriminatory manner. The court's ruling is worth quoting at length because it shows that the Court accepted the state's contention that literacy tests were not being specifically aimed at suppressing the Native American vote:

> We have before us a large number of exhibits submitted by the plaintiffs to the Justice Department in February 1966, and submitted to us in support of plaintiffs' motion for summary judgment. These include affidavits and letters of voting officials in the three plaintiff counties, stating that they have not applied the literacy test in a discriminatory matter. These submissions are not bald conclusory assertions, but include materials and comment purporting to account for the phenomenon of low voter registration among the Indians and detailing increased efforts to provide Indians with more, and more conveniently located, registration facilities, notably efforts to provide more deputy registrars on the reservation." Specifically, the court noted that an investigation by the U.S. General Attorney Civil Rights Division following the complaint "turned up evidence of one incident of discriminatory use of the literacy test. The Department officials further report that no other discriminatory incident was unearthed in the course of the investigation. We are also advised that in 1965, subsequent to this incident, the Arizona legislature amended its voting laws so that the ability to read the Constitution in English, though retained as a requirement for initial registration, was eliminated as a ground for challenge of registered voters at the polls.[8]

48.    This decision affirms that a federal court believed that the State of Arizona and county officials were making good faith efforts to fulfill legal obligations to protect Native American voting rights.

49.    In 1970, Congress adopted a national prohibition on literacy tests. In 1972, the Arizona State Legislature repealed the literacy test.

---

[8] http://law.justia.com/cases/federal/district-courts/FSupp/256/903/2349455/

50.     The battle to repeal the literacy test had been fought in the courts and in the political arena, but a battle had been won. Progress had been made in the political and legal arenas.

**VII.    Mail-In Voting: A History of Increased Participation**

51.     Arizona mail-in voting has been proclaimed as a model for mail-in voting. As Arizona Governor Doug Ducey stated in a press conference, "In Arizona, we're going to do it right. It will be free and fair. It will be difficult if not possible to cheat and it will be easy to vote" (Conover, 2020).

52.     The State of Arizona has a long history of mail-in voting. Indeed, Arizona was a pioneer in mail-in voting. In 1991, the state legislature enacted legislation that allowed eligible Arizona voters to request an absentee ballot for any reason. Prior to this, voters needed to prove that they could not make it to the polls on Election Day. Six years later, the state legislature changed Arizona law to replace the word "absentee" with "early."

53.     As a result of these legislative changes, early mail-in balloting has become popular. By the General Election in 2012, 61% of Arizona voters cast early ballots, according to the Secretary of State's office. By the mid-terms in 2018, 79% of voters cast early ballots.

54.     This increase in mail-in voting reflects voter confidence that the process is working fairly. This has placed great responsibility on county recorders to ensure that mail-in ballots represent registered voters and the ballots received are not fraudulent. Citizen confidence in the voting system cannot be maintained without strict oversight by election officials. The Secretary of State is responsible for ensuring that elections remain fair. The state of Arizona has a constitutional responsibility, as do all states, to establish fair provisions and strict requirements for fair elections. The increase in mail in balloting shows that voters have confidence in the system. Without confidence in fair elections, democracy itself is jeopardized.

55.     Legislative actions to provide early balloting suggest state lawmakers' intent to expand the electorate and not suppress it. These legislative measures were enacted under

Republican-controlled bodies. Plaintiffs' argument that the political history of Arizona reveals a continuity in systematic racism is belied by vote-by-mail legislation.

**VIII.** <u>**Expert Conclusions**</u>

56.     Historical and social science research is by its nature contentious, but the obligation of scholars is to show through empirical evidence causal relations between events. The Plaintiffs and their experts do not show a causal relationship between early events and current actions by the Secretary of State imposing ballot deadlines.

57.     The political history of Arizona reveals that strenuous efforts have been made to overcome discriminatory legislation.

58.     Early anti-miscegenation legislation at the turn of the 20th century was repealed in court and by legislative actions. In 1931, state legislation allowed Native Americans and whites to marry, even while preventing intermarriage between ethnic and religious groups. In 1942, anti-miscegenation laws were ruled unconstitutional and repealed.

59.     The imposition of literacy tests in early Arizona legislation, while ruled constitutional by the Supreme Court in 1959, was challenged in the courts and were repealed by the state legislature.

60.     Native American voting participation in federal and state elections continues to increase, including among members of the Navajo Nation. This increased participation suggests profound changes within tribal political culture and success of federal, state, and local efforts to encourage and mobilize Native American voters.

61.     Native American citizenship was achieved in 1924. This did not translate, however, into increased voter participation in federal, state, or local elections. Early reticence of Native Americans, including Navajo people, to participate in federal and state elections indicates greater interest in inner tribal affairs rather than overt voter suppression. By the early 21st century, Native American, including Navajo voting participation in federal and state elections rose dramatically and continues to rise.

1       I declare under penalty of perjury under the law of the United States of America that

2 the foregoing is true and correct. Executed on this 14th day of September, 2020.

Donald T. Critchlow

# APPENDIX A

# <u>Selected Bibliography</u>

Alba, Richard. *Blurring the Color Line: The New Chance for a More Integrated America* (2009)

Berman, David R. *Arizona Politics and Government: The Quest for Autonomy, Democracy, and Development* (Lincoln and London: University of Nebraska Press, 1998).

Blackhawk, Ned (2008) *Violence over the Land: Indians and Empires in the Early American West*. Cambridge, MA: Harvard University Press.

Brooks, James F. (2002) *Captives and Cousins: Slavery, Kinship, and Community in the Southwest Borderlands.* Chapel Hill: University of North Carolina Press.

Capriccioso, Rob. "Diana Humetewa, Confirmed to Federal Bench, Makes History, Indian Country News, May 15, 2014

Carter, Susan B. "Labor." In *The Historical Statistics of the United States, Millennial Edition*. Edited by Susan B. Carter, Scott S. Gartner, Michael Haines, Alan Olmstead, Richard Sutch, and Gavin Wright. New York: Cambridge University Press, 2004.

Cavanaugh, Wade. "Indian Tribal Council to Study Problems of Voter Registration." *Arizona Republic*, July 23, 1964. https://newspapers.com/image/118425135.

Conover, Christopher. "Arizona's Long History with Voting by Mail," *Arizona Pima News,* August 21, 2020

Critchlow, Donald T. *The Brookings Institution, 1916-1952: Expertise and the Public Interest in a Democratic Society* (1985).

_____. *America! A Concise History* (1994).

_____. *American Political History: A Very Short Introduction (2015).*
_____ ed. *The Oxford Encyclopedia of American Political and Legal History* (2012).

_____ ed. *The Oxford Handbook of American Political History* (2020).

DeLay, Brian (2008) War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War. New Haven, CT: Yale University Press.

Farzan, Antonia Noori, "Racist History 101: When Arizona Blocked Spanish Speakers from Voting," *Phoenix New Times,* March 19, 2018.

Ferguson-Bohnee, Patty. "The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression." *Arizona State Law Journal* 48 (4) (2015): 1099-1144.

Hämäläinen, Pekka (2009) *The Comanche Empire*. New Haven, CT: Yale University Press.

Hardaway, Roger D. "Unlawful Love: A History of Arizona's Miscegenation, Law, *(Arizona History,* (1986).

Harrod, W.R. "Ruling Due for Appeal, Board Hint." *Arizona Republic*, Feb. 10, 1953. http://ww.newspapers.comg/image/116711987.

Hirschman, Charles and Ellen Percy Kraly. "Racial and Ethnic Inequality in the United States, 1940 and 1950: The Impact of Geographic Location and Human Capital." *International Migration Review* 24 (1) (1990); 4-33.

Houghton, N.D. "The Legal Status of Indian Suffrage in the United States, *California Law R Review,* (1931).

Inter-Tribal Council of Arizona, "History of Indian Voting in Arizona," DVD, 2004; http://www.itcaonline.com/evento11/historyofIndian votinginaz.pdf.

Kreis, Anthony Michael. "Marriage Demosprudence," *University of Illinois Law Review,* (2016). "Original Americans First Vote," *Literary Digest,* September 22, 1928.

*Lassiter v. Northhampton County Board of Elections https://www.* Courtlistenerner.com./opinion/105/899.

*McKay v. Campbell* (1871), https://law.resource.org/pub/us/case/reporter/F.Cas/0016.f.cas/0016.f.cas.0161.pdf

Peterson, Helen L. "American Indian Political Participation," *The Annuals of the American Academy of Political and Social Science,* (May, 1957).

Philip, Kenneth R. *John Collier's Crusade for Indian Reform, 1920-1954* (1977).

Porter, Robert Odawi, "The Inapplicability of American Law to Indian Nations," *Iowa Law Review* (2004).

Rollings, Willard Hughes. "Citizenship and Suffrage: The Native American Struggle for Civil Rights in the American West, 1830-1964" *Nevada Law Review* (2004).

Taylor, Quintard, *In Search of the Racial Frontier: African Americans in the American West* (New York: Norton Press, 1999).

Tucker, James Thomas and Rodolfo Espino. "Voting Rights in Arizona: 1982-2006." *RenewtheVRA.org*. March 2006. http://www.civilrights.org/voting-rights/vra/states.html.

Tucker, James Thomas, Rodoldo Espino, Tara Brite, Shannon Conley, Ben Horowitz, Zak
    Walter, and Shon Zelman. "Voting Rights in Arizona: 1982-2006." *Review of Law and
    Social Justice* 17 (2) (2008): 283-365.

"Race and Hispanic or Latino Origin: Phoenix." *United States Census Bureau: American Fact*

VanderMeer, Philip. *Desert Visions and the Making of Phoenix, 1960-2009* (Albuquerque,
    University of New Mexico Press, 2010).

"Voting and Registration by Race in Arizona (1996-2014)." *Current Population Survey*.
    Accessed June 30, 2016.
    http://thedataweb.rm.census.gov/TheDataWeb_HotReport2/voting/voting.hrml?GESTFIPS
    =4&INSTANCE=Nov+2014.

Williamson, Kevin D. "Desegregation, before Brown: Barry Goldwater and the Forgotten
    Campaign in Phoenix." *National Review*, April 29, 2013.
    http://www.nationalreview.com/node/346881/print.

# APPENDIX B

Donald T. Critchlow

Business Address: Faculty of History, Arizona State University,
        Coor Hall, 4th Floor, 975 S. Myrtle Avenue, Tempe, AZ 85287-4302

Telephone: cell: 369-8455; Email Address: Donald.Critchlow@asu.edu

Present Position: Katzin Family Professor, Faculty of History; Director, Program in Political History and Leadership, Arizona State University; Founding editor, *Journal of Policy History*; General editor, "Cambridge Essential Histories," (Cambridge University Press).

**EDUCATION**

Ph.D.   University of California, Berkeley, 1978 (History)
M.A.    University of California, Berkeley, 1972 (History)
B.A.    San Francisco State University, 1970 Magna Cum Laude

**TEACHING FIELDS**

United States History
20th Century American History
History of Public Policy
American Political History

**HONORS/FELLOWSHIPS/APPOINTMENTS**

Founding President, Institute for Political History, (Endowed Public Non-Profit Foundation to
        promote the study of American history and graduate education, (501C) (2001-present)
Panelist,  NEH Public Scholars Fellowship, (2020)
External Reviewer, NEH Teaching History Program, Stillman College History Academy for Hale County (2008)
Panelist, National Humanities Endowment, Year-Fellowship Program (2004)
Fellow, Fulbright Scholars Program, University of Hong Kong (1997-98)
Fellow, Woodrow Wilson International Center for Scholars (l996-97)
USIA grant for a five volume history of the U. S. published in Polish (1995)
University Faculty Exchange Program, University of Warsaw (1988-1989)
USIA, AmParts Distinguished Lecturer (1988-1989)
Panel, Employment and Technology, National Academy of Sciences (l986)
Guest Scholar, Woodrow Wilson International Center for Scholars (l984)
Rockefeller Summer Fellow (l983) (l994)
NEH Summer Fellow (1980)
Guest Scholar, The Brookings Institution (l976-l977)

1

**Administrative and Leadership Positions**

Director, Center for Political Thought and Leadership, 2014-present
Chair, Department of History Saint Louis University, 1991-96
Director of Graduate Studies in History, University of Notre Dame, 1989-91

**PUBLICATIONS**

Books (Monographs)

*In Defense of Populism: Protest and Democratic Change* (University of Penn Press. September 2020).

*Republican Rivals: From Nixon to Reagan* (Philadelphia: University of Pennsylvania Press, 2017)

*Future Right: Forging a New Republican Majority* (New York: St Martins, 2016).

*A Very Short Introduction to American Political History* (New York: Oxford University Press January 2015)

*When Hollywood Was Right: How Movie Moguls, Celebrities, and Big Business Remade American Politics* (New York: Cambridge University Press, 2013) 224 pp.

*The Conservative Ascendancy: How the GOP Right Made Political History* (Harvard University Press, 2007; University Press of Kansas, 2011 pap.) 315 pp.

*Phyllis Schlafly and the Republican Right: A Woman's Crusade* (Princeton University Press, 2005) 422 pp.

*Intended Consequences: Birth Control, Abortion and the Federal Government in Modern America* (Oxford University Press, 1999; paperback edition, 2001).

*Studebaker: The Life and Death of an American Corporation, 1852-1963* (Indiana University Press, l997) 272 pp. 304 pp.

*The Brookings Institution, 1916-1952 Expertise and the Public Interest in a Democratic Society* (Northern Illinois University Press, 1985) 242 pp.

Books (under contract):

*Revolutionary Minds* (under contract, manuscript due March 2021)

2

Books (Textbooks and Edited):

Co-editor with Paula Baker, *Oxford Handbook of American Political History,* (under contract with Oxford University Press, 2020).

Co-editor, "The Election of 1964," *Journal of Arizona History,* (special issue, Spring 2020).

Co-editor-in-chief with Philip VanderMeer *Oxford Encyclopedia of American Political and Legal History* (New York, Oxford University Press, 2012), part of a five volume project Encyclopedia of American History, Paul Boyer, general editor.

Co-authored/edited with Nancy MacLean, *Debating the Conservative Movement* (Washington, D.C. Rowman and Littlefield, 2009).

Co-edited with Emilie Raymond, *Hollywood and Politics: A Documentary History* (New York: Routledge, 2009).

Co-edited, *American Conspiracy Revealed: From the Founding to Today (*Indiana University Press, 2007).

Co-authored with Paula Baker and William Rorabaugh, *America's Promise* (Revised and expanded edition) (Rowman and Littlefield Press, 2003); initially published as *America!: A Concise History* with William Rorabaugh, (Belmont, CA: Wadsworth Publishing, 1993).

Co-edited with Agnieszka Critchlow, *Enemies of the State: Personal Stories of Survival in the Gulag* (Chicago: Ivan Dee Publishers, 2002; paper 2003).

*Encyclopedia of American History*, *Volume X, 1968 to the Present,* Volume editor, Donald T. Critchlow, Gary Nash, general editor, (New York: Facts on File, 2002).

Co-edited with Charles Parker, *With Us Always: Private Charity and Public Welfare in Historical Perspective* (Lantham, MD: Rowman & Littlefield, 1998).

Edited, *The Politics of Abortion and Birth Control in Historical Perspective* (University Park, PA: Pennsylvania State University Press, l996).

Edited, *A History of the United States, I-V*, a five volume history including with essays contributed by thirty Polish and American scholars (Warsaw, Poland: Polish Academic Press, 1995).

Co-edited with Ellis Hawley, *Poverty and Public Policy in Modern America* (Belmont, CA: Wadsworth Publishing, 1989)

Co-edited with Ellis Hawley, *Federal Social Policy: The Historical Dimension* (University Park, PA: Penn State University Press l989)

3

Edited, *Socialism in the Heartland: The Midwestern Experience, 1890-1920* An anthology of eight original essays (Notre Dame, Indiana: University of Notre Dame Press, 1986)

Articles/Chapters/Essays:

In Print:

"A Somewhat Reassuring Defense of Populism," *Athenaeum Review, (October, 2019),  84-91.*

"Nationalism, Populism, and Fear," *Journal of World Complexity and Science*  (Spring, 2020)

"Ronald Reagan," *Conservative Moments*, edited Mark Garnet (Bloomsbury 2018), 219-226.

"Humanae Vitae in Historical Perspective," in *Humanae Vita: 50 Years Later,* edited, Therese Notare, (Catholic University Press, 2019), 3-29.

"Silent Majority: Richard Nixon and Law and Order," in Britta Walddschmidt and Anna Vandergoltz, *Inventing the Silent Majority in Western Europe and the United States* (New York: Cambridge University Press, 2017).

"Understanding American Conservatism," *Cairo Review of Global Affairs* (Autumn, 2016).

"The Rise of Conservative Republicans: A History of Fits and Starts," in Iwan Morgan and Robert Mason, *Seeking a New Majority: The Republican Party and American Politics*, *1960-1980 Revival,* (Nashville, TN., Vanderbilt University Press).

"On a Darkling Plain," *Historically Speaking* (Spring, 2001)

"Rethinking American Conservatism: Towards a New Narrative," *Journal of American History* (December 2011).

"Reconsidering ERA: Social Mobilization, Public Opinion, and State Ratification," *Journal of Policy History*, Special Issue, Julian Zelizer and Bruce Schulman, (Fall 2008)

"Mobilizing Women: The Social Issues and the Reagan Presidency," The *Reagan Presidency*, edited Hugh Graham and Elliot Brownlee, (Lawrence: University of Kansas Press,  2003).

"Phyllis Schlafly and Reconsidering Postwar American Conservatism," *Conservatism in the 1960s,* edited David Farber, (London: Peter Lang, 2003).

"Conservatives in Congress," *Congress: An Historical Perspective*, edited Julian Zelzer, (New York: Houghton Mifflin, 2004).

4

"Innovation in the Classroom: Teaching Policy History," *The History Teacher*, 31, (August, 1999), 469-476.

"Implementing Family Planning Policy in Postwar America," in Charles Parker and Donald T. Critchlow, eds., *With Us Always: Private Charity and Public Welfare in Historical Perspective* (Lantham, Md., 1998), 211-241.

"Birth Control, Population Control, and Family Planning: An Overview," *Journal of Policy History*, 7,  (March l995), 1-21.

"Think Tanks, Antistatism, and American Democracy," in Michael Lacey and Mary Furner, eds., *Knowledge and Social Science Research* (Cambridge University Press, 1993), 279-322.

"A Prognosis of Policy History: Stunted--Or Deceivingly Vital?" *The Public Historian*, 15, (Fall l993), 51-61.

"The Presidential Commission on Employment and Technology, 1966: An Historical Perspective," in National Academy of Sciences Panel on *Employment and Technology Employment and Technology in the United States* (N. Y.  Ballinger, December 1988).  Reprints of essay on file at the National Academy of Sciences.

"Robert S. Brookings: The Man and His Vision," *Review of Politics*, 46, (October, 1984), 561-580.

"Wheels of Fortune: Studebaker in the Early Years," *Timeline*, 4,  (March/April 1987), 16-30.

"Industrial Relations at Studebaker, 1905-1935, Paternalism and Corporate Identity Within An Auto Company," *American Studies*, 11,  (1991), 83-95.

"Communist Unions and Racism: A Comparative Study of Responses of the United Electrical Radio and Machine Workers and the National Maritime Union to the Black Question During World War II," *Labor History* 17, (Spring 1976), 230-244; also see August Meier and Elliot Rudwick, "Communist Unions and the Black Community," *Labor History* (Spring 1982).

"Lewis Meriam, Expertise, and Indian Reform," *The Historian*, 23, (Spring, 1981), 325-344.

"The Political Control of the Economy: Deficit Spending as Political Belief, 1932-1952," *The Public Historian,* 3, (Fall, 1981), 5-22.


Selected Review Essays/Encyclopedia Articles

"Policy Knowledge: Non-Profit Institutions," *International Encyclopedia of the Social and Behavioral Sciences*," Neil J. Smelser and Paul B. Balters, editors, (Oxford, England: Elsevier Science, 2002) 5000 word essay.

"Government," Encyclopedia of American and Intellectual History, edited Mary Kupiec Cayton and Peter W. Williams, (N.Y.: Charles Scribner's Sons, 2001) 5000 word essay.

"Galling Wasp: Sexual Misbehavior in the Human Scientist," *Reviews in American History* (October, 1999).

"What's In and What's Out," *Reviews in American History* (September 1997).

"*Liberty and Sexuality: The Right to Privacy and the Making of Roe v. Wade* by David Garrow," extended review essay *Journal of American History (*March, l995).

"Keeping the Life Stream Pure," *Reviews in American History* (1992).

"Knowledge for What? Private Philanthropy in American History," *Reviews in American History* (l991).


## INVITED ADDRESSES AND LECTURES/CONFERENCE PAPERS

Invited Lecture: "Intended Consequences: Abortion and Family Planning Policy in the United States," Rio de Janeiro, Brazil, November 2019

Invited Lecture: Keynote Panel, "Preserving Women of the Right," Radcliffe College/Harvard University (2017)

Invited Lecture *The Conservative Ascendancy:*  George McGovern Center, South Dakota;  North Carolina History Forum, Raleigh, North Carolina, public lectures in Washington, D.C., New York City, Portland, Oregon, and Gainsville, Florida,

Invited Lectures for *Phyllis Schlafly and Grassroots Conservatism* book tour: Seattle Town Hall Lecture Series; University of Washington, Seattle; George Washington University; Fordham University; Henry Salvatori Distinguished Lecture Series, Claremont College; Public Lecture, La Jolla, California

Selected Invited University Lecture: University of London (2009); University of  Missouri Public Lecture (2007);  Iowa State University College Distinguished Lecture Series, (2004); University of Arkansas College Lecture Series (2003); Oxford University and Cambridge University, June, 2001; Keynote Address, "Family Planning Policy: Successes and Failures," Title X Federal Family Planning Policy Regional Conference, Lake Geneva, WI, 2000; Beijing Foreign Language University (2000); University of Oregon (2000); University of Virginia (2000); Vanderbilt University (2000); Dartmouth College (1999).

USIA Am Parts Program, "Think Tanks and the Washington Establishment in Historical Perspective," Lectures at United States Embassies in Barcelona, Madrid, Rome, Bonn, Frankfurt,

6

Helsinki, and Luxemburg,  1988-1989.

"American Conspiracy Revealed," State of the Field panel, Organization of American Historians Meeting, April 2008.

"What's Wrong with the New Conservative History?" State of the Field panel, Organization of American Historians Meeting, March 2007

"The New History of Conservatism," American Historical Association Meeting, January 2007

"Reconsidering the History of Postwar Conservatism: Phyllis Schlafly and the Grassroots," American Historical Association Meeting, January 2001

"Integrating Social History and Policy History in the Classroom," Organization of American Historians Meeting, April l996

"The Quiet Revolution: Family Planning Policy in the l960s," Organization of American Historians Meeting, April l995

"The Current State of Political History," Western Political Science Meeting, March l995

"The Work Ethic and Welfare Reform in Modern America," American Historical Meeting, December 1987

"Social Policy as History," Organization of American Historians Annual Meeting, April 1986.

"The Emergence of Think Tanks in Modern America: Antistatism and Expertise in a Democratic Society, 1916-present," American Historians Association Annual Meeting, December 1985.

"The Evolution of the Studebaker Company, 1900-1920 from a Wagon Company to an Automobile Corporation," the Organization of American Historians Annual Meeting, April 1985,

"Think Tanks, Anti-Statism, and American Public Policy," Evening Dialogue, Woodrow Wilson Center for International Scholars, December 17, 1984.

"Robert S. Brookings: The Man, His Vision and His Institution," American Historical Association Annual Meeting, 1983.

"American Businessmen, Class-Consciousness, and the State, 1941-1976," Organization of American Historians Annual Meeting, April, 1983.

"Fear of the Leviathan: Anti-Statist Thought in Corporate Political Consciousness," Pacific Historical Conference, August, 1982.

"Harold G. Moulton, Keynes, and the Public Interest," Missouri Valley Historical Conference,

March, 1982.

"Science, Morality, and Prostitution: Public Policy During World War II," Brown Conference, University of Alabama, December, 1981.

"Economic Public Policy Formulation: The Political Control of the Economy, 1932-Present," the Organization of American Historians Annual Meeting, Detroit, April, 1981

"Leo Pasvolsky, Bureaucracy, and the Founding of the United Nations," Society of American Historians of Foreign Relations Annual Meeting, Lawrence, Kansas, August, 1979.

## PROFESSIONAL ACTIVITIES

Founding President, Institute for Political History (501c educational foundation), 2004-

Editor, *Journal of Policy History*.

Organizer, Policy History Conference for St. Louis 2002-2020;  Conferences have been held in St. Louis, MO; Columbus, Ohio; Charlottesville, VA.; Nashville, TN; and Tempe, AZ. (This conference draws approximately 200-350 participants from History, Political Science, Sociology, and Law.

Member of Board of Directors, Truman Library Institute, 1991-1996.

Series Editor, "Critical Issues in European and American History," Rowman & Littlefield Press.

Reader for Cambridge University Press; Columbia University Press; Johns Hopkins University Press: Cornell University Press: Kansas University Press; Princeton University Press; Northern Illinois University Press; Temple University Press; Bedford-St. Martins Press;  Pennsylvania State University Press;  and Houghton-Mifflin, *Journal of American History* and *Review of Politics*.

Member of Planning Committee, National Public Policy Conference, Bowling Green State University, Bowling Green, Ohio, August, 1997.

Program Co-Director, Conference on Private Charity and Public Welfare, Saint Louis University, St. Louis, Missouri, June, 1996.

Program Co-Director, Conference on the Evolution of Federal Social Policy, University of Notre Dame, South Bend, Indiana, October, 1985.

Program Chairman, Conference on the History of the Small Town, North Central College, Naperville, Illinois, April 1981.

Member of Illinois Steering Committee, OAH Conference on the Promotion of History held at Wesleyan University, Bloomington, Illinois, April, 1980.

Faculty Advisor, Phi Alpha Theta, University of Dayton, Dayton, Ohio.

Faculty Advisor, Phi Alpha Theta, University of Notre Dame, Notre Dame, Indiana.


**DIRECTED DISSERTATIONS**


Mariann Scholte, "The Political Economy of Banking Reform: The Monetary and Banking Acts of 1980 and 1982," University of Notre Dame, Department of Economics (l988).

David Hay, "The Military-Intellectual Complex: The U.S. Army Air Forces and the Ascendancy of Quantitative Management Control, 1940-1946" University of Notre Dame, Department of History (1993).

Thomas F. Curran, "The Weapons of our Warfare are not Carnal: The  Ideological Origins of Pacifism in the Civil War Era," University of Notre Dame, Department of History (l993).

John Korasick, "Imaging Africa: The Collection of African Art in America and the Failure of Postcolonial Theory," Saint Louis University, Department of History, (2004).

Aharon Zorea, "RICO:  From Organized Crime to Terrorism," Saint Louis University, Department of History, (2004).

Stephen Randall, "Public Health, Epidemics, and Civil Liberties in Chicago, 1950-1920," (2009) ).

Matthew Sherman, "Protecting the President: From Abraham Lincoln through Theodore "Roosevelt," (2009)

Cindy Stachecki, "ERA Ratification in Illinois," (2008).

Amy Wallhermfechtel, Cecile B. DeMille and the Right-to-Work Campaign," (2015) .

**DISSERTATION**

"The Brookings Institution: The Early Years, 1916-1952: Expertise and Influence in a Democratic Society" (University of California 1978).

Professor Samuel Haber, Chairman
Professor Charles G. Sellers, Reader
Dr. Clark Kerr, Reader

**Ph.D. EXAMINATION FIELDS**

United States History
History of Science
Political Science

**TEACHING AND RESEARCH EXPERIENCE**

2013-2020 Professor of History, Arizona State University

1992-2012 Professor of History, Saint Louis University

1992-96 Chair, Department of History, Saint Louis University

1983-91    Assistant/Associate Professor (1987), Department of History,  Director of Graduate Studies  (1980-92) University of Notre Dame

1981-83    Assistant Professor, Department of History, Grants Office, Social Sciences, Research Institute University of Dayton

1978-81   Assistant Professor, Department of History, North Central College, Naperville, Illinois

1977     Acting Instructor, Environmental Studies, University of California, Berkeley

1976     Acting Instructor, Department of History, San Francisco State University

1975     Research Assistant, Institute of Industrial Relations, University of California

1974     Teaching Assistant, Department of History, University of California, Berkeley

*For additional biographical information see *Who's Who in America; Who's Who in the World*

**APPENDIX**

Selected Book Reviews:

*The American Religious Debate over Birth Control, 1907-1937* by Kathleen Tobin, *Journal of American History*. (June, 2003).

 *More Than They Promised: The Studebaker Story by Thomas E. Bonsall,*  (Stanford University Press, 1999), *Business History Review* (Summer, 2002).

 *Sexual Chemistry: A History of the Contraceptive Pill by Lara V. Marks,* (Yale University Press, 2001),  *American Historical Review*, (December 2002) .

*Coping with Sickness, Medicine, Law, and Human Rights--Historical Perspectives,* edited by John Woodward and Robert Jutte, (Association of European History of Medicine, 2001), *Isis,* (June, 2002).

*Bold Relief: Institutional Politics and the Origins of American Social Policy* by Edwin Amenta, *American Historical Review*, (February, 2001)..

"*Socializing Security: Progressive-Era Economists and the Origins of American Social Policy* by David A. Moss,"  *Business History Review* (Autumn, 1998).

"*Minneapolis Teamsters Strike of l934* by Philip Korth," *Journal of American History* (September 1996).

"*Losing Time* by Otis Graham," *Business History* (February l994).

"*The Transformation of American Politics* by David Ricci," *American Historical Review* (October l994).

"*The Politics of Immigrant Workers: Labor Activism and Migration in the World Economy since 1830*  by Camille Guerin-Gonzales and Carl Strikwerda," *Journal of American History* (September l994).

"*Red or Rackets? The Making of Radical and Conservative Unions on the Waterfront* by Howard Kimeldorf," *Labor History* (Fall, l994).

"*American Automobile Workers, 1900-1933* by Joyce Shaw Peterson," *Journal of American History* (November l988).

"*Auto Slavery: The Labor Process in the American Automobile Industry, 1897-1950* by David Gartman," *Journal of American History* (March, 1985).

11

"*Union Power and American Democracy: The UAW and the Democratic Party, 1935-72* by Dudley W. Buffa," *Journal of American History* (March, 1985).

"*Corporate Liberalism: The Origins of Modern American Political Theory, 1890-1920* by R. Jeffrey Lustig," *Public Historian* (Spring, 1985).

"*Model Research: The National Advisory Committee for Aeronautics Vol. I and II* by Alex Roland," *Science* (November 29, 1985).

"*Workingmen's Democracy: The Knights of Labor and American Policies* by Leon Fink," *The Journal of Economic History* (September, 1984).

"*Unrepentant Radical: An American Activist's Account of His Five Turbulent Decades* by Sidney Lens," *Labor History* (Summer, 1984).

"*The Business Response to Keynes* by Robert M. Collins," *The Public Historian* (Summer, 1983).

"*The Dynamics of Business--Government Relations, 1893-1921* by William H. Becker," *Journal of Economic History* (September, 1982).

"*Basic Rights: Subsistence, Affluence, and U.S. Foreign Policy* by Henry Shue," *Annals of the Academy of American Political and Social Science* (March, 1983).

"*The Office of Management and Budget and the Presidency, 1921-1979* by Larry Berman," *Business History Review* (Autumn, 1982).

"*Political Control of the Economy* by Edward Tufte," *Labor History* (Winter, 1982).

"*The Speculator: Bernard M. Baruch in Washington, 1917-1965* by Jordan M. Schwarz," *The Journal of Economic History* (December, 1981).

"*The American Establishment* by Leonard and Mark Silk," *Annals of the Academy of American Political and Social Science* (Fall, 1981).

"*Friend and Foe in the U.S. Senate* by Ross K. Baker," *Annals of American Political and Social Science* (November, 1980).

"*James M. Landis: Dean of Regulators* by Donald A. Ritchie," *American Historical Review* (October, 1981).

"*Henry Cabot Lodge and the Search for An American Foreign Policy* by William C. Widenor," *Annals of the Academy of American Political and Social Science* (June 1981).

"*Herbert Hoover, The Great War and its Aftermath, 1914-1923* by Lawrence E. Gelfand," *Business History* (Winter, 1980).

"*Edwin G. Nourse: Economist for the People* by Joseph G. Knapp," *American Historical Review* (December, 1980).

"*Mexican Workers in the United States: Historical and Political Perspective*, edited by George C. Kiser," *The Journal of Economic History* (December 9, 1979).