1   Roopali H. Desai (024295)
    D. Andrew Gaona (028414)
2   Kristen Yost (034052)
    **COPPERSMITH BROCKELMAN PLC**
3   2800 North Central Avenue, Suite 1900
    Phoenix, Arizona  85004
4   T:  (602) 381-5478
    rdesai@cblawyers.com
5   agaona@cblawyers.com
    kyost@cblawyers.com
6

7   Marty Harper (003416)
    **ASU LAW GROUP**
8   111 East Taylor Street, Suite 120
    MC8520
9   Phoenix, Arizona 85004
    T:  (602) 738-8007
10  Marty.Harper@asulawgroup.org

11  *Attorneys for Defendant Arizona Secretary of State*

12

13                **UNITED STATES DISTRICT COURT**

                    **DISTRICT OF ARIZONA**
14

15  Darlene Yazzie; Caroline Begay; Leslie      )   No. CV-20-08222-PCT-GMS
    Begay; Irene Roy; Donna Williams; and       )
16  Alfred McRoye,                              )   **DEFENDANT ARIZONA**
                                                )   **SECRETARY OF STATE'S**
17                          Plaintiffs,         )   **CONSOLIDATED MOTION TO**
                                                )   **DISMISS**
18  v.                                          )
                                                )   **-AND-**
19  Katie Hobbs, in her official capacity as    )
    Arizona Secretary of State,                 )   **RESPONSE TO PLAINTIFFS'**
20                                              )   **EMERGENCY MOTION FOR**
                                                )   **PRELIMINARY INJUNCTIVE AND**
21                          Defendant.          )   **DECLARATORY RELIEF**
    _____    )
22

23                       __INTRODUCTION__

24          Mere weeks before the November 3, 2020 General Election, Plaintiffs—six

25  members of the Navajo Nation[1]—seek the extraordinary remedy of a federal injunction

26  _____
    [1] The Navajo Nation is not a party to this lawsuit. In fact, the Navajo Nation has demanded
27  that Plaintiffs' supporters cease and desist from making any statements to suggest that the
    Navajo Nation is in any way involved in this action. *See* Apr. 28, 2020 letter from the
28  Navajo Nation to Four Directions, Inc., attached as **Exhibit A**.

    {00513989.3 }

to alter Arizona's Election Day ballot-return deadline, as applied to them and other similarly-situated Navajo individuals.  The relief sought is nearly identical to the relief sought in late 2019 in *Voto Latino Foundation v. Hobbs*, 2:19-cv-05685-DWL, which resulted in a settlement agreement affirming the Election Day ballot-return deadline and requiring extensive education and outreach to Arizona voters regarding the same. Plaintiffs' lawsuit undermines the work of that settlement, but in any event fails under Federal Rule of Civil Procedure 12(b) and, for largely the same reasons, Plaintiffs also do not make the required showing to warrant injunctive relief.[2]

As a threshold matter, Plaintiffs' complaint should be dismissed under Rules 12(b)(1), (b)(6), and (b)(7) of the Federal Rules of Civil Procedure.  Primarily, Plaintiffs do not have standing to sue in federal court.  Moreover, Plaintiffs' eleventh-hour request to alter the ballot-return deadline flouts the principles outlined in *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam).  Along the same lines, their last-minute request for relief is barred by the doctrine of laches.

More fundamentally, though, Plaintiffs fail to state a claim for relief on each of their constitutional and statutory causes of action.  Plaintiffs fail to muster competent support for their claim that the Election Day deadline results in a discriminatory burden on Navajo Nation voters in violation of Section 2 of the Voting Rights Act.  Nor do they set forth a legally significant relationship between the Election Day deadline and the social and historical conditions of Navajo Nation members as required to state a claim for relief. Plaintiffs' federal civil rights and state constitutional claims also fail to state a claim.  The Court should thus dismiss Plaintiffs' action under Rule 12 based on any of these grounds.

The Court should also deny Plaintiffs' motion for a preliminary injunction because Plaintiffs fail to show that they are entitled to preliminary injunctive relief.  *First*, Plaintiffs cannot establish a likelihood of success on any of their claims for the same reasons that their claims warrant dismissal outright.

---

[2] A certificate of consultation required by Local Rule 12.1(c) is attached as **Exhibit B**.

1      *Second*, Plaintiffs do not advance the kind of exogenous "irreparable injury" that

2      ordinarily merits injunctive relief.  They do not explain why it is not possible for them to

3      return their completed ballots in time to meet the existing deadline, given the expansive

4      timeframe that state law affords voters to vote by mail.  It is not the place of a federal

5      court to rearrange a State's election deadlines to avoid inflicting an injury that the plaintiff

6      could altogether avoid using any of the multiple ballot return options available to voters.

7      *Third*, all the equities tip sharply against Plaintiffs.  There is no guarantee that their

8      requested relief would ensure that more ballots from Navajo Nation members would be

9      counted.  Moreover, altering the ballot-return deadline so close to the election will

10     impose significant administrative burdens and is certain to sow confusion throughout

11     the electorate.

12     For these reasons, the Court should grant the Secretary's motion to dismiss and

13     deny Plaintiffs' motion for a preliminary injunction. [Doc. 9]

14                              **LEGAL STANDARD**

15     This Court may grant a motion to dismiss under Rule 12(b) where a complaint

16     does not demonstrate that the plaintiff is entitled to relief.  A lack of standing under Article

17     III of the Constitution requires dismissal for lack of subject matter jurisdiction under

18     Federal Rule of Civil Procedure 12(b)(1).  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067

19     (9th Cir. 2011).  Under Rule 12(b)(6), a claim must be dismissed if it fails to allege

20     "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

21     its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(7) permits dismissal

22     for the failure to join an indispensable party.  *In re Apple iPhone Antitrust Litig.,* 846 F.3d

23     313, 319 (9th Cir. 2017).

24     An injunction, on the other hand, "'is a matter of equitable discretion' and is 'an

25     extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

26     entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010)

27     (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 32, (2008)).  This sort of relief

28     is "never awarded as of right." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131 (9th Cir. 2011).  Rather, "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

A federal court should be particularly wary of harnessing its injunctive powers to enjoin a sovereign state's enforcement of its election deadlines on the eve of a general election.  The Supreme Court has reminded lower courts of this rule several times this very year.  *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.") (citing cases). Plaintiffs' request to alter Arizona's statutory Election-Day ballot-return deadline runs afoul of these recent rulings.

## ANALYSIS

**I.    Plaintiffs' Complaint Should Be Dismissed Under Rule 12(b).**

**A.    Plaintiffs lack standing because their alleged injuries are speculative, and are not caused by, and cannot be redressed by, the Secretary.**

At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing to sue in federal court under Article III of the Constitution.  *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).  A plaintiff seeking to establish standing must demonstrate, in turn, that (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180–81, (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Plaintiffs cannot satisfy any of these three prerequisites for federal court jurisdiction.

1

2

**1.      Plaintiffs merely speculate that their votes will not be counted under the election-day return deadline.**

3       Nowhere in their complaint do Plaintiffs explain why they are likely to suffer the

4  injury of their votes not being counted.  Instead, they catalogue a variety of circumstances

5  that they argue make it statistically more difficult for Navajo Nation members, in general,

6  to return their ballots by mail.  But absent specific allegations about why they *themselves*

7  will not be able to obtain and return a mail-in ballot by the election-day deadline, Plaintiffs

8  offer only hypothetical, generalized grievances—not the kind of concrete, particularized,

9  and imminent harms required to show injury-in-fact under Article III.

10       All that Plaintiffs tell us about themselves in their complaint and motion for a

11  preliminary injunction is that they are enrolled members of the Navajo Nation who live

12  on the reservation, and who are registered voters who "desire to participate in the electoral

13  and political processes of Arizona on an equal basis with non-Indian voters."  [Doc. 1

14  ¶¶ 2–7; *see also* Doc. 9 at 1].  Right away, these allegations (even taken to be true)[3] are

15  facially insufficient to establish any cognizable injury-in-fact.  Plaintiffs do not once

16  express their intent to vote in the 2020 General Election, let alone to do so by mail, nor

17  do they allege they have submitted a request to receive a ballot by mail.  Without knowing

18  these basic details, the Court is forced to guess whether Plaintiffs would even actually

19  vote, setting aside the separate, critical question of whether they will experience any

20  cognizable injuries from not having their votes counted due to the Election Day ballot-

21  return deadline.  This kind of speculation is decidedly not the kind of "concrete" and

22  "imminent" injury that can form the basis of a federal action—it amounts instead to

23  impermissible "'conjectural or hypothetical'" harm.  *Spokeo v. Robbins*, — U.S. at —,

24  136 S. Ct. 1530, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).  Indeed, the Supreme

25  Court has explained that even mere allegations of "'some day' intentions—without any

26  description of concrete plans, ...—do not support a finding of the 'actual or imminent'

27

28

[3] The Secretary has been unable to confirm, among other facts, that Alfred McRoye is a registered Arizona voter.

1    injury that our cases require." *Lujan*, 504 U.S. at 564.  Plaintiffs have offered far less

2    than even that here.

3         Plaintiffs attempt to paper over the glaring deficiencies in their complaint by

4    spending the bulk of their pleadings cataloguing various geographic, demographic, and

5    socio-economic characteristics of the Navajo Reservation that they imply make it

6    generally more difficult for Navajo Nation members to return their ballot by mail.  [*See,*

7    *e.g.*, Doc. 1 ¶ 68 (explaining that isolation on the reservation due to physical features such

8    as mountains, canyons, rivers and vast expenses of unoccupied land is compounded by

9    the lack of paved roads); *id.* ¶ 55 (contending that the poverty rate on the reservation is

10   38%, twice the poverty rate in the State of Arizona); *id.* ¶ 26 (alleging that there is only

11   one Post Office for every 707 square miles on the reservation); *id.* ¶ 63 (explaining that

12   Navajo members on the reservation often lack reliable transportation to travel the vast

13   distances to election offices and post offices); *id.* ¶¶ 71 (claiming that voting by mail

14   breaks down in Indian Country because of housing instability/homelessness and lack of

15   physical address where election materials may be mailed)]  They repeat many of these

16   contentions in their motion for a preliminary injunction.  [*See, e.g.*, Doc. 9 at 3, 11, 13]

17        To be sure, Plaintiffs never claim that *they* are isolated from Post Offices, lack

18   reliable transportation, or are homeless.  Nor do they contend that other unavoidable

19   circumstances or personal characteristics (like a disability, limited English proficiency,

20   poverty, or other limitations) will prevent them from returning a mail-in ballot well in

21   time to meet the current deadline.  Rather, they imply that the particular geographic,

22   socio-economic, and demographic features of the Arizona Navajo Reservation make it

23   more likely that the "typical" tribal member will have fewer days to complete and return

24   a ballot to arrive by the Election Day deadline, Doc. 9 at 2, implying that there is a greater

25   likelihood that Navajo voters' ballots in general will not be counted.  But Plaintiffs cannot

26   satisfy the injury-in-fact requirement simply by alleging that "there is a statistical

27   probability that some of [their] members are threatened with concrete injury." *Summers*

28   *v. Earth Island Institute*, 555 U.S. 488, 497 (2009).  Without any explanation of the

specific impediments to Plaintiffs' ability to timely obtain and return mail-in ballots by the deadline, their complaint collapses into a collection of generalized grievances about the difficulties of ensuring regular mail delivery and collection on the Navajo reservation. A generalized grievance, however, is an inappropriate injury on which to base a federal claim. *See Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).

In sum, it is unclear whether Plaintiffs will suffer any cognizable, redressable harms on November 3, 2020, regardless of which ballot-return deadline is in effect. Because Plaintiffs fail to present more than generalized circumstances, as legitimate as those circumstances may be, the Court would be forced to manufacture a theoretical plaintiff from whole cloth to rule in their favor. This exercise would require it to imagine contingency upon contingency—that the plaintiff will want to vote by mail, that they will register to receive their mail-in ballot in a timely fashion, but that they will not be able to complete and return their ballot in advance of Election Day due to circumstances outside their control, or that they lack access to a mailbox or adequate transportation to a Post Office to be able to return their ballots with a sufficient cushion to meet the deadline, or that the Postal Service will be so unreliable as to likely frustrate their best efforts to vote by mail. But such an injury resting "on a highly attenuated chain of possibilities" is unduly speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). What's more, this kind of conjectural dispute is exactly antithetical to Article III's "limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Plaintiffs have not demonstrated they will suffer a concrete and imminent injury; they have no standing.

>**2.** **Any injuries that plaintiffs may experience are a consequence of Postal Service operations in a pandemic, or other exogenous circumstances over which the Secretary has no control.**

Plaintiffs fail to satisfy the second element of standing—causation—because the face of their complaint attributes their injuries to factors outside the Secretary's control. The Supreme Court has been averse to embracing causation "theories that rest on

speculation about the decisions of independent actors."  *Clapper*, 568 U.S. at 414.
Plaintiffs thus cannot establish that their injuries are "fairly traceable" to the Secretary,
which is required to meet the "irreducible constitutional minimum" of standing to proceed
in this forum.  *Spokeo*, 136 S. Ct. at 1547.

Plaintiffs trace the difficulty of timely ballot return to various circumstances other
than those the Secretary has the power to change—the hardship of travelling on the
Navajo reservation, the Covid-19 pandemic, and recent policy changes to Post Office
operations to name a few examples.  *See, e.g.*, Complaint ¶¶ 33, 37, 39-40, 61-62; *see
also* Doc. 9 at 2, 11, 13. None of these issues is "fairly traceable" to the Secretary or her
duty to uphold the Election Day ballot-return deadline.

A simple hypothetical illustrates this point:  Suppose the Secretary were to change
the deadline to a postmark deadline.  This would have no impact on the ability of Navajo
Nation members to access a mailbox or Post Office, or on the ease or frequency with
which mail can be delivered and collected.  A voter on the Navajo reservation could face
the same risk that their ballot would not be counted because of Post Office delays in
collection schedules if they were to place their ballots in a mailbox, and the same
difficulties in traveling to a Post Office, were they able to travel.  And the Plaintiffs do
not explain how many of them would only be able to return their mail-in-ballots during a
window that will prevent them from complying with the current deadline, but allow them
to meet a postmark deadline.  Thus, the Plaintiffs' harms are not fairly traceable to the
Secretary's actions.

### 3. Plaintiffs' requested relief will not eliminate—and may even exacerbate—the hardship experienced in their voting efforts.

Plaintiffs' injuries are not redressable for two reasons.  For one, they have not
named indispensable defendants, so the relief they seek cannot be effectuated in any
meaningful way.  More problematic for them is that their requested relief will not
eliminate their claimed underlying hardship in their efforts to vote, which is the gravamen

1   of their complaint; indeed, a postmark deadline may very well result in fewer Navajo

2   votes being tallied.

3     As a preliminary matter, issuing an injunction against the Secretary, as Plaintiffs

4   request, is insufficient.  [*See* Doc. 1 at 26 (asking the Court to order the Secretary "to

5   count [vote-by-mail] ballots cast by Tribal Members living on the reservation"); Doc. 9,

6   at 1 (same)]  The County Recorder—not the Secretary—is the relevant government

7   official responsible for accepting and counting mail-in ballots.  A.R.S. §§ 16-548; 16-

8   550.  Plaintiffs' failure to name as defendants all county recorders, or at least the Apache,

9   Navajo, and Coconino County Recorders (because Plaintiffs only seek a change in the

10  law for some voters in some counties) renders their claims non-redressable. *Carroll v.*

11  *Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (holding that injury was not redressable

12  where plaintiffs failed to name the United States as a party despite knowing at the outset

13  of the litigation that the government's participation was required).  It also provides

14  grounds to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(7) for

15  failure to join indispensable parties.  *Schnabel v. Lui*, 302 F.3d 1023, 1029 (9th Cir. 2002).

16    Plaintiffs' requested relief suffers from more fundamental flaws.  Merely changing

17  the mail-in ballot deadline to a postmark deadline will not eliminate the risk that Navajo

18  ballots will not be accepted and counted in a timely manner.  For one, the Post Office

19  does not habitually postmark mail-in ballots.  [Declaration of Patty Hansen ("Hansen

20  Decl.") ¶ 4, attached as **Exhibit C**]  As pre-paid mail, mail-in ballots are not required to

21  be postmarked, and many of them are not.  [*Id.*]  Indeed, the Post Office often expressly

22  forgoes procedures such as postmarking in order to expedite ballot delivery.  [*Id.*]  Nor

23  do the Plaintiffs explain how many of them (or how many other Navajo Nation members)

24  will likely only be able to return their mail-in-ballots during a window that will prevent

25  them from meeting the current deadline, but allow them to satisfy a hypothetical postmark

26  deadline.  The risk that Navajo mail-in ballots will not arrive in time to be counted is

27  fundamentally a consequence of irregular Postal Service operations on the Navajo

28  reservation and the difficulties of managing a vote-by-mail program during a global

1   pandemic.  Accordingly, shifting the ballot deadline to give Plaintiffs additional days to

2   return their ballots will not remedy the underlying circumstances that will affect mail-in

3   voters on the Navajo reservation no matter what the deadline is.   Thus, Plaintiffs'

4   proposed remedy will not result in a "'substantial likelihood' that the requested relief will

5   remedy the alleged injury." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,

6   529 U.S. 765, 771 (2000).

7          Worse still, the Plaintiffs' requested remedy may very well *reduce* the number of

8   Navajo ballots that will be counted.  Individuals who might otherwise have made efforts

9   to mail back their ballots well in advance of Election Day might be swayed by a postmark

10  deadline into delaying the planned return of their ballots.  Any interruptions or delays in

11  mail collection in the few days before November 3, 2020 could thus affect a larger share

12  of Navajo ballots than would otherwise have returned their ballots in time.

13         Moreover, Plaintiffs do not explain how their proposed deadline would interact

14  with the statutory signature cure period.  *See* Ariz. Rev. Stat. § 16-550(A).  Under this

15  procedure, county recorders verify voters' signatures, which may change over time due

16  to age or illness.  [Hansen Decl.  ¶ 6]  Where a signature discrepancy is identified, county

17  recorders contact voters and, for a general election, provide them with a five-day period

18  in which to correct or confirm their signature.  [*Id.*]  Were a postmark deadline to be

19  enforced, ballots that would have otherwise been allowed a five-day cure period may be

20  rejected out of hand.

21         Finally, there is no established procedure for how ballots received after Election

22  Day should be processed.  Currently, counties employ Early Boards to process mail-in

23  ballots, but those boards are typically discharged two days before the election.  [*Id.* ¶ 7]

24  Plaintiffs do not ask that early board service be extended past Election Day, but even if

25  they did, it is not clear that remedy is feasible, where it would consume resources that

26  would otherwise be devoted to canvassing duties.  [*Id.* ¶¶ 7, 9]

27         For these reasons, any injuries that Plaintiffs may suffer under the current Election

28  Day ballot-return deadline would not be redressed by an injunction against the Secretary

1    or the imposition of a postmark deadline.  Because Plaintiffs fail to bring suit against the

2    proper officials and request a remedy that would likely exacerbate—not ameliorate—their

3    injuries, they cannot establish the third element of Article III standing.

4              **B.     The *Purcell doctrine* warrants dismissal.**

5              In *Purcell v. Gonzalez*, the Supreme Court affirmed the cardinal rule that lower

6    federal courts should not alter election rules on the eve of an election.  549 U. S. 1, 5

7    (2006).    As justification, the Court explained that lower "[c]ourt orders affecting

8    elections, … can themselves result in voter confusion and consequent incentive to remain

9    away from the polls."  *Purcell*, 549 U.S. at 4–5.  The Court observed the reality that such

10   a risk of voter confusion will only increase "[a]s an election draws closer."  *Id.*

11             The Supreme Court has repeatedly reaffirmed the *Purcell* doctrine, including

12   multiple times this year, particularly by way of staying lower-court injunctions.  *See, e.g.*,

13   *Little*, No. 20A18, 2020 WL 4360897, at *2; *Raysor v. DeSantis*, No. 19A1071, 2020 WL

14   4006868, at *4 (U.S. July 16, 2020); *Republican National Committee*, 140 S. Ct. at 1207;

15   *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 574 U. S. __ (2014).  These cases

16   make clear that Plaintiffs' requested injunction, issued mere weeks before an impending

17   General Election, would flout binding Supreme Court law.

18             In *Republican National Committee v. Democratic National Committee*, for

19   example, the Court granted a stay of a district court injunction changing absentee ballot

20   deadlines to "allow[] ballots to be mailed … after Election Day."  140 S. Ct.  1207.  The

21   Court noted that by extending the absentee-ballot deadline and consequently prolonging

22   the public release of election results, the injunction changed the election rules "close to

23   the election date" and "in essence enjoined nonparties to this lawsuit."  *Id.*  By doing so,

24   the Court concluded, the district court "contravened [the Supreme Court's] precedents ...

25   repeatedly emphasiz[ing] that lower federal courts should ordinarily not alter the election

26   rules on the eve of an election."  *Id.*; *see also Little v. Reclaim Idaho*, No. 20A18, 2020

27   WL 4360897, at *2 (U.S. July 30, 2020) (Roberts, C.J., concurring in the grant of a stay)

28

1    (a district court's injunction was "all the more extraordinary" for having "disable[d] [a

2    state] from vindicating its sovereign interest" in the enforcement of election laws).

3           Plaintiffs ask for relief that would have near-identical consequences to the orders

4    that the Supreme Court recently invalidated; an injunction in this case would extend

5    ballot-return deadlines "close to the election date" and possibly require nonparties to this

6    suit to take action.  It would also prevent the State from enforcing its statutory ballot-

7    return deadline and will require election officials to scramble to adopt new signature-

8    verification procedures.

9           In sum, Plaintiffs' requested injunction is all but expressly foreclosed by *Purcell*.

10   Dismissal under Rule 12(b)(6) is thus appropriate.  *See, Godecke v. Kinetic Concepts,*

11   *Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (dismissal under Rule 12(b)(6) is appropriate

12   where plaintiffs fail to plead a viable cause of action); *UMG Recordings, Inc. v. Shelter*

13   *Capital Mgmt. Partners*, 718 F.3d 1006, 1014 (9th Cir. 2013) ( "[d]ismissal can be based

14   on the lack of a cognizable legal theory") (quoting *Balistreri v. Pacifica Police Dep't*,

15   901 F.2d 696, 699 (9th Cir. 1988)).

16          **C.      Plaintiffs' claims are barred by the doctrine of laches.**

17          A federal court may dismiss a complaint based on laches where a plaintiff has

18   unreasonably delayed in bringing suit, and where continuing with the action would

19   prejudice a defendant.  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838

20   (9th Cir. 2002); *see also Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013)

21   (explaining that a court may properly consider the assertion of an affirmative defense on

22   a motion to dismiss where the "allegations in the complaint suffice to establish"

23   entitlement to the defense).

24          Both elements of laches are satisfied here.  To evaluate whether Plaintiffs have

25   unreasonably delayed in bringing suit, the Court must look to "the length of delay, which

26   is measured from the time the plaintiff knew or should have known about its potential

27   cause of action," and assess the reasonableness of the period of inaction.  *Jarrow*, 304

28   F.3d at 838 (citing *Portland Audubon Soc'y v. Lujan*, 884 F.2d 1233, 1241 (9th Cir.

1989)).  The current Election-Day ballot-return deadline has been the existing, governing law in Arizona for 23 years and, in fact, was challenged in the *Voto Latino* case filed in November 2019 and settled in June 2020.  The geographic, demographic, and socio-economic conditions of the Navajo reservation have not changed recently.  And Plaintiffs have known about the Covid-19 pandemic and its potential effects on election administration for months.  Yet they filed their complaint and moved for injunctive relief weeks before the General Election.  The unreasonable delay from this conduct is self-evident.

The Secretary will undoubtedly be prejudiced if this suit were to continue.  The Secretary is currently preparing for the rapidly-approaching General Election, and is immersed in the work of coordinating statewide election preparations in the midst of a global pandemic.  This litigation will distract from her efforts to conduct an orderly election, and may frustrate her efforts if the mail-in ballot-return deadline is changed to a postmark deadline.  This is not to say that the Secretary has not devoted time or attention to assist Navajo voters.  In fact, the Secretary of State's Office has engaged in targeted outreach to assist Native voters.  [Declaration of Sambo Dul ("Dul Decl.") ¶ 6, attached as **Exhibit D**]  Specifically, the Office has published and will be distributing an AZVoteSafe Guide for Native American Voters, which highlights the Election Day receipt deadline and encourages voters to drop-off their ballots at any voting location in their county if they still have it on Election Day. [*Id.*]  The Secretary of State's office also secured $1.5 million in funding to increase access to early voting and ballot drop-off options in tribal and rural communities.  [*Id.* ¶ 10]  Those funds have been used to, among other things, purchase close over 80 secure ballot drop boxes, 38 of which will be installed in Coconino, Navajo, and Apache Counties, and rent mobile voter outreach and early voting trailers/vehicles for use in tribal and rural communities, at the request of County Recorders.  [*Id.*]  Litigating this case will only burden the Secretary and take away from the considerable time and energy she has already expended to accommodate Plaintiffs.

1   **II.      Plaintiffs fail to state any plausible claims.**

2            **A.      Plaintiffs have failed to state a claim under Section 2 of the VRA.**

3            The "results test"[4] of Section 2 of the Voting Rights Act involves a two-step

4   process. *Democratic Nat'l Comm. v. Hobbs (DNC)*, 948 F.3d 989, 1012 (9th Cir. 2020)

5   (en banc).  The first step asks whether, as a result of a challenged practice, a protected

6   group lacks "equal opportunity to participate in the political processes and to elect

7   candidates of their choice." *Id.* (cleaned up).  "[T]he mere existence—or bare statistical

8   showing—of a disparate impact on a racial minority, in and of itself, is not sufficient."

9   *DNC*, 948 F.3d at 1012 (cleaned up).  Rather, step one requires "proof of a causal

10  connection between the challenged voting practice and a prohibited discriminatory

11  result." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc) (citation

12  omitted).

13           Plaintiffs allege that the "requirement that VBM ballots are to be received—rather

14  than postmarked—on or before Election Day, leads to the disenfranchisement of Navajo

15  Nation Tribal Members living On-Reservation when their overdue ballots are rejected,"

16  [Doc. 1 ¶ 42], but they fail to allege any facts in support of that conclusion. *Dean v. Allred*,

17  No. CV 13-1202-PHX-GMS, 2014 WL 231992, at *1 (D. Ariz. Jan. 22, 2014) ("The

18  principle that a court accepts as true all of the allegations in a complaint does not apply

19  to legal conclusions or conclusory factual allegations."). While the complaint generally

20  alleges that mail service is slower on the reservation [Doc. 1 ¶¶ 21-31, 36, 40-41],

21  Plaintiffs do not allege that tribal voters' ballots have been rejected for arriving past the

22  Election Day deadline at a higher rate than any other class of voters.[5] In fact, they do not

23  allege that in *any* prior election—including the recent 2020 Presidential Preference and

24  _____

25  [4] Plaintiffs do not allege that the Election Day deadline violates Section 2 under the "intent test," nor could they.

26  [5]  The Ninth Circuit has declined to conclusively decide whether a facially-neutral policy

27  must affect more than a certain number of voters to violate step one of the results test, but
    has assumed that "more than a de minimis number of minority voters" must be affected.

28  *See DNC*, 948 F.3d at 1015.

1  Primary Elections—even a *single* mail ballot cast by an on-reservation Navajo Nation

2  voter was rejected because it arrived past the deadline. Without these factual allegations,

3  Plaintiffs fail to state a claim that the Election Day deadline denies Navajo Nation voters

4  an equal opportunity to vote. Plaintiffs' VRA claim should be dismissed.

5       **B.    Plaintiffs fail to state an Equal Protection claim.**

6       Where, as here, a challenged election law is facially neutral, plaintiffs must prove

7  that a "racially discriminatory intent or purpose" was a "substantial or motivating factor"

8  behind the law. *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985). If plaintiffs do so,

9  then "the burden shifts to the law's defenders to demonstrate that the law would have

10  been enacted without this factor." *Id.* at 228; *Arlington Heights v. Metro. Hous. Dev.*

11  *Corp.*, 429 U.S. 252, 264–65 (1977).

12       "Proof of racially discriminatory intent or purpose is required to show a violation

13  of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. The requisite

14  racially invidious intent may only be inferred from disproportionate impact and

15  disproportionate impact alone in the "rare" case where the pattern of disproportionate

16  impact is "stark," "clear," and "unexplainable on grounds other than race." *Id.* at 266.

17       Plaintiffs' undeveloped and conclusory allegations fall far short of meeting this

18  standard. Again, Plaintiffs have not alleged any facts to show that the Election Day

19  deadline results in a legally-significant discriminatory impact on Navajo Nation voters.

20  Plaintiffs' speculative and conclusory allegation that the deadline "will have a significant

21  disparate impact on Tribal members' voting power," [Doc. 1 ¶ 45], is not sufficient. And

22  their failure to sufficiently plead a discriminatory impact by definition means that they

23  have also failed to allege that this is the "rare" case where this Court may infer the

24  required racially invidious intent from impact alone because the pattern of

25  disproportionate impact is *so* stark, clear, and "unexplainable on grounds other than race."

26  *Arlington Heights*, 429 U.S. at 266.

27       Plaintiffs' conclusory allegation [Doc. 1 ¶ 114] that the State has "no legitimate,

28  non-racial reason" for imposing the deadline need not be accepted as true, and is not

1   sufficient to save the Complaint. Plaintiffs' generalized history of discrimination against

2   Native Americans [¶¶ 57-97] likewise does not suffice; instead, Plaintiffs must show that

3   *this* law was enacted with a racially discriminatory purpose or intent. *See, e.g.*, *Hunter*,

4   471 U.S. at 230–33 (examining the legislative history of particular disenfranchisement

5   provision to conclude that the intent, at least in part, was to disenfranchise Black

6   residents); *Arlington Heights*, 429 U.S. at 268 (explaining that the legislative or

7   administrative history of the particular challenged law or decision "may be highly

8   relevant," especially contemporary statements by members, minutes, or reports).[6]

9          **C.    Plaintiffs fail to state a claim under the Arizona Constitution.**

10         Plaintiffs allege that the Defendants "deprive Tribal Members equal elections by

11  arbitrarily refusing to count VBM ballots from Tribal Members postmarked on or before

12  Election Day." [Doc. 1 ¶ 118] But they allege no facts to support that vague conclusion.

13  *Iqbal*, 556 U.S. at 678 ("Threadbare recitals" of a claim, "supported by mere conclusory

14  statements, do not suffice.").

15         Plaintiffs do not allege any facts to suggest that the Election Day deadline is

16  selectively enforced or that it has a discriminatory purpose. As detailed above, Plaintiffs'

17  state constitutional claim fails for the same reasons as their federal constitutional claim.

18  *Pub. Integrity All. Inc. v. City of Tucson*, No. CV 15-138-TUC-CKJ, 2015 WL 10791892,

19  at *7 (D. Ariz. May 20, 2015) ("The Court declines to find that the Free and Equal

20  Elections Clause of the Arizona Constitution affords any greater protections than either

21  the Due Process Clause of the U.S. Constitution or the Privileges and Immunities Clause

22  of the Arizona Constitution.").

23                              *        *        *

24  _____

25  [6] Race-based Equal Protection Clause voting rights challenges are evaluated under the
    *Arlington Heights* standard, but even if this claim were evaluated under the *Anderson-*
26  *Burdick* framework, the State's significant interests in promoting voter confidence,
    orderly election administration, and "protecting the integrity, fairness, and efficiency of
27  [] ballots and election processes" would justify any incidental burden caused by the
    neutral, non-discriminatory Election Day deadline. *E.g.*, *Timmons v. Twin Cities Area*
28  *New Party*, 520 U.S. 351, 364 (1997).

1    For the foregoing reasons, the Secretary respectfully requests that the Court grant

2 her motion to dismiss Plaintiffs' complaint under Rule 12(b) of the Federal Rules of Civil

3 Procedure for lack of jurisdiction, failure to state viable claims for relief, and failure to

4 join an indispensable party.  Doing so will obviate the need to consider Plaintiffs' motion

5 for preliminary injunctive relief, which, for the reasons below, is not warranted in any

6 event.

7 **III.    Plaintiffs Are Not Entitled To A Preliminary Injunction**

8    **A.    Plaintiffs are not likely to succeed on any of their claims.**

9    In order to prevail on the merits-success prong at the preliminary-injunction

10 stage, Plaintiffs' "burdens ... track the burdens at trial."  *Gonzales* v. *O Centro Espirita*

11 *Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).  Plaintiffs cannot carry their

12 burden at this stage for the same reasons that they could never do so at a trial.  As

13 discussed above, Plaintiffs lack standing and have failed to state a claim. And even if

14 Plaintiffs' Complaint could survive dismissal, Plaintiffs' Motion for Preliminary

15 Injunction fails to establish a likelihood of success on the merits.

16    **1.    Plaintiffs are unlikely to prevail under Section 2 of the VRA.**

17    As detailed above, the first step of the "results test" asks whether the challenged

18 practice causes a discriminatory result. *Gonzalez*, 677 F.3d at 405. It is not enough to

19 make a "bare statistical showing." *DNC*, 948 F.3d at 1012.

20    If a plaintiff establishes the first step, they also must show that under the "totality

21 of the circumstances," there is a "legally significant relationship" between the challenged

22 practice and social and historical conditions, and that this relationship "causes an

23 inequality in the opportunities" of a protected group to participate in the political process.

24 *DNC*, 948 F.3d at 1012 (citing *Gingles*, 478 U.S. at 43, 47).  Put differently, step two asks

25 how the challenged policy interacts with social and historical circumstances to cause the

26 disparate burden identified in step one.  *Id.*

27    The step two assessment requires "a searching practical evaluation of the past and

28 present reality."  *Id.* at 1013 (citation omitted).  It involves considering a number of

factors, most commonly the list of nine factors known as the "Senate factors"—although the Senate list "is neither comprehensive nor exclusive." *Id.*  Plaintiffs argue that the relevant Senate factors here are the first, fifth, and eighth Senate factors:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

*Id.* (citing S. Rep. No. 97-417 at 28–29 (1982)); [*see* Doc. 9 at 9–13].  "Thus, the second step asks not just whether social and historical conditions 'result in' a disparate impact, but whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions."  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 638 (6th Cir. 2016) (emphasis added).

Plaintiffs have failed to show a likelihood of success on step one or step two.

> **a.    Plaintiffs have not shown that the Election Day Deadline causes a disparate burden on Navajo Nation voters.**

Plaintiffs' undeveloped step one argument falls short of making the requisite showing that the Election Day deadline causes a disparate burden on Navajo Nation members living on-reservation.  Indeed, Plaintiffs inexplicably skip directly to step two of the results test.  [*See* Doc. 9 at 9–15]  The Court should deny their motion for this reason alone.  *See, e.g.*, *Madison v. First Magnus Fin. Corp.*, No. CV-08-1562-PHX-GMS, 2009 WL 2783098, at *1 (D. Ariz. Aug. 31, 2009) ("If an argument is not properly argued and explained, the argument is waived.").

But even construing the Motion as generously as possible, at *best* their step one argument rests on a series of geographic and socioeconomic statistics about Navajo Nation members living on the reservation, combined with an irrelevant anecdotal "study"

of mail times. [*See id.* at 13–14] Courts require much more than this. In *DNC*, for example, the plaintiffs submitted expert evidence demonstrating that Native American, Latino, and Black voters were twice as likely as white voters to have their votes thrown out entirely under Arizona's policy of discarding out-of-precinct votes. 948 F.3d at 1014. Likewise, in *Veasey v. Abbott*, one plaintiffs' expert reported that Latino and Black voters were respectively 195% and 305% more likely than white voters to lack voter ID that complied with a Texas law, and another plaintiffs' expert similarly showed that Black and Latino voters were respectively 1.78 times and 2.24 times more likely to lack sufficient ID than their white peers. 830 F.3d 216, 250–51 (5th Cir. 2016). And in *League of Women Voters of N. Carolina v. North Carolina*, the plaintiffs showed that Black voters had used the since-eliminated same-day registration option at nearly twice the rate of white voters during recent elections. *See* 769 F.3d 224, 245 (4th Cir. 2014) (citing *N. Carolina State Conference of NAACP v. McCrory*, 997 F.Supp.2d 322, 349 & n.28 (M.D.N.C. 2014)). Each of these cases involved extensive evidence that examined the impact of challenged practices on thousands of voters and demonstrated stark racial disparities—directly tied to the challenged practices at issue—in protected groups' ability to vote.

No such evidence exists here. Plaintiffs' experts state that Plaintiffs' attorney asked them to research whether "requiring mail-in ballots to be returned—rather than postmarked—on or by Election Day lead[s] to the disenfranchisement of Tribal Member voters when their overdue ballots are rejected." [Doc. 9-3 at 5] Yet the report is conspicuously absent of an answer to this question[7] [*see id.* at 5, 26–29], and it provides no evidence that any tribal voters have been impacted by the Election Day deadline.

---

[7] Plaintiffs' motion falsely claims that the report *did* conclude that "requiring mail-in ballots to be returned—rather than postmarked—on or by 7:00 pm on Election Day leads to disenfranchisement of Tribal Member voters when their overdue ballots are rejected." [Doc. 9 at 14] No surprise, then, that the Motion provides no citation to the report for this alleged "conclusion," unlike the surrounding sentences.

1    Courts have found much more evidence insufficient to establish step one. In

2    *Gonzalez*, for example, the plaintiffs' expert had presented evidence that in the first

3    general election after the challenged voter ID law went into effect, Latino voters

4    comprised between 2.6% and 4.2% of voters, but represented 10.3% of the ballots that

5    went uncounted because of inadequate identification.  677 F.3d at 442–43 (Pregerson, J.,

6    dissenting).  But the Ninth Circuit found that the plaintiffs still had not shown the requisite

7    "causal connection between the challenged voting practice and a prohibited

8    discriminatory result."  *Id.* at 405 (citation omitted).  This was in part because no expert

9    "testified to a causal connection between [the challenged voter ID requirement] and the

10   observed difference in voting rates of Latinos," nor did the plaintiffs produce evidence

11   supporting their allegation that Latinos "are less likely to possess the forms of

12   identification required."   *Id.* at 406–07; *see also Ohio Democratic Party v. Husted*, 834

13   F.3d at 639–40 (finding that evidence of disparate effect did not outweigh contrary

14   evidence of the political process being equally open to African Americans, such as

15   statistically indistinguishable registration rates and similar turnout rates between African

16   Americans and whites); *Ortiz v. City of Philadelphia Office of City Comm'r Voter*

17   *Registration Div.*, 28 F.3d 306, 308–14 & n.2 (3d Cir. 1994) (that Pennsylvania's "voter

18   purge" law did not disproportionately burden Black and Latino voters, despite expert

19   evidence showing that Black and Latino voters were both slated for purging and actually

20   purged at higher rates than white voters).

21   Plaintiffs' lack of evidence of any discriminatory impact is fatal to their claim.

22   And even if Plaintiffs could show a disparate impact based on slower mail service, they

23   still fail to show a likelihood of success that the disparity in mail times results in a

24   disparate *burden*, and not a mere disparate *effect*.  *See DNC*, 948 F.3d at 1012; *Gonzalez*,

25   677 F.3d at 383.  Even accepting as true Plaintiffs' assertion that Navajo Nation members

26   who reside on-reservation and are mailed a ballot on the first day of the early voting

27   period have as few as 15 days in which to consider and cast that ballot, versus the up to

28   25 days white voters in Scottsdale have to do the same, *see* Mot. at 13–14, Plaintiffs have

not shown why this constitutes a disparate *burden*.  After all, voters who vote early in person or vote on Election Day have at most a number of hours in which to consider and cast their ballot—far less time than the (low-end) estimate of 15 days for tribal member voters who vote by mail *and* plan to return their ballot via mail.  Further, Arizona law requires that both a Citizens Clean Elections Commission (CCEC) voter education guide and a Secretary of State voter education pamphlet be *delivered* to every registered voter prior to the start of early voting on October 7.  [*See* Dul Decl. ¶ 3; Declaration of Thomas Collins ("Collins Decl.") ¶ 8, attached as **Exhibit E**]  Thus, even if a voter lacks internet service or other resources to research the candidates and races on the ballot, they may still begin to consider their votes even in advance of receiving their mail ballot because of the CCEC guide and the Secretary's pamphlet.  [*See id*.]

Further, returning a ballot by mail is just one of five ways that voters may return their ballots.  If a voter lacks sufficient time to mail their ballot back, they can also drop it off at a drop-box, drop it off at any early voting site, drop it off at the county recorder's office, or drop it off at any polling place in their county on Election Day.  [*See* Dul Decl. ¶ 14; EPM Ch.2 §§ H, I]  Moreover, Apache, Coconino, and Navajo Counties have multiple in-person Election Day and in-person early voting locations; thus, Navajo Nation voters registered in those counties have considerably more options for returning their mail ballots than, say, a white voter residing in similarly-rural Graham County,[8] whose lone in-person early voting location is at the Graham County Recorder's office.  [*See* Dul Decl. ¶ 14]  Because Plaintiffs have not demonstrated why having at worst 15 days (rather than, at best, 25 days) to consider and cast their mail ballot constitutes a disparate *burden* and not a mere disparate *effect*, *see DNC*, 948 F.3d at 1012, Plaintiffs cannot show a likelihood of success on their VRA claim.

---

[8] According to Census data, Graham County is 81.7% white. U.S. Census Bureau, *QuickFacts: Graham County, Arizona* (2019), https://www.census.gov/quickfacts/fact/table/grahamcountyarizona/RHI125219#RHI125219.

1

2

     **b.**  **Plaintiffs cannot succeed at step two of their Section 2 claim.**

3

4

   Plaintiffs' failure to plead sufficient facts to satisfy step one dooms their Section 2 claim. *See, e.g.*, *Husted*, 834 F.3d at 640 ("Plaintiffs have failed to meet the first step in establishing a vote denial or abridgement claim. . . . Consequently, the second step inquiry regarding the causal interaction of [the challenged law] with social and historical conditions that have produced discrimination is immaterial."). Nonetheless, the Secretary will briefly address why Plaintiffs fall short of establishing step two.

5

6

7

8

9

   As applied here, step two requires Plaintiffs to show two things. First, Plaintiffs must show that under the totality of the circumstances, there is a legally significant relationship between the Election Day deadline on one hand, and, on the other hand, social and historical conditions of Navajo Nation members. *See DNC*, 948 F.3d at 1012. If there is such a legally significant relationship, step two further requires demonstrating that this relationship "causes an inequality in the opportunities" of on-reservation Navajo Nation members to participate in the political process. *See id.* Put differently, "the second step asks not just whether social and historical conditions 'result in' a disparate impact," but whether the Election Day deadline "causes the discriminatory impact as *it* interacts with social and historical conditions." *Husted*, 834 F.3d at 638.

10

11

12

13

14

15

16

17

18

19

   The Secretary does not discount Arizona's history of discrimination against members of the Navajo Nation. The Secretary also does not dispute that members of the Navajo Nation living on-reservation bear the effects of discrimination in areas like education, employment, and health. But the Secretary's awareness of these racial disparities has led her to actively work to combat them, and thus the Secretary objects to Plaintiffs' unsupported assertion that, under the eighth Senate factor, "there is a significant lack of responsiveness on the part of [the Secretary] to the particularized needs of the members of the [Navajo Nation]." *See DNC*, 948 F.3d at 1013; Mot. at 13. To the contrary, since the Secretary took office in January 2019, she has diligently and creatively worked to ensure that Native American voters are able to vote without undue barriers.

20

21

22

23

24

25

26

27

28

The current Secretary ran for office in 2018 on a platform designed to combat Arizona's long history of disenfranchising minority voters. *See* Hobbs Brief in Opp. to Cert. at 5, *Brnovich v. DNC*, No. 19-1257. Thus, since the Secretary took office in January 2019, she has worked diligently to ensure that all Arizonans have adequate opportunity to exercise their right to vote, and especially Arizona voters who have historically encountered unique burdens in exercising the franchise. For example, the Secretary actively campaigned on her opposition to H.B. 2023, the law criminalizing ballot collection efforts, in large part because she recognized how it disproportionately harmed voters of color, including Native American voters. *See id.* Likewise, in part because of the evidence demonstrating that Arizona's out-of-precinct policy disproportionately burdened voters of color—including Native American voters—the Secretary opposed the Arizona Attorney General's decision to appeal the en banc decision in *DNC v. Hobbs*. *See id.*; Press Release, Ariz. Sec'y of State, *Hobbs Opposes AG's Appeal of DNC v. Hobbs* (Jan. 29, 2020). And when the Navajo Nation sued to challenge Arizona's missing-signature policy as imposing a disproportionate burden on Navajo Nation voters, the Secretary reached a settlement with the Plaintiffs and agreed to propose language in the EPM that would allow curing of unsigned ballots to alleviate this burden. *See Navajo Nation v. Hobbs*, 3:18-cv-08329-DWL (D. Ariz.) (Doc. 44-2).

The Secretary has also undertaken a statewide voter outreach and education campaign, with special efforts targeted toward Navajo Nation voters (including radio ads in Navajo). [Dul Decl. at 9] She also secured $1.5 million in funding to increase access to early voting and ballot drop-off options in tribal and rural communities. [*Id.*] Further, she has developed relationships with key Navajo Nation stakeholders to work cooperatively with them to address barriers their voters may face. [*Id.* ¶¶ 11-12] The Secretary also created an AZVoteSafe Guide for Native American Voters to help those voters safely vote during the Covid-19 pandemic. [*Id.* ¶ 6] And perhaps most significantly, in order to mitigate any rural mail disparities and help ensure that as many mail ballots are received by the Election Day deadline as possible, the Secretary has been

1    actively coordinating with the USPS and the County Recorders of Coconino, Navajo, and

2    Apache Counties to develop and implement a plan for USPS to hold ballots at designated

3    USPS facilities in Coconino, Navajo, and Apache Counties for regular pick-up by

4    authorized County Recorder staff beginning at least seven days before the General

5    Election.  [*Id.* ¶ 12]  Given the Secretary's diligent efforts, Plaintiffs cannot plausibly

6    argue that "there is a significant lack of responsiveness" to the "particularized needs" of

7    Navajo Nation members by the Secretary—and indeed, their only support for this

8    allegation is that the Secretary has publicly stated her intent to enforce the statutorily-

9    required Election Day deadline.  [*See* Doc. 9 at 13]

10        Finally, although the Secretary agrees that Navajo Nation members have

11   historically been subjected to voting-related discrimination and that they bear the effects

12   of discrimination in many areas, courts have consistently held that these factors alone are

13   insufficient to demonstrate a violation of Section 2.  In *Gonzalez*, for example, the en

14   banc court affirmed the district court's finding that while "Latinos had suffered a history

15   of discrimination in Arizona that hindered their ability to participate in the political

16   process fully [and] that there were socioeconomic disparities between Latinos and whites

17   in Arizona," the plaintiffs had not adequately connected those factors to the challenged

18   law nor explained the causal connection Section 2 requires.  677 F.3d at 406.  Similarly,

19   in a case involving a Section 2 challenge to Virginia's voter ID law, the court observed

20   that "there is no serious dispute in this case that the Commonwealth of Virginia, like many

21   states, has a regrettable history of discriminatory policies and practices designed to

22   suppress voting within the black community."  *Lee v. Virginia State Bd. of Elections*, 188

23   F.Supp.3d 577, 603 (E.D. Va.), *aff'd*, 843 F.3d 592 (4th Cir. 2016).  But because there

24   was a "progressive pattern of . . . remediation," the plaintiffs could not successfully

25   demonstrate a Section 2 violation.  *Id.* at 603–04. Here, because Plaintiffs have not tied

26   the challenged law to any historical discrimination Navajo Nation members have

27   experienced, they cannot succeed on a Section 2 claim.

28

**2.      Plaintiffs are not likely to succeed on their claims under the Equal Protection Clause of the federal Constitution or the Free and Equal Elections Clause of the Arizona Constitution.**

For the same reasons that Plaintiffs' Complaint fails to state a claim, Plaintiffs' vague, unsupported arguments in their Motion [at 13, 16] are not sufficient to demonstrate a likelihood of success on these claims.

In sum, the Court should deny Plaintiffs' motion for a preliminary injunction, as a failure to satisfy even one of the necessary elements is fatal to the overall claim for equitable relief. *Cottrell*, 632 F.3d at 1135 (explaining that *Winter* requires a plaintiff to make a showing on all four prongs of the test for a preliminary injunction).

**B.      Plaintiffs have not established the kind of irreparable harm that merits the solemn power of a federal injunction.**

Plaintiffs must also establish that irreparable harm is likely, not merely possible. See *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. 21–22). This they cannot do, where they have not shown why any of their injuries are particularly likely to occur, or why Plaintiffs could not avoid harm simply by availing themselves of basic self-help measures. After all, "[s]elf-inflicted wounds are not irreparable injuries." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).

As discussed above, Plaintiffs point to a host of factors that they claim generally make it more difficult for Navajo Nation members residing on the reservation to cast mail-in ballots. *See, e.g.*, Complaint ¶¶ 26, 55, 63 68, 71; Doc. 9 at 12. Plaintiffs, however, never claim that *they* are isolated from Post Offices, lack reliable transportation, or are homeless. Nor do they contend that any other circumstances or personal characteristics will prevent them from returning a mail-in ballot well in time to meet the current deadline. In sum, Plaintiffs decidedly never allege that they will be unable (or likely unable) to obtain and return a mail-in ballot in time to arrive at a county recorder's office by 7:00 p.m. on Election Day with sufficient cushion to accommodate mail-travel delays. By their own contentions, the risk that they will suffer irreparable injury thus appears to be non-existent.

Further, it appears that Plaintiffs possess the very tools required to avoid the possibility that their votes will not be counted.  Specifically, they give no reason why they cannot complete and mail their ballots with enough lead time to account for any mail travel time or utilize the multiple other ballot drop-off options available to voters.  Plaintiffs are entitled to request mail-in ballots from their County Recorder at any point between now and October 23, 2020.  They may thus conceivably have as many as several weeks to receive, complete, and return their ballots before November 3, 2020.  Where, as here, "the purported harm could … [be] avoided through [a plaintiff's] own conduct," there is an insufficient showing of irreparable harm.  *Wham-O, Inc. v. Manley Toys, Ltd.*, No. 08-56188, 2009 WL 1353752, at *1 (9th Cir. May 15, 2009); *see also Al Otro Lado*, 952 F.3d at 1008 (concluding that alleged injuries were not irreparable where they were avoidable and thus self-inflicted).  And where a comparatively simple mechanism exists to avoid the harm resulting from late mail-in ballots, it is unnecessary for a federal court to harness its extraordinary equitable powers to reset a state's preferred election deadline.

Because Plaintiffs cannot show that they are likely to suffer the kind of irreparable, unavoidable injury that will result from their mail-in vote not being counted, they are not entitled to injunctive relief.  *Cottrell*, 632 F.3d at 1135.

### C.     The balance of equities and the public interest tip sharply against the plaintiffs.

The final requirements for obtaining an injunction are that the balance of equities tips in favor of awarding relief and that an injunction is in the public interest.  *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 20).  Plaintiffs do not—and cannot—come close to making either showing.

First, the balance of equities tip sharply against Plaintiffs.  As previously explained, their requested remedy will not even necessarily help guarantee that more Navajo ballots will be counted in the upcoming election.  Individuals who might otherwise have made efforts to return their ballots well in advance of Election Day might be swayed by a postmark deadline into delaying the planned return of their ballots.  This

1    may result in more ballots arriving late and may deprive Navajo voters of the statutory

2    signature-cure period that would otherwise have been afforded to them under Arizona

3    law.  *See* A.R.S. § 16-550(A); [Hansen Decl. ¶¶ 5-6].

4           Additionally, an injunction would uniquely burden the Secretary. Arizona's

5    election officials are working around the clock to implement a successful General

6    Election with anticipated record turnout in the midst of a global pandemic.  Issuing an

7    injunction to alter the ballot-return deadline so soon before the election will be sure to

8    frustrate those efforts, requiring a diversion of resources to development procedures for

9    and training elections on how to implement a new postmark rule. The election is now 50

10   days away and voting starts in just 23 days.

11          Changing the rules this late in the process would also sow confusion in the

12   electorate generally as well as among Navajo voters.  An injunction changing the ballot

13   deadline will conflict with the extensive and consistent voter education efforts that the

14   Secretary is engaged in, [Dul Decl. ¶¶ 9-10], including the Secretary's statewide publicity

15   pamphlet and the Citizens Clean Elections Commission's voter education guide, both of

16   which will be mailed to every household with a registered voter. [*Id.* ¶¶ 3-4; Collins Decl.

17   ¶¶ 8-9]

18          For these reasons, the Court should deny Plaintiffs' motion for a preliminary

19   injunction.

20                                    **CONCLUSION**

21          For the above reasons, the Secretary respectfully requests that the Court dismiss

22   Plaintiffs' Complaint in its entirety or, in the alternative, deny the motion for preliminary

23   injunction and declaratory relief.

24          Respectfully submitted this 14th day of September, 2020.

25                                    **COPPERSMITH BROCKELMAN PLC**

26
                                      By  s/ Roopali H. Desai
27                                         Roopali H. Desai
                                           D. Andrew Gaona
28                                         Kristen Yost

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ASU Law Group**

By   s/ Marty Harper (w/ permission)
         Marty Harper

*Attorneys for Defendant Arizona Secretary
 of State Katie Hobbs*