# Exhibit A

# Exhibit A

# KELLER ROHRBACK L.L.P.

LAURIE B. ASHTON ^AZ, CO**
IAN S. BIRK ^WA
KENNETH A. BLOCH ^WA**
KAREN E. BOXX ^WA**
GRETCHEN FREEMAN CAPPIO ^MI, WA
ALISON CHASE ^AZ, CA
JEFF N. COMSTOCK ^WA
T. DAVID COPLEY ^AZ, NY, WA
FELICIA J. CRAICK ^WA
ROB J. CRICHTON ^NY, WA
ADELE DANIEL ^WA
MAUREEN M. FALECKI ^WA
JULI FARRIS ^CA, WA
RAYMOND J. FARROW ^WA
ERIC J. FIERRO ^AZ
WILLIAM L. FLEMING ^WA
ALISON S. GAFFNEY ^WA
GLEN P. GARRISON ^ID, WA
LAURA R. GERBER ^WA

MATTHEW M. GEREND ^WA
MAX GOINS ^WA
GARY A. GOTTO ^AZ, MT
BENJAMIN GOULD ^CA, WA
CHRISTOPHER GRAVER ^AZ
MARK A. GRIFFIN ^AZ, WA
ZACHARY W. GUSSIN ^WA
IRENE H. HECHT ^WA
GARRETT HEILMAN ^IL, WA
SCOTT C. HENDERSON ^WA
DEAN N. KAWAMOTO ^CA, DC, WA
ERIKA M. KEECH ^WA
RON KILGARD ^AZ, DC, NY
DAVID J. KO ^WA
TANYA KORKHOV ^NY
BENJAMIN J. LANTZ ^WA
ERIC R. LALIBERTE ^WA
CARI CAMPEN LAUFENBERG ^WA
ELIZABETH A. LELAND ^WA

JEFFREY LEWIS ^CA
TANA LIN ^DC, IL, MI, WA**
DEREK W. LOESER ^NY, WA
EMMA J. LUTON ^WA
HOLLY E. LYNCH ^WA
RYAN MCDEVITT ^MI, WA
DANIEL MENSHER ^OR, WA
RACHEL MOROWITZ ^CA, DC, WA
NATHAN L. NANFELT ^WA
GRETCHEN S. OBRIST ^WA
DUDLEY B. PANCHOT ^WA**
DAVID S. PREMINGER ^NY
MATTHEW J. PREUSCH ^CA, OR
ERIN M. RILEY ^WA, WI
STEVEN N. ROSS ^WA**
DAVID J. RUSSELL ^WA
MARK D. SAMSON ^AZ, DC
LYNN LINCOLN SARKO ^AZ, DC, WA, WI
CHRISTOPHER L. SPRINGER ^CA

THOMAS A. STERKEN ^WA
BETH A. STROSKY ^WA
KARIN B. SWOPE ^WA
PAUL A. TONELLA ^WA
HAVILA C. UNREIN ^CA, MT, WA**
GABE E. VERDUGO ^WA
AMY WILLIAMS-DERRY ^MA, OR, WA
MICHAEL WOERNER ^WA
BENSON D. WONG ^WA
EDWIN G. WOODWARD ^WA**
EMMA WRIGHT ^WA

** OF COUNSEL

August 28, 2020

**VIA EMAIL AND CERTIFIED MAIL**

Four Directions, Inc.
Rosebud Sioux Indian Reservation
P.O. Box 194
Mission, SD 57555
tateota@hotmail.com

Re:   Four Directions, Inc.'s Infringement of First Amendment Rights

Dear Counsel:

We represent the Navajo Nation ("Nation") in enforcing and licensing its intellectual property and First Amendment rights. The Nation recently learned that a lawsuit in Arizona District Court, *Darlene Yazzie, et al. v. Katie Hobbs*, was filed by six individuals, who are members of the Navajo Nation. A copy of the Complaint is attached as Exhibit A. You have also incorrectly posted on your website and stated in a email mailing that "The Navajo Nation files lawsuit over mail-in ballot counting." Exhibit B, attached to this letter, shows a mailing from Four Direction making this false statement. The Navajo Nation, which is the government of the federally recognized Indian Tribe, is not a party to this litigation.

This false statement has been picked up by news outlets, including *Tuscon.com, Lake Powell Life News, and KNAU, NPR News.* Your misstatements have harmed the Nation. Your actions constitute libel and defamation. You have 1) made a false statement purporting to be fact; 2) published or communicated this false statement on your website and in an email mailing to third person; 3) it was, at a minimum, negligent to state the Nation was suing the Secretary of State for the State of Arizona when you should have known that six individual members of the Nation, not the Nation are suing the Secretary of State of the State of Arizona. You should have known because you have advertised on your website that you assisted Navajo Nation members in filing the voting rights complaint. *See*, http://www.fourdirectionsvote.com, *and* 4) it has caused

KELLER ROHRBACK L.L.P.

August 28, 2020
Page 2

reputational harm to the Nation to broadcast that the Nation is suing the Secretary of the State of Arizona when it is not.

This constitutes libel and defamation. Accordingly, as the Navajo Nation's legal counsel, we ask that you immediately cease and desist making false statements with respect to the Navajo Nation. The Navajo Nation would greatly appreciate your cooperation and compliance with this request. However, if you continue infringing on the Navajo Nation's First Amendment rights, we will seek redress in court. We demand an immediate correction on your website and in a follow up mailing made to the email list to those who have received the original misstatement.

Here is an example of a corrective statement we request that you use:

An earlier version of this website and emails sent misstated the correct party of who is suing the Secretary of State for the State of Arizona regarding mail-in voting. Although online and emails stated the party suing the Secretary of State of the State of Arizona was the Navajo Nation, in fact, six members of the Navajo Nation are suing the Secretary of State of the State of Arizona, Darlene Yazzie, Caroline Begay, Leslie Begay, Irene Roy, Donna Williams and Alfred McRoye.

The Navajo Nation is hopeful that this matter can be resolved expeditiously and amicably. Please contact us within 10 days from the date of this letter and confirm that you have taken down all misstatements on your website, and show us proof that you have posted a corrective statement on your website and in an email mailing to your listserve who received the original mailing.

Nothing in this letter should be construed to limit the Navajo Nation's rights or remedies, all of which are expressly reserved.

Sincerely,

Karin B. Swope
kswope@kellerrohrback.com

KBS:rm
Enclosure

cc:    Doreen Paul, Attorney General, Navajo Nation Department of Justice
       Katherine Belzowski, Assistant Attorney General, Navajo Nation Department of Justice

# EXHIBIT A

Michael J. Novotny
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005
AZ State Bar No. 033792
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: mnovotny@bigfirelaw.com

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DARLENE YAZZIE, CAROLINE BEGAY, LESLIE BEGAY, IRENE ROY, DONNA WILLIAMS and ALFRED MCROYE, <br><br> Plaintiffs, <br><br> v. <br><br> KATIE HOBBS, in her official capacity as Secretary of State for the State of Arizona, <br><br> Defendant. | Case No. _____ <br><br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

Plaintiffs Darlene Yazzie, Caroline Begay, Irene Roy, Donna Williams, Leslie Begay and Alfred Mc Roye ("Plaintiffs") bring this Complaint against Secretary of State Katie Hobbs ("Defendant") alleging that Arizona's requirement that Vote By Mail ("VBM") ballots be received – not postmarked – before 7:00 pm on November 3, 2020 ("Election Day") to be counted is an unconstitutional burdens on Plaintiffs' right to vote at Navajo Nation as applied during the COVID-19 pandemic and United States Postal Service ("USPS") reorganizational issues.[1]

### PARTIES

### Plaintiffs

1. Plaintiffs are Tribal Members of the Navajo Nation, a federally recognized Indian Tribe with a government-to-government relationship with the United States. The Navajo Nation Reservation ("Reservation") was established by the Treaty of 1868 and was thereafter expanded by successive executive orders. The Reservation consists of approximately 13,989,222 acres of tribally-owned, allotted and government-owned land. The Reservation is located in Apache, Navajo, and Coconino counties in Arizona, as well as 13 counties in Utah and New Mexico. According to the 2010 census, the population of the Reservation is 173,667 of whom

---

[1] According to U.S.P.S. employees, recent actions by the new Postmaster General Louis DeJoy are causing additional delays in processing the mail. American Postal Workers Union President Mark Dimondstein, has received reports of slowed mail delivery and "degraded" service. This is consistent with an internal U.S.P.S. memo stating that postal workers are to stop making late trips and extra trips that did not originate at postal service headquarters. *See* Dean, Jessica, Jessica Schneider, and Caroline Kelly. 2020. "Postal Services Says It Has 'Ample Capacity' to Handle Election After Trump Casts Doubt." CNN. August 3, https://www.cnn.com/2020/08/03/politics/postalservide-says-it-has-ample-capacity-to handle-election-after-trump-casts-doubt.

Case 3:20-cv-08222-GMS Document 43 Filed 08/24/20 Page 6 of 25

101,835 live on the Arizona portion of the Reservation. The Navajo Nation has a voting age population exceeding 67,000 living within the Arizona portion of the Reservation.

2.     Plaintiff, Darlene Yazzie, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

3.     Plaintiff, Caroline Begay, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

4.     Plaintiff, Irene Roy, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

5.     Plaintiff, Donna Williams, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. She resides on-Reservation in Apache County.

6.     Plaintiff, Leslie Begay, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. He resides on-Reservation in Apache County.

7.     Plaintiff, Alfred McRoye, is an enrolled member of the Navajo Nation, and is a registered voter from Apache County. He resides on-Reservation in Apache County.

8.     The Plaintiffs desire to participate in the electoral and political processes of Arizona on an equal basis with non-Indian voters.

### Defendant

9.     Defendant Secretary of State Katie Hobbs is the chief elections officer in the state, and is responsible for supervising and issuing directives concerning the conduct of all elections in the state. A.R.S. § 16-142.  Her duties include certifying the results of the elections. A.R.S. §16-648.

## JURISDICTION AND VENUE

10.     This case arises under the Constitution and laws of the United States. This Court has original jurisdiction over this matter pursuant to 52 U.S.C. § 10301(a) and (b); 42 U.S.C. § 1983; 28 U.S.C. §1362; 28 U.S.C. §1331; 28 U.S.C. § 1343(a)(3) and (4); and 28 U.S.C. § 2201 and 2202, along with Article III of the United States Constitution.

11.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because this action is predicated upon a federal question and a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this District.

## BACKGROUND

13.     "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected by the Equal Protection Clause of the Fourteenth Amendment. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886)).

14.     Arizona first made Voting By Mail ("VBM") available to all voters in 1998.

15.     The 2010 election marked the first time that more than half of all ballots cast in Arizona were through VBM. *See Archived Table; Voting by Mail*, N.Y. Times (Oct. 7, 2012), *available at* https://nyti.ms/3fEKQeV.

Case 3:20-cv-08222-GMS Document 48-1 Filed 09/16/20 Page 9 of 25

16. Defendant has publicly announced that Ballots will only be counted if they are received by 7:00 p.m. on Election Day, November 3, 2020 ("Election Day"). *See* https://azsos.gov/votebymail.

17. Arizona requires that VBM ballots be received by 7:00 p.m. on Election Day. A.R.S. 16-548(A).

18. For the upcoming general election, the last time that a voter can request a ballot-by-mail is Friday October 23 at 5:00 p.m. when the county recorder office closes for the day. A.R.S. 16.

19. Defendant requested an investigation of the President Trump Administration's intervention in the USPS regarding VBM. *See* https://www.12news.com/article/news/politics/katie-hobbs-asks-arizona-ag-to-investigate-trump-administration-over-usps/75-bc57ca9a-789a-40ab-9305-16be8ec236e0.

20. Plaintiffs have fewer days to cast their ballot if they VBM in comparison to non-Indian voters who utilize the VBM ballot due to slower postal service when compared to affluent areas like Scottsdale, Arizona.

21. USPS mail sent First Class from Pinon, Arizona requires six (6) days to arrive at the Navajo Recorder's Office in Holbrook, Arizona.

22. USPS mail sent Priority from Teec Nos Pos, Arizona requires six (6) days to arrive at the Apache Recorder's Office in St. Johns, Arizona.

23. USPS mail sent Certified First Class from Scottsdale, Arizona required less than eighteen (18) hours to arrive at the Maricopa Recorder's Office in Phoenix, Arizona.

24. USPS mail sent Certified First Class from Dinnehotso required ten (10) days to arrive at the Apache Recorder's Office in Phoenix, Arizona.

25.     USPS mail sent Certified First Class from Rock Point required six (6) days to arrive at the Apache Recorder's Office in Phoenix, Arizona.

26.     There is one Post Office for every 15.3 square miles in Scottsdale versus one Post Office every 707 square miles On-Reservation.

27.     Tribal Members face the additional cost of renting a Post Office box, which can be a considerable amount if one is poor or even near poor. For example, the fees at the Leeup Post Office are as follows: $6.00 key fee for new box, $9.00 for replacement of a key, and $136.00 rental for a year.

28.     Non-Indians in Scottsdale and other affluent areas effectively have twenty-five (25) days to consider, cast and return their VBM ballots while Tribal Members effectively only have fifteen (15) days to consider, cast and return their VBM ballots.

29.     6.72% of Arizona households do not own a vehicle while approximately 29% of Tribal Member households do not own a vehicle.

30.     The Scottsdale median household income is 327% of the Tribal Member median household income.

31.     Plaintiffs residing at or near Teec Nos Pos and utilizing the post office at Teec Nos Pos where their mail has to travel 26-fold further than Scottsdale residents (917 miles v. 35 miles).

32.     A novel coronavirus has killed more than 167,000 Americans and continues to spread throughout the country. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html.

33. The pandemic has triggered an extraordinary increase in voting by mail. For example, the use of mail-in voting increased by 1,000% in the 2020 Iowa primary and just under 500% in South Dakota.

34. The U.S.P.S. has been cutting back on delivery and services and closing post offices and processing centers since 2011. Many state processing centers are also simply unprepared to handle the mass influx of mailed ballots when they arrive. *Id*. During the 2020 Wisconsin and Ohio primaries, mail processing errors and other problems resulted in more than 2,000 ballots not being counted.

35. The U.S.P.S. recommends that voters request mail-in ballots at least fifteen (15) days prior to Election Day to ensure that their ballots will be returned by state deadlines.

36. Voting by mail systems rest upon the premise that all citizens have equal mail service, however, hundreds of thousands of rural Americans have non-standard mail service burdened with a range of service limits including irregular service or unreliable service, no residential delivery, excessive distances to post offices or other postal providers with limited hours of operation among other issues.

37. Other states across the country have seen the increase in absentee balloting due to COVID19 stretch the capacity of their election officials and the U.S. Postal Service. See Michelle Ye Hee Lee and Jacob Bogage, *Postal Service Backlog Sparks Worries that Ballot Delivery Could be Delayed in November*, Wash. Post, (July 30, 2020), https://www.washingtonpost.com/politics/postal-service-backlog-sparks-worries-that-ballotdelivery-could-be-delayed-in-november/2020/07/30/cb19f1f4-d1d0-11ea-8d32-1ebf4e9d8e0d_story.html.

38.     Tribal Members living on the Arizona portion of the Navajo Nation Reservation ("Tribal Members") have more restrictive access to VBM than non-Indian voters in Arizona.

39.     Native Americans living on reservation lands are among the most impacted by the lack of standard mail service and non-standard addresses.

40.     VBM is not a simple or easy task for Tribal Members. In addition to general barriers impeding voting access, VBM adds an additional layer of challenges which include lack of home mail delivery, the need for language translation, lack of access to public transportation and lack of access to any vehicle all impede voter registration by mail. In general, VBM does not have the accessibility for Tribal Members living in Reservation communities as it does for voters in urban areas.

41.     Nearly 60% of the Navajo Nation's population resides within the boundaries of the State of Arizona and the population density of the Navajo Nation is 6.33 persons per square mile in comparison to the U.S.  average of 345 persons per square mile.  Most residents do not have access to at home delivery and must travel from their home in order to obtain their mail.  The reservation has eleven post offices and fifteen postal provider offices which service the Arizona portion of the Reservation, compare this to the rural state of West Virginia, which has a smaller land mass but includes 725 post offices and/or postal provider sites.

42.     Defendant's requirement that VBM ballots are to be received – rather than postmarked – on or before Election day, leads to the disenfranchisement of Navajo Nation Tribal Members living On-Reservation when their overdue ballots are rejected.

43.     On August 17, 2020, Plaintiffs requested that Defendant count VBM ballots postmarked on or before Election Day.

44.     Defendant has the authority to compile VBM ballots postmarked - or with date information encoded - by Election Day and count these ballots if received within ten (10) days or November 13, 2020.

45.     Defendant's refusal to count VBM ballots postmarked on or before Election Day will have a significant disparate impact on Tribal members' voting power.

46.     Plaintiffs allege that this failure to act, if allowed, would reinforce a "history of official racial discrimination in voting."

47.     If the Defendant's action and inaction is allowed, the ability of Navajo Nation Tribal Members living On-Reservation to effectively participate in the political process will be hindered.

48.     Plaintiffs seek declaratory and injunctive relief, both temporary and permanent, compelling the Defendant to count Tribal Members VBM ballots postmarked on or before Election Day. This relief is sought on the grounds that failure to provide the requested relief is an abridgement of their right to vote.

49.     The failure to count ballots postmarked on or before Election Day is an abridgement of Plaintiffs and other Tribal Members' right to vote.

50.     Accordingly, Plaintiffs ask this Court to grant them declaratory and injunctive relief compelling Defendant to count VBM ballots from Tribal Members postmarked on or before Election Day that are received on or before November 13, 2020.

**Voting in Arizona**

51.     On March 19, 2020, California became the first state to issue a stay-at-home order. Arizona followed on March 31, 2020 along with most remaining states. *See* Sarah Mervosh,

Denis Lu & Vanessa Swales, *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (updated Apr. 20, 2020), *available at* https://nyti.ms/30NSnns.

52. Elections proved that they were not immune to the pandemic's effects. Arizona held its primary on March 17, 2020, but it was one of the last states to do so. Sixteen states postponed their primaries because of the pandemic. *See* Nick Corasaniti & Stephanie Saul, *16 States have Postponed Primaries During the Pandemic*. Here's a List, N.Y. Times (May 5, 2020), *available at* https://nyti.ms/2C-cqtHm.

53. Currently, approximately 80 percent of all Arizonans receive their ballot by mail. See Ariz. Clean Elections Comm'n, *Ballot by Mail*, *available at* https://bity.ly/3ffz2a4P.

### Navajo Nation Tribal Members Bear the Effects of Discrimination in Education, Employment and Health which Hinder their Ability to Participate Effectively in the Political Process

54. The Navajo Nation is the largest reservation in the United States and is located within the states of Arizona, New Mexico, and Utah.[2]

55. The poverty rate on the Reservation is 38%, twice the poverty rate in the State of Arizona.[3] On the Arizona part of the Navajo Nation Reservation, 21.8% have incomes below the 0.5 of the poverty threshold and another 19.3% are between 0.5 and 0.99 of the poverty threshold, while another 8.4% meet the criteria for near poor (1.0 to 1.24% of the poverty threshold).

56. The median household income on the Reservation is $27,389, "which is approximately half that of the State of Arizona." *Id.* at 29. Thirty-two percent of the population

---

[2] navajobusiness.com/FastFacts/Overview.htm

[3] Ariz. Rural Policy Institute, Demographic Analysis of the Navajo Nation Using 2010 Census and 2010 American Community Survey estimates at 34, available at https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf.

lives below the poverty level. *Id.* Only 7% of the Tribal membership have obtained a college degree.

57. The overall American Indian Alaska Native H1N1-related death rate was 3.7 per 100,000 population, compared with 0.9 per 100,000 for all other racial/ethnic populations combined resulting in a mortality rate ratio of 4.0. https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5848a1.htm?s_cid=mm5848a1_e.

58. Public transportation on the Navajo Nation is minimal and access to a vehicle is crucial because in addition to the time and travel distance required to get to a post office, there is the added financial burden of fuel or the expense of paying someone to take them to the post office or postal provider.

59. For many voters, especially Tribal Members and others living in remote or rural areas, casting a ballot by mail is difficult. As a result, the Inter-Tribal Council of Arizona opposes having all ballots cast through VBM. Native American Rights Fund ("NARF"), *Obstacles at Every Turn: Barriers to Political Participation Faced by Native American Voters93* (2020) ("NARF Report") (quoting Travis Lane). The NARF Report is *available at* https://bit.ly/2Ccrc.Ac.

60. Approximately one-third of all American Indians and Alaska Natives ("AIAN") live in Hard-to-Count Census Tracts – roughly 1.7 million out of 5.3 million people from the 2011-2015 American Community Survey ("ACS") estimates. Hard-to-Count Census Tracts include those Census Tracts "in the bottom 20 percent of 2010 Census Mail Return Rates (i.e. Mail Return Rates of 73 percent or less) or tracts for which a mail return rate is not applicable because they are enumerated in 2010 using the special Update/Enumerate method." *See* The Leadership Conference Education Fund, Table 1a: States Ranked by Number of American Indian/Alaska Natives (race alone or combination) living in Hard-to-Count ("HTC") Census Tracts,

*available at* https://bit.ly/2ACvn08. The states with the greatest percentage of the Native population in such tracts reside in the western states: New Mexico (78.6 percent), Arizona (68.1 percent) and Alaska (65.6 percent). *See* The Leadership Conference Education Fund, Table 1b: States Ranked by Percent of American Indian/Alaska Natives (race alone or combination) living in Hard-to-Count ("HTC") Census Tracts, *available at* https://bit.ly/2CfY9nv.

61.     Geographic isolation is a significant reason states like Arizona have such a large percentage of their Native population in HTC areas.

62.     Isolation due to physical features such as mountains, canyons, oceans, rivers and vast expenses of unoccupied land are compounded on-Reservation by an absence of paved roads to connect tribal lands with off-reservation communities.

63.     Even where roads are present, Tribal Members often lack reliable transportation to travel the vast distances to county seats, election offices and post offices.

64.     In Arizona, the Reservation has over 10,000 miles of roads, 86 percent of which are unpaved. FY2019 Navajo Nation Tribal Transportation Plan at 1, *available at* https://bit.ly/.

65.     Services by the U.S. Postal Service are limited in Indian Country because of the poor quality of the road systems on Indian reservations and many of the roads are unnamed. A significant number of these reservation residents have no traditional street addresses. Brief for National Congress of American Indians et al. as Amici Curiae supporting Petitioners, *Crawford v. Marion County* as 11-12 (2008), *available at* https://bit.ly/3fznL.Kp.

66.     Alaska, Arizona and New Mexico have the largest number of Limited-English Proficient (LEP) persons voting-age citizens (that is, U.S. citizens who are 18 years of age and older). Between them, they account for approximately 87 percent of all AIANs who reside in

an area required to provide language assistance in an AIAN language under Section 203 of the Voting Rights Act. AAJC, NALEO & NARF, Voting Rights Act Coverage Update 3 (Dec.2016) ("Section 203 Update"), *available at* https://bit.ly/2Binug6.

67.     Six Arizona counties are subject to Section 203 for Indian languages: Apache, Coconino, Gila, Graham, Navajo, and Pinal and must provide all election materials, including assistance and ballots, in the language of the applicable language minority group.[4] This includes the Navajo language in Apache, Coconino, and Navajo Counties.

68.     Over 70% of the households on the Reservation speak a language other than English, and over 18% of individuals over the age of 5 speak English less than very well.[5]

69.     In Arizona, in covered areas for which census data is available, the illiteracy rate among LEP American Indians of voting age is 25 percent for Navajo-speakers. *See* U.S. Census Bureau, Voting Rights Determination File: Section 203 Determinations. (Dec. 5, 2016), Public Use Data File and Technical Documents (Excel spreadsheet of "Determined Areas Only") (Section 203 *Determination* File") available at https://bit.ly/3diHdd6. The illiteracy rate among LEP voting-age citizens in covered areas compares to the national illiteracy rate of 1.31 percent as follows: 19.1 times higher for Navajo-speakers. *See id.*

70.     Among all population groups, the digital divide is most profoundly felt in Indian Country. People residing in tribal areas have virtually no access to computers or the internet, with the Federal Trade Commission estimating broadband penetration in tribal communities at less than 10 percent. Parkhurst el al., The Digital Reality: E-Government and Access to Technology

---

[4] Voting Rights Act Amendments of 2006, Determinations under Section 203, 81 See. Reg. 87532, 87533 (2016).

[5] Ariz. Rural Policy Institute, Demographic Analysis of the Navajo Nation Using 2010 Census and 2010 American Community Survey estimates at 59, *avaialable at* https://gotr.azgovernor.gov/sites/default/files/navajo_nation_0.pdf.

and Internet for American Indian and Alaska Native Populations 3, *available at* https://bit.ly/3edV2uz.

71.    VBM breaks down in Indian Country because of housing instability/homelessness and lack of physical address where election materials will be mailed. According to the 2016 ACS, only 52.9 percent of single-race AIAN householders owned their own home, compared to 63.1 percent of the total population. *See* 2017 AIAN Summary, U.S. Census Bureau, Facts for Features: American Indian and Alaska Native Heritage Month: November 2017 (October 6, 2017), *available at* https://bit.ly/37F2z2.

72.    AIANs also experience high levels of literal homelessness and near homelessness. Nancy Pindus, et al., U.S. Dep't of Housing and Urban Development, Housing Needs of American Indians and Alaska Natives in Tribal Areas 76-77 (U.S. Dep't of Hous. and Urb. Dev. 29 (2017)).

73.    When defining "literal homelessness" as living on the street and "near homelessness" as living in a place that is not one's own (e.g., not having their own home – couch surfing, living with a friend, doubling up), HUD discovered that 99.8 percent of tribes surveyed said that their members experience near homelessness. *Id.* at 79. 88 percent of tribe also stated that, despite "doubling up" or living with a friend, their members also experience literal homelessness. *Id.* at 82.

74.    HUD has estimated that, out of 399,400 households in tribal areas, 67,900 households include someone who qualifies as near homeless. There are an estimated 42,100 to 84,700 living in near homelessness in tribal areas. Seventeen percent of AIANs surveyed stated that they have people living in their household only because they have nowhere else to go. *Id.* at 85.

75.     Even for those who have a home, access to voting in Indian Country is made substantially more difficult because of the prevalence of "non-traditional" addresses. Non-traditional addresses are prevalent among AIANs residing on tribal lands. These addresses encompass "noncity-style" addresses, which the Census Bureau define as those that do not contain a house number and/or a street name." U.S. Census Bureau, 2020 Census Local Update of Census Addresses Program improvement Project Recommendations 2 (April 13, 2015), *available at* https://bit.ly/3fB3OCW. Examples of non-city-style mailing addresses include: general delivery; rural route and box number; highway contract route and box number; post office box only delivery; or location descriptions such as "Brick house with attached garage on the right," geographic coordinates, or other geographic coding. It is commonplace for homes on tribal lands to use noncity-city-style addresses.

76.     In Arizona, only 18 percent of Native American voters outside of urban Maricopa (metropolitan Phoenix) and Pima (metropolitan Tucson) areas have physical addresses and receive mail at home. *Democratic Nat'l comm. v. Reagan*, 329 F. Supp. 3d 824, 869-870 (D. Ariz.), *rev'd sub nom DNC v. Hobbs*, No. 18-15845 (9th Cir. Jan 27, 2020) (en banc).

77.     The Navajo Nation, the largest reservation in the United States, does not have an addressing program, and most people live in remote communities. Carrie Jung, *Home Addresses on Navajo Nation are Rare* (Oct. 8, 2015), *available at* https://bit.ly/2USR3Ma.

78.     Throughout Indian Country, many Native voters can only receive election mail through post office boxes. NARF Report, supra note 16, at 40 (quoting Beverly Harry and Thomas Eugene)."

79.     The distance Navajo Nation voters must travel to obtain mail is compounded by socioeconomic factors including decreased access to public transportation, personal

transportation or requisite funds to travel such distances to obtain or return a ballot. Getting mail-in ballots is a "big problem" for Native Voters. *Id.* (quoting Hangry Cagey).

**A History of Discrimination by Arizona Officials Restricting the Rights of Navajo Nation Tribal Members to Register to Vote, Vote and Otherwise Participate in the Democratic Process**

80.     In addition to the depressed socio-economic status of Indians in Navajo country, there is a long history of racial discrimination against Indians in Arizona.

81.     Prior to 1924, Indians were denied citizenship and the right to vote based on the underlying trust relationship between the federal government and the tribes and on their status as citizens of their tribes. Indians could only become citizens through naturalization "by or under some treaty or statute."[6]

82.     It was not until Congress passed the Indian Citizenship Act of 1924 that all Indians were granted United States citizenship.[7]  Enactment of the 1924 Act ended the period in United States history in which United States citizenship of Indians conditioned on severance of tribal ties and renunciation of tribal citizenship and assimilation into the dominant culture.[8]

83.     Notwithstanding the passage of the Indian Citizenship Act, states continued to discriminate against Indians by denying them the right to vote in state and federal elections through the use of poll taxes, literacy tests, and intimidation.[9]

---

[6] *Elk v. Wilkins*, 112 U.S. 94, 103 (1884).

[7] An Act of June 2, 1924, 43 Stat. 253, Pub. L. 175 (1924) (codified as amended at 8 U.S.C. § 1401(b)).

[8] COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 14.01[3], n. 42-44 (2005 Ed.).

[9] Continuing Need for Section 203's Provision for Limited English Proficient Voters: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 309 (2006) (letter from Joe Garcia, NCAI).

84.     Even after 1924, Arizona Indians were prohibited from participating in elections. The Arizona Supreme Court upheld the prohibition finding that Indians living on reservations could not vote because they were wards of the federal government and, as such were "persons under guardianship" and thereby prohibited from voting in Arizona.[10]

85.     Reservation Indians in Arizona did not achieve the right to vote in state elections until 1948 when the Arizona Supreme Court overturned the *Porter v. Hall* decision.[11]

86.     The State of Arizona continued its discrimination through its imposition of English literacy tests which were not repealed until 1972.[12] Only those Indians who could read the United States Constitution in English and write their names were eligible to vote in state elections.

87.     The enactment of the VRA included a temporary prohibition of literacy tests in covered jurisdictions. Apache County, Arizona was included in the original list of jurisdictions covered by Section 5 of the VRA.[13]

88.     On November 19, 1965, Navajo and Coconino Counties also became covered by Section 5.[14]

---

[10]*Porter v. Hall*, 34 Ariz. 308, 331-332, 271 P. 411, 419 (Ariz. 1928).

[11]*Harrison v. Laveen*, 67 Ariz. 337, 196 P.2d 456 (Ariz. 1948) (holding that Indians living on Indian reservations should in all respects be allowed the right to vote).

[12] *See* ARIZ. REV. STAT. ANN. § 16-101(A)(4)-(5) (1956); Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1372 (2006) (appendix to the statement of Wade Henderson).

[13]Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (Aug. 7, 1965).

[14] Determination of the Director Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 14505 (Nov. 19, 1965).

89.     As a result of this coverage, the Arizona literacy tests were suspended in each of these three counties.

90.     In 1966, these three counties became the first jurisdictions to successfully bail out from coverage under Section 5 after the U.S. District Court for the District of Columbia held that Arizona's literacy test had not been discriminatorily applied against Indians in the preceding five years.[15]

91.     When the VRA was amended in 1970, it included a nationwide ban on literacy tests, which again preempted the operation of Arizona's literacy tests.[16]  Arizona became one of the states to unsuccessfully challenge the ban on literacy tests. In upholding the ban and striking down literacy tests, the Supreme Court noted that Arizona had "a serious problem of deficient voter registration among Indians."[17] The Court recognized that non-English speakers may make use of resources in their native languages in order to responsibly and knowledgeably cast a ballot.[18]

92.     The VRA amendments of 1970 included, as one of the measures of voting discrimination, registration and turnout in the 1968 presidential election. As a result, Apache, Coconino and Navajo Counties again became covered by Section 5 along with five (5) other Arizona counties.

93.     Even after 1970, there were a number of challenges to Indians' right to vote and to hold office. Many of these cases challenged activities in Apache County, one of only

---

[15]*Apache County v. United States*, 256 F. Supp. 903, 910911 (D.D.C. 1966).

[16]The Voting Rights Act, 42 U.S.C. § 1973aa (1970) (current version at 42 U.S.C. § 1973b (2008)).

[17] *Oregon v. Mitchell*, 400 U.S. 112, 117, 132, 153 (1970).

[18] 400 U.S. at 146.

a few counties within the United States in which the predominant languages spoken are American Indian. Of these languages, the most commonly used is Navajo, a historically unwritten language.[19]

94.     The Arizona Supreme Court quashed a permanent injunction by the lower court against the seating of Tom Shirley, a Navajo Indian living on the Navajo Reservation, who had been elected to the Apache County Board of Supervisors.[20] The Arizona Court reaffirmed the right of Indians to vote, vacated the injunction and directed the Apache County Board of Supervisors to certify Shirley as the elected supervisor from District 3.[21]

95.     Apache County also discriminated against Indian voters by gerrymandering the districts for the three seats on the County's Board of Supervisors. In the early 1970's, Apache County District 3 had a population of 26,700 of whom 23,600 were Indian, while District 1 had a population of 1,700 of whom only 70 were Indian and District 2 had a population of 3,900 of whom only 300 were Indian. Several Indian voters challenged Apache County for violating the one-person, one-vote rule.[22]  Apache County claimed that Indians are not citizens of the United States and the Indian Citizenship Act granting them citizenship was unconstitutional.[23]  The federal court rejected the County's arguments, noted that the County must be redistricted in

---

[19] Considering the Navajo Reservation as a whole, including parts of the States of Arizona, New Mexico and Utah, over one-third of the voting age citizens on the Navajo Nation Reservation are limited-English proficient and over one-quarter are illiterate. Voting Rights Act: Evidence of Continued Need, Vol. I: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1403-1404 (2006) (appendix to the statement of Wade Henderson).

[20] *Shirley v. Superior Court for Apache County*, 109 Ariz. 510, 516, 513 P.2d 939, 945 (Ariz. 1973).

[21] *Id*. at 516, 513 P.2d at 945.

[22] *Goodluck v. Apache County*, 417 F. Supp. 13, 14 (D. Ariz. 1975), aff'd, 429 U.S. 876 (1976).

[23] 417 F. Supp. at 14.

accordance with one-person, one-vote standards and granted plaintiff's motion for summary judgment.[24]

96.     In 1976, Apache County attempted to avoid integration of its public schools to include Indian students by holding a special bond election to fund a new school in the almost entirely non-Indian southern part of the county. Although the special election affected Indian students who would be denied equal schooling, Indian turnout for the election was abnormally low. Investigation demonstrated that the low turnout was a result of the closing of nearly half of the polling places on the reservation, the total lack of language assistance, the absence of Navajo language informational meetings regarding the bond election and the use of English-only in the implementation of absentee voting procedures.[25]

97.     In 1988, the United States filed a complaint to enforce Sections 2 and 4(f)(4) of the VRA.  The complaint alleged that various election standards, practices, and procedures by the State of Arizona, the Apache County Board of Supervisors and Navajo County Board of Supervisors unlawfully denied or abridged the voting rights of Navajo citizens residing in Apache and Navajo counties.  The challenged practices included discriminatory voter registration, absentee ballot, and voter registration cancellation procedures, as well as failure to implement effective bilingual election procedures, including the effective dissemination of election information in Navajo and providing for a sufficient number of adequately trained bilingual persons to serve as Navajo translators on election day.  This litigation ended in a Consent Decree, which established the Navajo Language Election Information Program, required the Counties to employ two full-

---

[24] 417 F. Supp. at 16.

[25] *Apache County High School No. 90 v. United States*, No. 77-1815 (D.D.C. June 12, 1980).

time bilingual outreach workers, and agreed to a number of changes to increase voter registration and the dissemination of election procedures.[26]

98.     Following the 2018 election, the Navajo Nation and Navajo voters filed suit arguing that the lack of language assistance in the VBM process violated Section 203 and there were insufficient in-person voting locations. Even though there was low participation in VBM on the Navajo Nation Reservation, over 100 VBM and in-person early voting ballots were discarded for failure to sign the ballot affidavit. These voters were neither properly instructed in the Navajo language on how to complete the ballot and were not given an opportunity to cure the deficiency, violating Section 203, and the lack of curing violated the Equal Protection and Due Process clauses of the U.S. Constitution. *Navajo Nation v. Hobbs*, No. CV-18-0829-PCT-DWL, First Amended Complaint (Dec. 11, 2018).

99.     VBM ballots in Apache and Coconino counties were rejected for missing signatures at twice the statewide rate. Dianna Nanez, *Navajo Nation: Arizona's Broken Compact Discriminates Against, Disenfranchisement Native Voters* (May 7, 2020) *available at* https://bit.ly/3fzJSAn. Although the settlement agreement in that case required the Secretary of State to include a ballot-curing provision in the election manual to allow unsigned ballot voters the same amount of time to cure as those with mismatched signatures and those who fail to show ID on election day, the Attorney General quashed that change. *Navajo Nation v. Hobbs*, No. CV-18-08329-PCT-DWL, Settlement Agreement (Aug. 6, 2019).

100.     Current voting practices utilized in Arizona discriminate against the Navajo Nation's Tribal members.

---

[26]*Apa v. Arizona*, Consent Decree, CIV 88-1989 (May 22, 1989).

# RELEVANT STATUTES

101.    This action is brought by the Plaintiffs pursuant to Sections 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301 (formerly codified at 42 U.S.C. 1973); 42 U.S.C. § 1983, providing for civil action for deprivation of rights; the Fourteenth Amendment to the United States Constitution; 28 U.S.C. §§ 2201-2202 providing for declaratory relief and other necessary or proper relief; and Article 2, Section 21 of the Constitution of the State of Arizona.[27] This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear claims under the Constitution and laws of the State of Arizona.

102.    Article 2, Section 21 of the Constitution of the State of Arizona provides that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."

103.    Section 2 of the VRA, 42 U.S.C.S. § 1973(a), provides that no voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

104.    Section 4(f)(4) of the VRA provides in relevant part:

> Whenever any State of political subdivision [subject to the bilingual electoral requirements] . . . provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, it shall provide them in the language of the applicable language minority group as well as in the English language.

---

[27]Article 1, Section 21. Free and equal elections.  All elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

105.    Arizona law provides, "Any election called pursuant to the laws of this state shall provide for early voting. Any qualified elector may vote by early ballot." A.R.S. § 16-541(A).

## WHY THIS ACTION IS NECESSARY

106.    Tribal Members bear the effects of discrimination on the basis of race and tribal status in education, housing, employment, and health services which have resulted in a lower socioeconomic status which hinders their ability to participate effectively in the political process.

107.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part, states that it is a violation of the Voting Rights Act, if,

> based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected… in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Thus, Section 2 of the Voting Rights Act, as amended, protects Indians from voting practices which have a disparate impact on their right to vote.

108.    The crux of Plaintiffs' § 2 claim is that the failure to count VBM ballots from Tribal Members postmarked on or before Election Day interacts with the socioeconomic factors of poverty and the predominant non-use of the English language on the Reservation to deprive Plaintiffs and other members of the Navajo Nation who would like to VBM on an equal basis to non-Indians. The ability to VBM on the Reservation must be viewed in conjunction with practical realities—such as poverty and a predominant non-use of the English language—that exist on the Reservation and must be compared to the opportunity to vote available to other Arizona citizens.

109.     The legitimate interests of the Defendants will not be undermined in the event that the Court grants the relief prayed for herein.

110.     Plaintiffs have no adequate remedy at law.

111.     Plaintiffs will suffer irreparable harm as a result of the violations complained of herein, and that harm will continue unless Defendants' count VBM ballots from Tribal Members postmarked on or before Election Day in the 2020 general election is declared unlawful and enjoined by this Court.

**FIRST CLAIM FOR RELIEF**
**(Violation of the 14th Amendment of the United States Constitution**
**and 42 U.S.C. § 1983)**

112.     Plaintiffs restate and incorporate by reference every allegation in the preceding paragraphs.

113.     Section 1 of the Fourteenth Amendment of the United States Constitution provides: "No…State shall . . . deny to any person within its jurisdiction the equal protection of the law."

114.     Defendants have no legitimate, non-racial reason for rejecting the Nation' request that Tribal Members VBM ballots postmarked on or before Election Day be counted.

115.     By engaging in the acts and/or omissions alleged herein, Defendant acted and continues to act under color of state law to deprive the Plaintiffs their rights that are guaranteed by the Fourteenth Amendment to the United States Constitution and will continue to violate said rights absent relief

116.      granted by this Court.

## SECOND CLAIM FOR RELIEF
### (Violation of the Arizona Constitution)

117.   Plaintiffs restate and incorporate by reference every allegation in the preceding paragraphs.

118.   The Defendants have acted under color of state law to deprive Tribal Members equal elections by arbitrarily refusing to count VBM ballots from Tribal Members postmarked on or before Election Day.

## THIRD CLAIM FOR RELIEF
### (Violation of the Voting Rights Act of 1965)

119.   Plaintiffs restate and incorporate by reference every allegation in the preceding paragraphs.

120.   Section 2 of the VRA, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group. Section 2 provides: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," or membership in a language minority group.  52 U.S.C. § 10301.

121.   Indians are recognized as a language minority group under the VRA.

122.   The Navajo Nation is a covered jurisdiction under Section 203 of the VRA.

123.   Defendant's failure to count VBM ballots from Tribal Members postmarked on or before Election Day denies members of the federally-recognized Tribe, including the Plaintiffs, the same rights of other members of the electorate to participate in the political process and elect representatives of their choice, in violation of Section 2 of the VRA.

124.     Plaintiffs will continue to suffer the violation of their rights as alleged in the Complaint absent relief granted by the Court.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully request this Court to enter judgment as follows:

1.     That this Court assume jurisdiction;

2.     That this Court declare that the Defendant's failure to count VBM ballots of Tribal Members living On-Reservation that are postmarked on or before Election Day violates existing law, including, but not limited to, § 2 of the VRA, as amended, the Fourteenth Amendment to the United States Constitution, and the Arizona Constitution;

3.     That this Court grant preliminary and permanent injunctive relief by ordering Defendant to count VBM ballots cast by Tribal Members living On-Reservation that are postmarked on or before Election Day for all future elections, and further relief as the interest of justice may require;

4.     That this Court grant preliminary and permanent injunctive relief by ordering Defendant to count VBM ballots cast by Tribal Members living On-Reservation in the 2020 election that are postmarked by Election Day and received on or before November 13, 2020, and further relief as the interest of justice may require;

5.     That this Court grant Plaintiffs' reasonable attorneys' fees, litigation expenses and costs pursuant to 42 U.S.C. § 1973(e) and § 1988; and

6.     That this Court grant the Plaintiffs any further relief which may in the discretion of the Court be necessary and proper to ensure that the voting rights of Tribal Members living On-Reservation are properly respected in accordance with the Orders of this Court.

Dated this 26th day of August 2020.

       /s/ Michael J. Novotny        

Michael J. Novotny
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005
AZ State Bar No. 033792
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: mnovotny@bigfirelaw.com

*ATTORNEY FOR PLAINTIFFS*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

/s/  Lourdes Zoe Sorando, Paralegal

# EXHIBIT B

---------- Forwarded message ---------
From: **OJ Semans** <vote@fourdirectionsvote.com>
Date: Thu, Aug 27, 2020 at 10:17 AM
Subject: this is huge:
To: <drew@rupcorp.org>

―――――――――――――





Hi Madeline,

We tested the speed of mail in Navajo Nation and found that first-class mail takes a week to te
days to reach the election office. With the expected surge in mail voting, this could effectively
disenfranchise thousands of Native American voters.

**That's why we organized the litigation team to assist Native plaintiffs take on the State**
**Arizona this week, filing a voting rights lawsuit in federal court yesterday.** We're demand

that the Secretary of State comply with the Voting Rights Act by ensuring that all absentee bal postmarked by Election Day from Native voters are counted.

**Four Directions is at the forefront of Native voting rights, and that's thanks to your generous support. But this fight is far from over and we've got less than 10 weeks to wi and only a few days to reach our critical monthly deadline. Can you rush a donation rig now so we can raise $15,000 by 11:59 p.m. CDT on August 31?**

*If you've saved your payment information with ActBlue Express, your donation will be processed immediately:*

**DONATE $15**

**DONATE $30**

**DONATE $50**

**DONATE $75**

**DONATE $125**

**DONATE $200**

***Donate another amount***

The results of our study show that Native voters in Arizona have up to 70% fewer days to cons mark, and return their ballots by mail.

*Unless they're able to go back in time, get their ballots, and send them by mail before they ev receive them, thousands of Native voters could be denied their fundamental right to vote.*

**We need your help to meet our critical monthly goal — click here to stand with us!**

Thank you,

OJ Semans

4

Exhibit B

# Exhibit B

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION OF CONSULTATION**

Pursuant to Local Rule 12.1(c), undersigned counsel certifies that counsel for Defendant Secretary of State Katie Hobbs conferred telephonically with Plaintiffs' counsel on September 11 and September 12 regarding the deficiencies in Plaintiffs' complaint. During these conferences, counsel for the Secretary notified Plaintiffs' counsel regarding the grounds for the Secretary's motion to dismiss the complaint, but Plaintiffs' counsel did not indicate that Plaintiffs would be willing to amend the complaint.

s/ Marty Harper
Marty Harper

{00513952.1 }

Exhibit C

# Exhibit C

**Declaration of Patty Hansen**

Patty Hansen declares as follows:

1.  I am the Coconino County Recorder. I have served in this role for 7 years. As County Recorder, I am responsible for managing three divisions; recording, voter registration and early voting, and election services. Duties within the recording and voter registration divisions include recording public records to include deeds, liens, and other real property documents; receiving and processing voter registration forms, early ballot requests, and permanent early voting list applications; determining voter eligibility and district assignments for precinct-level voting; maintaining and archiving all voter registration records, early voting requests, and the Coconino County permanent early voting list; preparing and distributing voter mailings and communications associated with voter registration and elections; preparing and distributing all early ballots for all elections within Coconino County; receiving, verifying, and processing all incoming early ballots. Duties within the election services division include preparation and programming of all ballots, receiving and processing of petitions and campaign finance filings; supervision of all poll workers and ballot boards, facilitation and set-up of all vote center locations; set-up and programming of ballot marking devices, electronic poll books, and tabulation equipment; tabulation of all voted ballots; and distribution of election results.

2.  Voters in Coconino County prefer to vote by mail. Currently, approximately 69% of our registered voters are on the Permanent Early Voting List, and in 2018 approximately 67% of all counted ballots were early ballots.

3.  I am aware of the lawsuit and the relief requested by the Plaintiffs, specifically that early ballots postmarked on or before Election Day be counted. While as Recorder I want

1

every valid vote counted, what the Plaintiffs request would impose a number of obstacles in the process of verifying and counting ballots.

4.      First, the post office does not post mark all early ballots. As pre-paid business reply mail, they are not required to be post-marked, and many of the ballots are not. Not only are they not required to be post-marked, but we are aware that sometimes, to expedite processing of election mail, some non-essential processes (such as post marking) are skipped to expedite the process. There is no way for a voter or the county to control whether a ballot envelope is post-marked by the U.S. Postal Service. The inconsistent use of post-marking could result in the disparate treatment of voters in my county for something entirely out of their control.

5.      This concern is further exacerbated by the fact that the majority of our mail travels from Flagstaff, to Phoenix, then back up to Flagstaff. Many people are unaware of this. Thus, a person could easily believe that because they dropped their ballot at the post office on Election Day that it would be received by my office within a few days. However, should there be an issue in delivery, which again, neither the voter nor my office can control, then that ballot might be post-marked on Election Day but still arrive many days later, and thus not be received in time to be counted. There also exists the possibility that a voter could deliver their early ballot to the post office the day after Election Day, not be post marked, and it be delivered to my office in time to be processed and counted.

6.      Second, it is unclear how Plaintiffs' proposed relief would interact with the ballot cure period, enacted as S.B. 1054 in 2019 and codified at A.R.S. § 16-550(A). We verify voter identity on mail-in ballots using the voter's signature, but we know that signatures change over

time. Signatures may also change because of a change in health circumstances, like a broken arm or arthritis. Thus, the Arizona Legislature created a period for voters to confirm that a signature, which initially appeared to be inconsistent with the voter's signature, was in fact theirs. Pursuant to A.R.S. § 16-550(A), if a voter signs a ballot affidavit and the signature "is inconsistent" with signatures in the voter file, we contact that voter and give them five business days after the election to correct the signature and verify that ballot was cast by the voter. This would appear to limit, if not entirely preclude, voters from using this cure period, even though it has been widely publicized as a right all early voters have. Thus, a person relying on a post-mark rule may have his or her ballot rejected for a mis-matched signature that would have been cured, had they submitted their ballot on time.

7.     Third, there is a timing burden on how these ballots would be processed. Currently, we have "early boards" that go through and verify all the signatures, and credit those who voted a valid early ballot. Then the early ballots go to be counted and tabulated, at this point they are removed from their envelopes so the votes are anonymous. This procedure must be finished first so that any early ballots that are received and verified and any provisional ballots that may have been cast by the same person, for instance, if they forgot or if they cast an in-person provisional "just in case" their ballot did not reach the Recorder by mail are not counted. This ensures no one can cast two ballots. It is unclear how we could process ballots being received after Election Day. Currently, our early boards are done approximately three to four days after Election Day. Under Plaintiffs' proposal, the County would have to incur additional expense to keep the Early Boards several additional days after Election Day to ensure every ballot that was postmarked by Election Day was properly processed before the

provisional boards began their work of processing ballots, making the statutory deadline for completion of provisional ballot verification and tabulation nearly impossible.

8.      In addition to the added expense of prolonging the work of the early boards and provisional boards, there are processes that are triggered by Election Day that will become more burdensome. For example, A.R.S. § 1 6-602(F) requires a hand count audit of early votes, which includes votes cast by mail. This hand count must begin within twenty-four hours of the polls closing and end prior to the county canvass to ensure the reliability of the results. *Id.* at (I).

9.      All the verification, curing, and tabulation processes must take place within a statutorily proscribed timeline to ensure the proper transition of new elected officials. For the general election, the County has no more than twenty days after the election to verify all signatures on all early ballots, process all provisional and conditional provisional ballots, conduct the hand count, and finalize the canvass. A.R.S. § 1 6-642(A). This provides us more time, but usually more people vote in the general election, so more time does not mean less of a burden. It will be extremely difficult to process all the ballots that come in after Election Day within these time limits.

10.      Coconino County is proud of the steps we have taken to ensure that every voter has a chance to cast a ballot. We are in the process of installing 18 ballot drop-boxes located throughout the County that allow 24-hour access for people who would rather deposit their ballot in the County drop-box than a mailbox. If a ballot is dropped in the drop box by 7:00 p.m. on Election Day, it will be counted.

11.   My other concern is that voters who do not have confidence that the system is fair do not vote. I am genuinely concerned about the suspicions that could arise, and what impact that would have on elections in my County, should a post-mark rule be introduced.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

DATED this _14th_ day of _September_ , 2020.

_Patty Hansen_
Patty Hansen

# Exhibit D

# Exhibit D

1

**Declaration of Sambo (Bo) Dul**

2

SAMBO (BO) DUL declares as follows:

3

4      1.      I am the State Elections Director in Secretary of State Katie Hobbs' Office. In

5   this role, I oversee the Election Services Division in the Department of State. I have served in

6   this role since January 2019.

7

8      2.      On October 7, 2020, early in-person voting will begin for the 2020 General

9   Election, and counties will begin mailing ballots to voters on that date.

10

11     3.      Under A.R.S. § 19-123, the Secretary of State's Office is responsible for

12  publishing a statewide publicity pamphlet that includes general election information,

13  information on judicial retention candidates, and information on statewide initiatives and

14  referenda that will appear on the ballot. The publicity pamphlet must be mailed to all

15  households with a registered voter, unless every registered voter in the household opts for email

16  delivery. Mailed pamphlets must be delivered to households before early voting begins on

17
18  October 7, 2020.

19

20     4.      In order to meet the statutory delivery timelines, all versions of the publicity

21  pamphlet (English, Spanish, and large print) have gone to print. Almost 2.3 million copies of

22  the publicity pamphlet will be printed. Further, the Secretary of State's Office has received

23
24  confirmation from our vendor that initial shipments are starting to be sent out and the first

25  copies should be arriving at households by September 14, 2020, if not earlier.

26     5.      The publicity pamphlet prominently states in multiple places that ballots must be

27
28  received by 7:00 p.m. on Election Day to be counted. The publicity pamphlet also states that

the recommended last day to mail back ballots is 7 days before the election (October 27, 2020)

{00514092.1 }                                           1

and that voters who still have their ballots after October 27, 2020 are encouraged to drop-off their ballots at their County Recorder's Office or any ballot drop-box, early voting location, or Election Day voting location in their county to ensure timely receipt by election officials.

6.      The Secretary of State's Office has also published and will be distributing an AZVoteSafe Guide for Native American Voters, which highlights the Election Day receipt deadline and encourages voters to drop-off their ballots at any voting location in their county if they still have it on Election Day.

7.      The Secretary of State's one-stop voter information website, Arizona.Vote, states that ballots must be received by 7:00 p.m. on Election Day to be counted. This information is also listed on the Citizens' Clean Elections Commission website, County Recorders' websites, and county Elections Departments' websites.

8.      The Secretary of State's voter information website also includes an online portal that allows voters who mailed their ballots to track the ballot, including when the ballot was processed, whether the ballot was counted, and if it was not counted, the reason it was not counted.

9.      Further, in fulfillment of the Secretary's obligations under the settlement in *Voto Latino v. Hobbs*, which also challenged the Election Day receipt deadline, the Secretary has engaged in an extensive and ongoing statewide voter outreach and education campaign, with a projected budget of close to $1.5 million. The campaign aims to ensure voters understand the options available for voting and the requirements to ensure their vote is counted, including the requirement that mail ballots be received by election officials by 7:00 p.m. on Election Day. It includes print advertisements, radio ads (including radio ads in Navajo on the Navajo Nation),

press releases, town halls, and numerous media interviews and other public appearances by the Secretary and Elections Division staff.

10.     Also pursuant to the settlement in *Voto Latino v. Hobbs*, the Secretary of State's Office secured $1.5 million in funding to increase access to early voting and ballot drop-off options in tribal and rural communities. Those funds have been used to, among other things, purchase over 80 secure ballot drop boxes, including 38 to be installed in Coconino, Navajo, and Apache Counties. The funds are also being used to rent, at the request of county recorders, mobile voter outreach and early voting trailers/vehicles for use in tribal and rural communities.

11.     Since taking office in January 2019, the Secretary has diligently worked to develop good working relationships with Native American stakeholders, including the Navajo Nation. The Secretary has sought to work collaborative with tribal stakeholders to address barriers their voters may face. For example, the Secretary's staff, along with staff from the Coconino, Navajo, and Apache Counties, meet regularly with Navajo Nation stakeholders to discuss election planning, including ensuring sufficient voting locations on the Navajo Nation, and coordinate efforts to address issues facing Navajo voters. Further, in response to concerns expressed by tribal stakeholders, the Secretary of State's Office implemented technical upgrades to the state's online voter registration system, ServiceArizona, to allow voters with nonstandard residential addresses to register to vote online using a description of residence location, latitude/longitude, or Google Plus Code.

12.     Because we understand mail in certain parts of the state travel long distances to processing facilities, including out of state, resulting in slower delivery times, the Secretary of State's Office is also actively coordinating with United States Postal Service (USPS)

representatives in Arizona and the County Recorders of Coconino, Navajo, and Apache Counties to develop and implement a plan for USPS to hold ballots at designated USPS facilities in Coconino, Navajo, and Apache Counties for direct pick-up by authorized County Recorder staff on a regular basis beginning at least seven days before the 2020 General Election. The designated USPS facilities where ballots will be held will be selected in consultation with the County Recorders of Coconino, Navajo, and Apache Counties, with the objective of ensuring more ballots mailed within seven days of the election in and around the Navajo Nation are received by the relevant County Recorder by 7:00 p.m. on Election Day.

13.     Based on prior coordination and information provided in recent litigation regarding printing deadlines, I understand that all 15 Arizona counties have already sent final ballot files, ballot envelopes, and early ballot instructions to print. Ballot envelopes and instructions tell voters that ballots must be received by 7:00 p.m. on Election Day to be counted. Under the federal Uniformed & Overseas Citizens Absentee Voting Act, counties must mail ballots to overseas and military voters by September 17, 2020.

14.     The Secretary of State's Office is also encouraging voters to utilize the multiple ballot drop-off options available for returning their mail ballots. In addition to returning their ballot by mail, voters can also drop their ballot off at the County Recorder's Office or any ballot drop-box, in-person early voting location, or Election Day voting location in their county, without having to wait in line.

15.     Not all counties provide multiple in-person early voting locations, but Apache, Coconino, and Navajo Counties do, including one in Teec Nos Pos. Graham County, for example, only allows in person early voting at the County Recorder's office.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

DATED this 14th day of September, 2020.

_____
Sambo (Bo) Dul

# Exhibit E

# Exhibit E

**Declaration of Tom Collins**

Thomas Collins declares as follows:

    1.    My name is Thomas Collins.  I am a resident of the State of Arizona, over the age of 18 years, and if called to testify in court or other proceeding I could provide the following testimony based upon my own personal knowledge.

    2.    I am the Executive Director of the Arizona Citizens' Clean Election Commission (the "Commission").  In that capacity I am responsible for day to day operations of the Commission's work.  I supervise and direct a staff of six as well as various contracted service providers in the Commission's voter education and campaign finance roles, along with the administration of the agency.

    3.    The Commission is charged by statute with voter education, as well as the administration and enforcement of the Citizens Clean Elections Act.  A.R.S. § 16-956.  Among other obligations, the Commission is responsible for delivering a voter education guide with statements from all legislative and state candidates to every household in the state that includes a registered voter.  A.R.S. § 16-956(1).  The Commission is also responsible for sponsoring debates for statewide and legislative candidates and engaging directly with candidates and elections officials to ensure compliance with the Act.  A.R.S. §§ 16-941, -949, -956.  We directly communicate with voters and potential voters to provide public education regarding the voting process.  Among other areas, we educate the public on how to register to vote, how to sign up for and use vote-by-mail, all relevant voting deadlines, information about candidates, how to find their polling place, and how to ensure their ballot was received, reviewed, and accepted by the county recorder.

4.     The Commission provides the voter education guide in both English and Spanish to every household in the state with a registered voter; the Commission also translates the guide into Navajo.  The guide includes directions on obtaining and returning ballots by mail and contact information for county election officials.  For example, the 2018 guide included specific information on the deadline to mail back a ballot in order to ensure it was timely received, the last day to cast a ballot early in person, and the deadline for return of any outstanding ballot.  This information is also provided on the Commission's website.

5.     The Commission has made strategic decisions to increase its reach into tribal lands and encourage Arizona's Native American community to participate in the voting process.  For example, the Commission translates its voter education guide into Navajo, a historically non-written language, and has made Navajo translations of the guide for the last six years.  The Commission also purchases advertisements in northeast Arizona to ensure people in the rural areas of Arizona, including those on tribal lands, are advised of the tools available to them with respect to voting.  This year, for example, the Commission will spend $25,000 on advertising on KTNN, a broadcasting station based in Window Rock and owned by the Navajo Nation.  It is the only station in Arizona that reaches all corners of the Navajo Nation.  These advertisements will provide information on the 2020 General Election and previously provided information on the 2020 Presidential Preference Election and Primary Election.

6.     The Commission continues to build on its successes with voter education.  In 2019, the Commission created a new outreach position that functions as a liaison among county, state, local and community groups.   These include Native American, African

2

American, and Latino voting organizations.  Since his hiring, our outreach specialist has conducted voter education classes, voter registration drives, and other voter outreach activities at approximately 121 events, including the African American Conference on Disabilities, the YMCA Spooktacular Potluck and Voter Education event, Ft. McDowell Orme Dam Victory Days, and training events for candidates in Santa Cruz County.

7.     Despite the COVID-19 pandemic, Commission Voter Education Staff continue to be involved with governmental and non-governmental organizations on Native American voter education.  Commission staff and staff from the Arizona Secretary of State's office have regular meetings with stakeholders on tactical challenges and decisions related to Native Americans' ability to vote.

8.     The 2020 General Election voter education guide is being printed right now.  It will be delivered to all households in the state over the week of September 22, ahead of the statutory deadline of the start of early voting.  The Commission is currently translating the guide into Navajo.  Each edition specifies the deadline for the return of ballots.  Copies of these editions are available at: https://www.azcleanelections.gov/arizona-elections/voter-education-guide.

9.     Because the Commission's 2020 General Election guide has already gone to press, there is no way to alter the information contained therein.  In 2018 the Commission distributed 2,026,841 copies of the General Election guide.  The time to change, reprint, and redeliver the guide would interfere with other election related deadlines, as well as the Post Office's distribution of this mailer and other election mail from the state and counties.

1       I declare under penalty of perjury that the foregoing is true and correct to the best of

2  my knowledge and understanding.

3

4       DATED this 14th day of September, 2020.

5

6

7                       Tom Collins

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4