Chris McClure
McClure and Hardy Prof. LLC
SD Bar No. 3962
101 S. Reid St. Ste. 307
Sioux Falls, SD 57103
605-496-9858
mcclurechris@gmail.com

Michael J. Novotny
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South Bellevue, NE 68005
AZ State Bar No. 033792
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
Email: mnovotny@bigfirelaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Darlene Yazzie, Caroline Begay, Leslie Begay, Irene Roy, Donna Williams and Alfred McRoye,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Secretary of State for the State of Arizona,<br><br>Defendant. | Case No. 3:20-cv-08222-GMS<br><br>**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO REQUEST FOR INJUNCTIVE RELIEF** |

Plaintiffs reassert that they are entitled to the injunctive relief sought by their complaint, motion for injunctive relief and as further detailed herein. Defendant opposes Plaintiff's Request for Injunctive Relief on the basis that Plaintiffs are not likely to succeed on the merits and are otherwise not entitled to relief. Plaintiffs have met their burden, are likely to succeed on the merits and are entitled to injunctive relief.

I. INTRODUCTION

At its most basic, the challenge presented by Plaintiffs asserts that the election system of the State of Arizona violates Section 2 of the VRA in that it fails to provide to Plaintiffs the opportunities to vote in the general election on November 3, 2020 that are equal to every other citizen. It is unfitting for the Secretary of State, the Chief Elections Officer for the State of Arizona, to so misunderstand the fundamentals of the Voting Rights Act. The assertion by Defendant that 'as long as there is at least one way for Plaintiffs to vote on election day, there is no injury', is a violation of Section 2 of the 1965 Voting Rights Act. To the contrary, every other citizen in the State of Arizona has three distinct options by which to exercise their right to vote. Under Section 2 of the VRA, every means of voting that is offered to the one segment of the electorate must be equally available to the entire electorate. Anything less than that is a violation of Section 2.

II. UNITED STATES STATEMENT OF INTEREST FOR SECTION 2 CASES

In the case of *Sanchez, et al. v. Cegavske, et al.*, 214 F. Supp. 3d 361 (2016), the Civil Rights Division of the United States Department of Justice filed a Statement of Interest wherein the United States detailed the legal understanding of the requirements for a Section 2 vote denial/abridgement case as distinguished from a vote dilution case. A true and Correct copy of the referenced United Stated Statement of Interest is attached to the Declaration of Chris McClure in Support of Reply as Exhibit A and fully incorporated herein (hereafter "US Statement"). This US Statement developed and specified the vote abridgment 'test' which has not been altered, over-

ruled or otherwise amended. In Plaintiffs' Memorandum in Support of Injunctive Relief filed in this action, the analysis of a Section 2 violation was discussed in detail starting at the bottom of page 4 and continuing through the top of page 15.  However, the specific requirement of a Section 2 vote abridgement case, as contained in the US Statement, bears further attention.

Courts are to utilize a two-step analysis to determine whether any limitation to early voting results in denial or abridgment of the right to vote under Section 2 of the VRA. Exhibit A, pg 3, lines 16-19. Step one is to assess "whether the practices amount to material limitations that bear more heavily on minority citizens than nonminority citizens."  Exhibit A, at pg 3, lines 19-20. This analysis must evaluate the "likelihood that minority voters will face the burden and their relative ability to overcome that burden." Exhibit A, at pg 3, line 21 -pg 4, line 1. Once there has been a finding that there is a disparity for minority voters, the court must engage in an "intensely local appraisal" of the "totality of the circumstances" in the relevant jurisdiction in order to determine whether the challenged practice "works in concert with historical, social, and political conditions to produce a discriminatory result." Exhibit A, pg 4, lines 9-13. This is where the court is to consider and evaluate a variety of typical factors to be considered and which were discussed as part of the Legislative history for Section 2; these are generally known as the 'Senate Factors'. Exhibit A, pg 4, line 18-pg 5, line 21. However, there is no requirement that any specific number of these be proven, nor is the list exhaustive. Exhibit A, at pg 5, lines 1-4.

Therefore, Section 2 of the Voting Rights Act prohibits any state or political subdivision from imposing or applying a "voting qualification," "prerequisite to voting," or "*standard, practice, or procedure*" that "*results in a denial or abridgement* of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 52 U.S.C. § 10301(a) (emphasis added).  On page 10, starting at line 5 of the Exhibit A, the Department of Justice states:

Defendants several times suggest that Plaintiffs must show an outright denial of access to voting opportunities. (*citations to Sanchez et al. omitted*). This ignores the plain text of the Act. Section 2 prohibits the "abridgment" as well as the outright "denial" of the right to vote. 52 U.S.C. § 10301(a). This prohibition does not require that a challenged practice deprive minority voters *completely* of the ability to vote. *See, e.g., Veasey*, 2016 WL 3923868, at *29 (quoting *Black's Law Dictionary* (10th ed. 2014) (defining "Abridgement" as the "reduction or diminution of something")) (emphasis added). **It requires only that Plaintiffs establish they have "less opportunity" to participate relative to other voters**. 52 U.S.C. § 10301(b). All electoral practices with a material disparate "effect on a person's ability to exercise [the] franchise" implicate the Voting Rights Act. *Cf. Perkins*, 400 U.S. at 387 (addressing Section 5); *see also League of Women Voters*, 769 F.3d at 243 (holding that Section 2 is not limited to practices that render voting "completely foreclosed" to the minority community); *Poor Bear*, 2015 WL 1969760, at *7 (concluding that Section 2 protects equal opportunity to cast a ballot via in-person absentee voting); *Spirit Lake Tribe*, 2010 WL 4226614, at *3, *6 (enjoining polling place closures under Section 2); *Chisom v. Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J., dissenting) (explaining that Section 2 would be violated if a county limited voter registration hours to one day a week, and "that made it more difficult for blacks to register than whites"). Exhibit A, pg 10, lines 5-23.

This bears repeating. Plaintiffs do not need to show that they have *no* opportunity to vote. Plaintiffs must *only* show that they have "less opportunities" to vote as compared to other voters, in this case in their county and state. The US Statement continues stating that not all voting systems are equivalent "and a court must consider the circumstances of each case and the impact a challenged practice has on opportunity to vote." (citations omitted) Exhibit A, pg 11, lines 3-7. Furthermore, the US Statement clarifies the requirements for a complaint under Section 2 stating that "[t]he plain text of Section 2(b) requires Plaintiffs to show only that the political process is not equally open to Native Americans because the practice at issue results in their having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."" Exhibit A, pg 12 lines 4-8 (citations omitted).

Furthermore, as included in the US Statement "Section 2 contains a comparative standard, but does not, in this context, require proof that minority voters lack an opportunity to elect. Exhibit A, pg 12, lines 11-13. Any Section 2 abridgement case must evaluate the totality of the circumstances. Exhibit A, pg 13, lines 15-20; pg 14-15.

3

### III. FACTS IN THIS CASE

Plaintiffs' lawsuit details the disparities between the opportunities to vote in the general election that exist for Plaintiffs who are Members of the Navajo Nation and who have voiced their desire to participate in the general election, and who reside within the State of Arizona, and who, in comparison to the wealthy members of the state, such as those residing in the Scottsdale do not have the same opportunities to utilize all available voting methods.

Specifically, Plaintiffs assert that they are enrolled members of the Navajo Nation and reside in on the Reservation within Apache County, Arizona. Complaint paragraphs 1-7. Plaintiffs assert that they desire to participate in the general election on the same terms as other voters. Complaint paragraph 8. Life for these voters who live on the Navajo Nation Reservation is not typical of other voters in the State of Arizona, and of Apache county in particular. Complaint paragraphs 54-79. Plaintiffs complaint details how the postal system and ability to access the postal system on the Reservation is exceedingly difficult and there is a distinct bias against anyone using a vote by mail ballot on the Reservation. Complaint paragraphs 20-28. Additionally, Plaintiffs detail the historic patterns of discrimination and bias that has been experienced in the State of Arizona. Complaint paragraphs 80-100.

Plaintiffs action does not seek to attack the entire voting process in the state of Arizona. However, there exists an extreme bias against the Plaintiffs when compared to other voters in the State of Arizona. The election system rules currently in place for the 2020 general election, increase the disparity for Plaintiff voters. Complaint paragraphs 16-53. Under the existing election rules, Plaintiffs do not have the same right or opportunity to exercise their most fundamental of all rights, that of the vote. Therefore, Plaintiffs lawsuit seeks to adjudicate how the existing election system in Arizona, is violative of Section 2 of the VRA.

It may be instructional to understand the day to day life of one Plaintiff, Darlene Yazzie, in the hope of understanding the extent to which she and the other Plaintiffs must go in order to cast their ballot in any election, and why Plaintiffs feel disenfranchised. Attached to the Declaration of Chris McClure as Exhibit B, is a true and correct copy of the declaration of Bret Healy regarding his interview of Darlene Yazzie.

Ms. Yazzie lives on the Navajo Nation Reservation in Apache County Arizona. Complaint paragraph 2. She lives on a fixed income in a home with no running water. Exhibit B, paragraphs 8 and 10. She does not receive mail at her home and instead must rent a Post Office box in a town that is 9 miles away however the office has limited hours and supplies and often when she needs stamps she must drive 35 miles each way to get to the regular post office. Exhibit B, paragraphs 5-7. She tries to make the 18-mile round trip once or twice a week to pick up her mail and to get water. Ms. Yazzie's only functional means of transportation is a 2016 pick-up truck that already has 197,000 miles on it. Exhibit B, paragraph 11. If anything goes wrong with her truck, she must drive to either Farmington, New Mexico or Cortez, Colorado, each approximately 90 miles away, to have it repaired. Exhibit B, paragraph 11. Money is always tight, so for a little extra money for gas and such, and so that she will have meat to eat, she raises sheep. Exhibit B, paragraph 9. She tries to fill out her ballot and return it the same day she receives it because she cannot trust the timeliness of the mail system. Exhibit B, paragraph 15.

Recall that the Navajo Nation Reservation, when analyzing the travel issues faced on the Reservation, the excessive distances Tribal Members must travel to obtain mail is compounded by socioeconomic factors faced by most Native Americans which include reduced access to public transportation and funds necessary to travel the distance required to obtain and return a ballot. And the alternative forms of electoral access do not provide a remedy for the disparities in voting-by-

mail. Instead each of those purported remedies is also unequal in terms of the opportunities available for voters on the Navajo Nation Reservation. Exhibit D, Exhibit E, page 33.

When analyzing the travel issues faced on the Reservation, the excessive distances Tribal Members must travel to obtain mail is compounded by socioeconomic factors faced by most Native Americans which include reduced access to public transportation and funds necessary to travel the distance required to obtain and return a ballot. As shown by Ms. Yazzie, having access to a vehicle is very important in order to have regular access to mail. However, traveling long distances to get mail is a burden in terms of travel distance and time, but it also imposes a financial cost to pay for gasoline. This increased distance for mail heightens the potential for problems and slow return of the ballot. See generally Exhibit D, Exhibit E, and Exhibit F.

It can be understood that voters, such as Plaintiffs, that live on the Navajo Nation Reservation, are subject to socioeconomic circumstances, that result in extremely limited availability of access to the post office to secure and timely mail delivery and transport. This burden, when compared to the ease with which other voters in Arizona are able to exercise their right to vote, is a direct result of the lack of post offices available on the Reservation, the reduced hours of service at those post offices and the fact that the majority of residents do not receive at home mail delivery; not one of these factors is a concern for any of the other voters in Arizona who do not live on the Reservation. Thus, it is clear that these Plaintiffs are being subjected to differing standards that indicate discrimination because of the disparate impact that suffered by these individuals, when compared to other voters in Arizona, most of which have at home mail service, or who would only have to drive a few miles at most to go to a post office.

IV.   **LEGAL ANALYSIS**

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors

the plaintiff; and (4) that the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have cataloged and detailed the facts and legal basis which underly its Section 2 abridgement challenge and are likely to succeed on the merits. Irreparable harm is presumed in voting rights cases, the hardships favor the Plaintiffs and injunction is in the public interest. For these reasons, Plaintiffs are entitled to injunctive relief.

A. **Plaintiffs Have Demonstrated They are Likely To Succeed on the Merits**

Plaintiffs are residents on the Navajo Nation, in Apache County, Arizona. Plaintiffs desire to participate in the general election. Plaintiffs are enrolled members of the Navajo Nation. Plaintiffs' Complaint provided the Court with evidence on the existing difficulties a voter residing on the Navajo Nation Reservation encounters with the mail system as well as the racist tactics historically employed by the State of Arizona to try and limit the votes of Native Americans. A Plaintiff utilizing the postal location at Dennehotso to Vote By Mail would have, on average, 18 fewer days to consider and return their ballot to the County Recorder compared to more affluent residents. Plaintiffs have 'less opportunity' to vote as defined under Section 2. Exhibit C.

B. **Arizona Vote By Mail Violates Section 2 of the VRA.**

As more fully detailed supra, this action is brought by the Plaintiffs pursuant to Sections 2 of the VRA. Section 14(c)(1) of the VRA defines the terms "vote" and "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to registration, …casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast." 52 U.S.C. § 10310(c)(1). Courts have found that opportunities for absentee voting are protected by Section 2. *See, e.g., Ohio State Conference of NAACP v. Husted*, 768 F.3d , 524, 552-53 (6th Cir. 2014), *stay granted*, 135 S. Ct. 42 (2014), *vacated on other grounds*, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014); *League of Women*

7

*Voters of N.C. v. North Carolina*, 769 F.3d 224, 238-39 (4th Cir. 2014), *stay granted*, 135 S. Ct. 6 (2014), *cert. denied*, 135 S. Ct. 1735 (2015).

1. The Test is not having One Opportunity, All Opportunities Must be Equal

The US Statement describes a violation of Section 2 as the imposition or application of a "voting qualification," "prerequisite to voting," or "standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color or membership in a language minority group." 52 U.S.C. § 10301(a). A violation of Section 2 does not require that minority voters be *completely* deprived of the ability to vote. *See, e.g., Veasey*, 2016 WL 3923868, at *29 (emphasis added). Instead, a plaintiff must only establish it has *"less opportunity"* to participate in the electoral process relative to other voters. 52 U.S.C. § 10301(b). The existence of alternative voting means or accessibility does not absolve the Defendant of the requirement to make all "opportunities" available on a nondiscriminatory basis.

As discussed supra, determination of a Section 2 abridgement violation is a two-step analysis. The first step requires the court to determine if the practice in question creates a material limitation that bears more heavily on minority citizens in comparison to nonminority citizens; and where this prong is satisfied, the court then is to review the "totality of the circumstances" in said jurisdiction in order to evaluate whether the discriminatory result is based on other issues such as the Senate Factors. *See, e.g., Veasey,* 2016 WL 3923868, at *17; *League of Women Voters of N.C.*, 769 F.3d at 240-241, 245; *Smith v. Salt River Project Agric. Improvement. & Power Dist.*, 109 F.3d 586, 591 (9th Cir. 1997).

2. Senate Factors/History of Discrimination

Defendant mistakenly asserts that Plaintiffs must address each of the "Senate Factors" in its analysis. There simply is no basis for such as assertion based on the rationale articulated within the US Statement. Rather, the Senate Factors are guidelines to be utilized when evaluating the

second prong of the Section 2 test. Both Plaintiffs' Complaint and Memorandum herein, contain detailed analysis of three of the Senate Factors which combine to demonstrate the discriminatory impact on the Plaintiffs, which is rooted in historic restrictions and discriminations against the Native Americans living in Arizona.

Defendant asserts Arizona's past practices are not relevant in the current climate. Regardless of "current practices," the Court is directed to evaluate the historic practices of the State. Plaintiffs' Complaint and Memorandum both extensively detail the historical practices perpetuated by the State of Arizona, which have limited Tribal Members' ability to exercise their right to Vote, including the Plaintiffs. To be sure, the Navajo Nation and members of the Navajo Nation were forced to file a lawsuit against the State in 2018 when Arizona refused requests for In-Person voter registration sites and In-Person early voting sites. While the State points to certain actions that it has taken, it fails to show how it has actually modified any of the practices in question that Plaintiffs allege have abridged their right to vote. As such, in a light most favorable to the State, its claim that Arizona's discriminatory tactics are no longer in practice is mere speculation. The evidence is strong that current and past voting practices utilized in Arizona discriminate against Tribal Members.

It has been undisputedly shown that Plaintiffs face extreme barriers in their ability to utilize the Vote By Mail system in Arizona. A mail delivery rate analysis evidenced that first class mail takes as long as 10 days to arrive at the County Recorder's Office from Dennehotso. Exhibit C. In comparison, the typical mail delivery rate for a resident of Scottsdale is 1 day. Exhibit C. In other words, residents in Scottsdale enjoy a nine-day advantage in comparison to Navajo Nation members near Dennehotso. The Secretary of State's Office has issued guidance to Arizona voters advising that a Vote By Mail Ballot should be mailed seven days in advance of election day. This means that if a member on the Navajo Nation Reservation were to follow this ballot directive after

requesting a mail ballot on October 23, the last day to request a mail ballot, his or her ballot would arrive on October 30, and if immediately completed and mailed back would not arrive by 7:00 pm on Election Day, November 3 at the County Recorder's Office, taking seven days to return, arriving back on November 6, three days late. Exhibit C.  Thus, the Vote By Mail system in Arizona clearly provides benefits to certain Arizona residents that simply are not provided to Plaintiffs and other residents of the Navajo Nation Reservation.  Since the Secretary of State is the chief election officer for the state, she is responsible for supervising and issuing directives concerning the conduct of all elections. A.R.S. § 16-142.  The ballot deadline falls squarely within the control of Defendant.

### C. Irreparable Harm is Presumed Since Suffrage is the Most Fundamental Right

It is clear that abridgement of the right to vote constitutes an irreparable injury. See *Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote ... constitutes irreparable injury.") (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986)).

Voting rights are protected because it is the vital core of the American democratic tradition, which holds that "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964); *accord Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

### D. The Hardships Favor Plaintiffs

The relief that Plaintiffs seek here is appropriately tailored—in the least restrictive manner—to Defendant's violation of federal law and will only cause minimal cost increase and/or administrative burden to Defendant. Arguments that the requested relief will cause public confusion and delay is not reasonable on its face. The Secretary of State need only alter the mailing deadline on the ballots mailed to citizens that reside on the Navajo Nation Reservation. The likelihood that there will be mass confusion throughout Arizona is at the very least bald speculation and that is unreasonable at first blush and upon further analysis. The equities favor Plaintiffs.

Moreover, Plaintiffs' injuries are not based on problems primarily related to the US Postal Service or COVID-19. While, these two factors present complications, COVID-19 and the Postal Service problems are present in every state and should been considered during the deliberative process when designing and implementing the election system infrastructure for the State of Arizona. The Defendant cannot abdicate responsibility for her actions by claiming these problems are outside of her control as such circumstances do not absolve her from her duty to act fairly and responsibly.

### E. Injunction is in the Public Interest

Finally, the public interest is always served by the inclusion of protected classes in the political process. See *League of Women Voters*, at 247. The requirement that Section 2 of the VRA be enforced falls squarely within the public interest and supports preliminary injunction.

### III.   CONCLUSION

For all of the forgoing reasons, the caselaw and facts support that Plaintiffs have met their burden and are entitled to injunctive relief.

Dated this 19th day of September 2020.          /s/ Chris McClure
                                                Chris McClure
                                                McClure and Hardy Prof. LLC
                                                SD Bar No. 3962
                                                101 S. Reid St. Ste. 307

        Sioux Falls, SD 57103
        605-496-9858
        mcclurechris@gmail.com

        Michael J. Novotny
        Big Fire Law & Policy Group LLP
        1404 Fort Crook Road South
        Bellevue, NE 68005
        AZ State Bar No. 033792
        Telephone: (531) 466-8725
        Facsimile: (531) 466-8792
        Email: mnovotny@bigfirelaw.com

        Attorney for Plaintiffs